IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**'09 - CV - 00736**

Civil Action No. _____

(To be supplied by the court)

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 2 - 2009

GREGORY C. LANGHAM
CLERK

_SOLOMON  BEN-TOV  COHEN_ , Plaintiff,

pro-se

v.

HONORABLE  JAMES  P  VANDELLO  ,
IMMIGRATION  JUDGE

ERIC  HOLDER  , ATTORNEY  GENERAL,
OF  THE  UNITED  STATES

MICHAEL  MUKASEY  ,
FORMER  ATTORNEY  GENERAL  OF  THE  UNITED  STATES

_____ ,

_____ ,

RECEIVED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 24 2009

GREGORY C. LANGHAM
CLERK

_____ ,

_____ ,

_____ , Defendant(s).

(List each named defendant on a separate line.)

PRISONER COMPLAINT

(Rev. 1/30/07)

## A. PARTIES

ALIEN #

1. SOLOIMON BEN-TOV COHEN pro-se, INMATE ID L2580, 773096Z5
(Plaintiff's name, prisoner identification number, and complete mailing address)
GEO-ICE DETENTION FACILITY, 11901 E30TH AVE
AURORA, CO 80010-1525, STATE OF COLORADO

2. HONORABLE JAMES P VANDELLO, IMMIGRATION JUDGE
AURORA IMMIGRATION COURT (Name, title, and address of first defendant) EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
11901 E 30TH AVE, AURORA, STATE OF COLORADO, CO 80010-1525

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? ___ Yes ✓ No (CHECK ONE). Briefly explain your answer:

FEDERAL LAW

3. ERIC HOLDER, ATTORNEY GENERAL, US DEPARTMENT OF JUSTICE
(Name, title, and address of second defendant)
DISTRICT OF
950 PENNSYLVANIA AVE NW, WASHINGTON, COLUMBIA
20530

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? ___ Yes ✓ No (CHECK ONE). Briefly explain your answer:

ATTORNEY GENERAL OF THE UNITED STATES

4. MICHAEL MUKASEY, FORMER ATTORNEY GENERAL
(Name, title, and address of third defendant) OF THE U.S.
C/0 DEPT OF JUSTICE, 950 PENNSYLVANIA AVE NW, WASHINGTON DC 20550

At the time the claim(s) alleged in this complaint arose, was this defendant acting under color of state law? ___ Yes ✓ No (CHECK ONE). Briefly explain your answer:

WAS ATTORNEY GENERAL OF THE UNITED STATES
DURING PERIOD (COMPLAINT

(If you are suing more than three defendants, use extra paper to provide the information requested above for each additional defendant. The information about additional defendants should be labeled "A. PARTIES.")

(Rev. 1/30/07)                                    2

## B. JURISDICTION

1. I assert jurisdiction over my civil rights claim(s) pursuant to: (check one if applicable)

____    28 U.S.C. § 1343 and 42 U.S.C. § 1983 (state prisoners)

✓    28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal prisoners)

2. I assert jurisdiction pursuant to the following additional or alternative statutes (if any):

28 USC. § 1343 ; 28 28 USC § 2201 et seq ; 5 USC§701 et seq    ALL WRITS ACT 28 USC § 1361

THIS ACTION IS BROUGHT UNDER THE 5TH AMENDMENT TO THE US CONSTITUTION AND LAWS OF THE STATE OF COLORADO AND IMMIGRATION & NATIONALITY ACT OF 1952 AS AMENDED, 8 USC. § 1101 et seq

## C. NATURE OF THE CASE

**BRIEFLY** state the background of your case. If more space is needed to describe the nature of the case, use extra paper to complete this section. The additional allegations regarding the nature of the case should be labeled "C. NATURE OF THE CASE."

1- PLAINTIFF, SOLOMON BEN-TOV COHEN, prose - is a CITIZEN OF THE UNITED KINGDOM, LEGACY RESIDENT IN THE UNITED STATES SINCE 1990, WHOSE WORK AUTHORIZATION H1-B EXPIRED 12/21/00 BECAUSE THE ENGLISH CROWN ORDERED HIS WRONGFUL DETENTION AT THE PRIORY PSYCHIATRIC CLINIC DURING VISIT TO THE UK OVER POLITICAL SATIRICAL PLAY INVOLVING INSIDER DEALINGS AND THE QUEEN. PLAINTIFF WAS FORCED TO FLEE AND HAS APPLIED FOR ASYLUM IN THE US. AN CURRENTLY DETAINED BY GOVERNMENT IN THE STATE OF COLORADO.

2, DEFENDANT, HONORABLE JAMES P VANDELLO IS AN IMMIGRATION JUDGE HEARING DETAINED CASES ONLY EMPLOYED BY EXECUTIVE OFFICE FOR IMMIGRATION REVIEW AURORA, STATE OF COLORADO. DEFENDANT HAS SENT AT LEAST TWO ASYLUM SEEKERS TO THEIR DEATHS.

(Rev. 1/30/07)    3

## D. CAUSE OF ACTION

State concisely every claim that you wish to assert in this action. For each claim, specify the right that allegedly has been violated and state all supporting facts that you consider important, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific cases to support your claim(s). If additional space is needed to describe any claim or to assert more than three claims, use extra paper to continue that claim or to assert the additional claim(s). The additional pages regarding the cause of action should be labeled "D. CAUSE OF ACTION."

1. Claim One: DEFENDANT, HONORABLE JAMES P VANDELLO

Supporting Facts: VIOLATED LAWS AND TREATY OF THE THE UNITED STATES BY ORDERING THE REMOVAL TO GUATEMALA OF ASYLUM SEEKER BREYNY LOPEZ-CHES WHERE HE WAS EXECUTED.

3. AT AURORA IMMIGRATION COURT IN 2008, BREYNY LOPEZ-CHES PLEADED WITH THE DEFENDANT HONORABLE JAMES P VANDELLO THAT HE WOULD BE KILLED IF REMOVED TO GUATEMALA.

4. THE DEFENDANT REFUSED TO LISTEN. BREYNY LOPEZ-CHES, TWO DAYS AFTER HIS REMOVAL FROM THE US TO GUATEMALA WAS FOUND DEAD IN THE STREET WITH HIS HANDS TIED BEHIND HIS BACK, SHOT THROUGH THE HEAD.

5. HE LEAVES SIX YOUNG US BORN CHILDREN IN THE UNITED STATES.

6. PLAINTIFF, SIMILARLY SITUATED, FEARING EXECUTIONS IN LONDON BY FREEMASONS, SEEKS DECLARATORY JUDGMENT THAT DEFENDANT IS LIABLE PERSONALLY FOR DAMAGES.

(Rev. 1/30/07)                4

7. EXHIBIT 13 IS A STATEMENT RELATING TO DEATH OF BREYNY LOPEZ-CHES BY RENAWI VERDI & UMAR MUSOEV, DETAINEES.

2. Claim Two: DEFENDANT, HON JAMES P VANDELLO'S

Supporting Facts: ULTRA VIRES BOND DECISIONS MADE IN COURT AND AFTER ON JUNE 25TH 2008 VIOLATED PLAINTIFF'S RIGHT TO DUE PROCESS GUARANTEED BY FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND IMMIGRATION AND NATIONALITY ACT ("INA").

8 PLAINTIFF HAS BEEN DAMAGED AS FOLLOWS:-
$1,000 PAID TO IMMIGRATION ATTORNEY KIM BAKER-MEDINA

9 $6,900 PAID TO BULL & DAVIES PC, IMMIGRATION LAW FIRM

AND

10 BECAUSE LAWYERS REPRESENTED PLAINTIFF AND BRIEFED ON DEFENDANT'S INSTRUCTIONS BOND MATTER HE HAS NO JURISDICTION TO CONSIDER, WHICH TOOK UNTIL OCTOBER 30TH 2008, PLAINTIFF'S COUNSEL NEEDED A CONTINUANCE on 11/06/09 TO PREPARE ASYLUM CASE, WHICH DEFENDANT DENIED. THEREFORE NO EVIDENCE WAS CONSIDERED, NO WITNESSES CALLED. PLAINTIFF WAS DENIED.

(Rev. 1/30/07) HIS RIGHT TO BE REPRESENTED BY PAID COUNSEL. FIRST DEFENDANT MUST REIMBURSE PLAINTIFF THE MONEY WASTED ON BOND HEARINGS AND BRIEFS.

## D. CAUSES OF ACTION-CLAIM TWO  ADDITIONAL SHEET 1

Supporting Facts (Continued):

11. Exhibit 5, in responds to Plaintiff's former attorney requesting Bond, Hon Judge Jon Milo Bryant on page 11 line 24 stated:

> "[N]o jurisdiction, asylum only....so I have no jurisdiction over Bond........You need to go see the District Director."

12. District Director granted Bond.

13. 'Exhibit 3 is a copy of the Defendant's *ultra vires* grant of Bond; Defendant violated Plaintiff's right of Due Process with his decisions and failure to inform Plaintiff's lawyer that she could obtain Bond by asking District Director.

14. In exhibit 3 Defendant vacated his previous *ultra vires* decision but Plaintiff's lawyer had to be paid $1,000.

15. In Exhibit 3 Defendant issued an ultra vires order that Bond Matter be briefed.

16. This incorrect decision by Defendant which violated Plaintiff's right to due process, cost Plaintiff $6,000 see exhibit 6.

On October 30/k 2008 Defendant Hon James P Vandell decided he had no jurisdiction to consider the Brief he ordered — exhibit 8. "[I] find I have no jurisdiction..." exhibit 7

3. Claim Three: DEFENDANT HON. JAMES P VANDELLO

Supporting Facts: ON NOVEMBER 6TH 2008 AT AURORA IMMIGRATION COURT, STATE OF COLORADO, IN FRONT OF PANEL OF OBSERVERS, DEFAMED PLAINTIFF FALSELY LABELING HIM "PARANOID" AND "DELUSIONAL" IN VIOLATIONS OF LAWS OF THE STATE OF COLORADO, DEFAMING HIM BEFORE THE BOARD OF IMMIGRATION APPEALS, AND DENIED PLAINTIFF DUE PROCESS BY REFUSING TO ALLOW PLAINTIFF TO OFFER EXPLANATIONS AND OFFERS OF PROOF.

17. INS INFORMED BRITISH CONSULATE IN WASHINGTON DC THAT PLAINTIFF WAS IN CUSTODY AND ASKING FOR ASYLUM.

18. IN FEBRUARY 2007, CAYMAN CHIEF JUSTICE DENIED PLAINTIFF $5.6 MILLION SENDING IT TO TRUSTEE, MARKUS WANGER "WITHDRAWING PROTECTION OF THIS COURT". AS A RESULT, PLAINTIFF IS A PENNILESS REFUGEE.

(Rev. 1/30/07)                                     6

**D. CAUSES OF ACTION-CLAIM THREE**      **ADDITIONAL SHEET 1**

Supporting Facts (Continued):

19. Exhibit 2 is a copy of a competency examination carried on march 19 2008 by Dr B Thomas

Gray, forensic psychiatrist from Colorado Mental Health Institute at Pueblo.

20. Cayman Chief Justice sent $5.6Million of plaintiff's money to Markus Wanger as trustee.

21. Wanger lied to Denver District Attorney denying this so that Plaintiff was arrested and

thought delusional.

22. <u>Dr Gray wrote in his report on page 3</u>:

"what were initially interpreted as psychotically delusional claims have since been

verified"

<u>On page 6</u>:

"Many of Mr Cohen's claims that initially seemed to be delusional in nature have been

shown to be accurate"

23. Exhibit 10 is the oral statement of the Defendant, in which on page 5 he stated: '[b]ut I also

find that his asylum case is based on...delusion and paranoia."-   **a highly damaging**

**defamation.**

24. Defendant then went on to say :"[ h]e has been taken into custody for this type of treatment".

This is a lie.

**D. CAUSES OF ACTION-CLAIM THREE**        **ADDITIONAL SHEET 2**

25. Exhibit 14 is a letter from  New York psychiatrist DR Jack Almeleh.

26. <u>Dr Almeleh writes:</u> "I treated Mr Cohen intensively in my office for a period of approximately 18 months for problems related to anxiety and low self-esteem resulting from anti-Semitism he experienced growing up in England."

Plaintiff asks for $50,000 in damages unless he is REMOVED from the United States in which case he asks for $10Million.

## D. CAUSE OF ACTION- CLAIM FOUR ADDITIONAL SHEET 1

Claim Four: Plaintiff alleges that Defendant Michael Mukasey, then Attorney General of the United States, between September 3rd 2008 when Plaintiff Applied for a **Writ of Habeas Corpus** in this Honorable Court and November 6th 2008 ordered Defendant Honorable James P Vandello, immigration Judge to deny continuance so that no evidence was presented, in order to deprive this honorable Court of jurisdiction, to prevent Government denial of Bond Hearings to asylum seekers being ruled UNCONSTITUTIONAL, *In Violation of PLAINTIFFS RIGHT of DUE PROCESS.*

Supporting Facts

27. Eric Holder is now Attorney General of the United States.

28. Plaintiff is facing death for revealing in a play that directors of British Investment firms, many of them MASONS have secret offshore accounts. Dudley Cottingham and Arthur Morris, Plaintiff's former trustees and accountants in Bermuda who are Freemasons.

29. Exhibit 11 is an email from Dudley Cottingham to Plaintiff. "Cayman Chief Justice "withdraw the protection of his Court".

30. Shortly afterward Plaintiff received Removal Notice and was taken into Custody.

## E. PREVIOUS LAWSUITS

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _✓_ Yes ___ No (CHECK ONE). If your answer is "Yes," complete this section of the form. If you have filed more than one lawsuit in the past, use extra paper to provide the necessary information for each additional lawsuit. The information about additional lawsuits should be labeled "E. PREVIOUS LAWSUITS."

1.  Name(s) of defendant(s) in prior lawsuit:

    MICHAEL MUKASEY,
    ATTORNEY GENERAL OF THE US.

2.  Docket number and court name:

    '08-CV-01844-LTB-CBS
    US DISTRICT COURT FOR THE DISTRICT OF COLORADO

3.  Claims raised in prior lawsuit:

    APPLICATION FOR WRIT OF HABEAS CORPUS

4.  Disposition of prior lawsuit (for example, is the prior lawsuit still pending? Was it dismissed?):

    PENDING

5.  If the prior lawsuit was dismissed, when was it dismissed and why?

6.  Result(s) of any appeal in the prior lawsuit:

    SEE ADDITIONAL SHEETS

## F. ADMINISTRATIVE RELIEF

1.  Is there a formal grievance procedure at the institution in which you are confined?

    _✓_ Yes ___ No (CHECK ONE).

2.  Did you exhaust available administrative remedies? _✓_ Yes ___ No (CHECK ONE).

(Rev. 1/30/07)                               7

**E. PREVIOUS LAWSUITS** (continued) - additional sheet 1

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes____No.

1.  Name of Defendants in prior lawsuit:

Jason Clemens, Immigration Agent
Shana Martin, Assistant Chief Counsel
Department of Homeland Security

4.  Docket number and court name:

**' 08- cv- 01991-ZLW**
US DISTRICT COURT, DISTRICT OF COLORADO

5.  Claims raised in prior lawsuit:

Making false statement, Perjury
Civil Rights violations

6.  Disposition of prior lawsuit:

Dismissed

7.  If prior lawsuit was dismissed when was it dismissed and why?

*Heck v Humphrey*

8.  Result of any appeal in the prior lawsuit:

Appeal pending

**E. PREVIOUS LAWSUITS** (continued) - additional sheet 2

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes____No.

1. Name of Defendant in prior lawsuit:

Denver County Jail, CO and
Chaplain Rev John Scott

2. Docket number and court name:

**1:08-cv-00978-ZLW**
US DISTRICT COURT, DISTRICT OF COLORADO

3. Claims raised in prior lawsuit:

   i.    Denial of kosher food- 1st Amendment violation
   ii.   request for additional law library time

4. Disposition of prior lawsuit:

Rendered moot

5. If prior lawsuit was dismissed when was it dismissed and why?

Denver County Jail granted both after lawsuit was filed and criminal charges dropped. Official reason:
failure to notify change of address.

6. Result of any appeal in the prior lawsuit:

N/A

**E. PREVIOUS LAWSUITS** (continued) - additional sheet 3

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes____No.

1. Name of Defendant in prior lawsuit:

Katherine Davis, HSA
Aurora/ ICE Detention Facillity

2. Docket number and court name:

**1:08-cv-02089-ZLW**
US DISTRICT COURT, DISTRICT OF
COLORADO

3. Claims raised in prior lawsuit:

Denial of medication

4. Disposition of prior lawsuit:

Withdrawn after settlement

5. If prior lawsuit was dismissed when was it dismissed and why?

N/A

6. Result of any appeal in the prior lawsuit:

N/A

**E. PREVIOUS LAWSUITS** (continued) - additional sheet 4

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes____No.

1.  Name of Defendant in prior lawsuit:  Representative Henry Waxman, US Capitol Police, DC, Agent Fred Bush

2.  Docket number and court name:  **1:08-cv-02188-LTB-CBS** US DISTRICT COURT, DISTRICT OF COLORADO

3.  Claims raised in prior lawsuit:  1st Amendviolation Wrongful arrest etc

4.  Disposition of prior lawsuit:  Pending

5.  If prior lawsuit was dismissed when was it dismissed and why?  N/A

6.  Result of any appeal in the prior lawsuit:  N/A

## E. PREVIOUS LAWSUITS  (continued) - additional sheet 5

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes____No.

1.  Name of Defendants in prior lawsuit:

    Hodges, Fuller, Prose, Morrissey et al

2.  Docket number and court name:

    **1:08-cv-02806-ZLW**
    US DISTRICT COURT, DISTRICT OF COLORADO

3.  Claims raised in prior lawsuit:

    Wrongful arrest, malicious prosecution, false imprisonment

4.  Disposition of prior lawsuit:

    Dismissed

5.  If prior lawsuit was dismissed when was it dismissed and why?

    Improperly pled

6.  Result of any appeal in the prior lawsuit:

    Will be filed

**E. PREVIOUS LAWSUITS** (continued) - additional sheet 6

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? _X_ Yes_____No.

1. Name of Defendants in prior lawsuit:      US DISTRICT COURT FOR THE DISTRICT OF COLORADO

2. Docket number and court name:      **09-1045**
   US COURT OF APPEALS FOR THE 10TH CIRCUIT

3. Claims raised in prior lawsuit:      Application for Writ of Mandamus

4. Disposition of prior lawsuit:      Denied

5. If prior lawsuit was dismissed when was it dismissed and why?

6. Result of any appeal in the prior lawsuit:

## G. REQUEST FOR RELIEF

State the relief you are requesting. If you need more space to complete this section, use extra paper. The additional requests for relief should be labeled "G. REQUEST FOR RELIEF."

ON CLAIM ONE: TEMPORARY RESTRAINING ORDER PREVENTING DEFENDANT ERIC HOLDER FROM REMOVING PLAINTIFF FROM THE JURISDICTION OF THIS COURT DECLARATION THAT ALL DEFENDANTS VIOLATED LAWS AND TREATIES OF THE UNITED STATES AND IS LIABLE PERSONALLY FOR ~~DEATH~~ EXECUTION OF BREYMY LOPEZ-CHES

ON CLAIM TWO: $7,000 AGAINST FIRST DEFENDANT

ON CLAIM THREE: $50,000 IN DAMAGES AGAINST FIRST DEFENDANT AND SUCK RELIEF AS COURT MAY DEEM APPROPRIATE.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed on  03/18/09
_____
(Date)

_____
(Prisoner's Original Signature)

SOLOMON BEN-TOV COHEN MA (cantab)
Tel: (303) 361-6612     pro se

(Rev. 1/30/07)                8

# CERTIFICATE OF SERVICE

I hereby certify that on _____03 /19 / 2009_____ I sent a copy of
[date]

the _____EXHIBITS_____,
[name of document]

to: _HONORABLE JAMES P VANDELLO , IMMIGRATION JUDGE_

at _EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,_
_AURORA IMMIGRATION COURT, 11901 E30TH AVE, AURORA_
_CO 80010_
_____, the last known address,
by way of ~~United States mail or courier.~~ _INTERNAL MAIL AT_
_GEO AURORA / ICE PROCESSING CENTER_

_03/20/09_
Date

Signature

## CERTIFICATE OF SERVICE

I hereby certify that on ___03/19/09___ I sent a copy of
[date]

the ___EXHIBITS___,
[name of document]

to: ___ERIC HOLDER, ATTORNEY GENERAL___

at ___US DEPARTMENT OF JUSTICE, 950 PENNSYLVANIA AVE NW___

___WASHINGTON, DC 20530___, the last known address,
by way of United States mail or courier.

___03/20/09___
Date

___[signature]___
Signature

A-5a  Pro Se Entry of Appearance Form 06/03

## CERTIFICATE OF SERVICE

I hereby certify that on ___03/20/09___ I sent a copy of
[date]

the ___EXHIBITS___,
[name of document]

to: ___MICHAEL MUKASEY, FORMER ATTORNEY GENERAL___

at ___US DEPARTMENT OF JUSTICE, 950 PENNSYLVANIA AVE-NW___

___WASHINGTON, D C 20530___, the last known address,
by way of United States mail or courier.

___03/20/09___
Date

___[signature]___
Signature

A-5a  Pro Se Entry of Appearance Form 06/03

# TABLE OF EXHIBITS
# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

Case No_____          *Cohen v Vandello*

| No | EXHIBIT | PAGE |
|---|---|---|
| 1 | Princess Diana speaking with Plaintiff in 1992 Color photo | |
| 2 | Psychiatric Evaluation by Forensic Psychiatrist Dr Thomas Gray (copy) | |
| 3 | Defendant's *ultra vires/* grant of Bond June 25th 2008<br>Defendant's *ultra vires* order that Bond Matter be briefed (copy) | |
| 4 | Immigration Court Rules stating Immigration Judge has no jurisdiction to review custody (copy) | |
| 5 | Copy of correct ruling by Hon Judge Bryant instructing lawyer to apply to District Director, Homeland Security for Bond. | |
| 6 | Fee Agreement with Bull & Davies PC (copy) $6,000 not including any Appeal | |
| 7 | BOND BRIEF written by Jonathan Hyman of Bull & Davies – very time consuming (copy) | |
| 8 | Defendant Order October 30th 2008 that he cannot consider the Bond matter (copy) | |
| 9 | Immigration lawyer Brett Davies asks for Continuance to prepare asylum case Nov6th 2008 and Defendant's decision to deny (copy) | |
| 10 | Oral decision by Defendant defaming Plaintiff calling him' paranoid' and 'delusional' (copy) | |

# TABLE OF EXHIBITS
## UNITED STATES DISTRICT COURT DISTRICT OF COLORADO

Case No_____          *Cohen v Vandello*

| No | EXHIBIT | PAGE |
|---|---|---|
| 11 | Cayman Chief Justice "withdraws protection of [his] Court", money being sent to Markus Wanger as trustee – copy of email | |
| 12 | Corroborating letter from attorney in Liechtenstein that Trustee is withholding $5.6Million from Plaintiff causing him to be unrepresented | |
| 13 | Statement concerning death of Breyny Lopez-Ches from fellow detainee Umar Muninjonovich Musoev- unsigned because he fears retaliation as Defendant is Judge is his immigration case (copy) | |
| 14 | Letter from Assistant Clinical Professor of Psychiatry Dr Jack Almeleh | |

# EXHIBIT 1



# EXHIBIT 2

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 1 of 7

## Identifying Information:

Solomon Ben-Tov Cohen is a man of either 42 or 47 years of age (he provides a date of birth different from that found in official records) who is currently facing a felony charge of Possession of a Controlled Substance, and a misdemeanor charge of Reckless Endangerment, in Denver County. Issues of competency were raised by Nikea Bland, the Public Defender assigned to the case, due to her concerns that he has an elaborate delusional system that prevents him from reasonably evaluating potential plea offers and from helping her in defending him. Mr. Cohen was previously seen for evaluation of his competency to proceed, was found incompetent, and was remanded to the Colorado Mental Health Institute at Pueblo (CMHIP) for restoration treatment and further evaluation. A restoration report opining him as restored to competency was submitted in January of this year, in response to which defense counsel apparently requested a second opinion. Pursuant to the order of the Honorable Sheila Ann Rappaport, Mr. Cohen was therefore remanded for another evaluation of his competency to proceed.

## Sources of Information:

- Mr. Cohen was seen for approximately 1 hour and 15 minutes on 03-18-2008 for the purpose of, once again, evaluating his competency to proceed. The meeting was conducted in a conference room on the CMHIP Maximum Security Unit where he was being housed. David Margiotta, Psy.D., was in attendance for the session
- I spoke by phone with Deputy Public Defender Nikea Bland, Mr. Cohen's Public Defender, on 03-18-2008; later that day Mr. Cohen showed me a letter he had received from Ms. Bland indicating she had passed the case to a colleague of hers, with whom I did not have contact.
- I spoke by phone with Deputy District Attorney Kandace Gerdes, who is involved in the prosecution of the case, on 03-17-2008.
- I consulted with Lennart Abel, M.D., his attending psychiatrist; with Sean Kelly, Psy.D., the ward psychologist; and with other ward staff and treatment team members.
- Various documents were also reviewed, including:
  o Order – In Custody Evaluation, dated 02-04-2008
  o Referral for Court Ordered Observations, dated 02-04-2008
  o NCIC Report
  o Complaint and Information, Arrest Warrant, Affidavit in Support of Warrantless Arrest, and related documents pertaining to Case Number 2007 CR 4282

COHEN, SOLOMON BEN-TOV
93373   B12/24/1960   M
02/21/08   RC-DENVER
EP005
DENVER   COMP EXAM   02/08

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 2 of 7

o Medical record pertaining to his stay at CMHIP, including prior evaluations of Mr. Cohen's competency to proceed

**Notification of Purpose:**

At the outset of the interview session, Mr. Cohen was informed:
- of the nature and purpose of the evaluation;
- of the limits of confidentiality;
- of the absence of a therapeutic relationship;
- that a report would be submitted to the court, with copies to his defense attorney and to the District Attorney; and,
- that I might be called to testify.

He indicated his understanding by responding accurately to questions intended to probe his comprehension of this information. He agreed to continue with the evaluation.

**Background Information/Past History:**

Mr. Cohen's background has been documented elsewhere, and only the most salient points will be reiterated here. As a cautionary note, it must be emphasized that he has been the primary source of this information, and little in the way of independent corroborative data has been made available.

Mr. Cohen was apparently the youngest of four children born to a working class Jewish family in London, England. He denied any family history of substance abuse or other psychiatric problems He has reported his father to have been physically and emotionally abusive. Mr. Cohen apparently did well in school, and went on to earn the British equivalent to a masters' degree in mathematics at Cambridge University in 1983. He then spent two years studying music (piano and violin) at the Guildhall School of Music and Drama in London before entering the financial world as a trader. He was reportedly quite successful at such endeavors, and went on to establish his own firm. He emigrated to New York in 1990, and although he has traveled widely, has remained based in the U.S. since then. He has never married, nor has he fathered any children.

Mr. Cohen reported no major medical conditions, and denied any history of head injury or seizures. He reported to me that he drank socially, and had stopped consuming alcohol altogether in 1986 after he became ill as the result of an evening of very heavy drinking. He also

COHEN, SOLOMON BEN-TOV
93373    B12/24/1960    M
02/21/08    RC-DENVER
EP005
DENVER    COMP EXAM    02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT

160

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 3 of 7

denied any history of illicit drug use. ████████████████████████████████████
████████. He stated during our interview, that he had never been hospitalized for psychiatric reasons. He did, though, report undergoing therapy for some 18 months beginning in 1991 due to social anxiety, and was prescribed an antidepressant (Prozac) and an anxiolytic (Klonopin). He also reported having been diagnosed with attention deficit hyperactivity disorder (ADHD) approximately seven years ago, for which he has been prescribed Dexedrine, and more recently Adderall. At the time of admission, though, he indicated to Kevin Snyder, M.D., the admitting psychiatrist, that he had been hospitalized on several occasions in the past, beginning with placements in 2000 at Jackson Memorial Hospital (presumably in Miami, Florida) subsequent to an arrest, and at San Francisco General Hospital for a three day period of observation. In 2003 he was hospitalized in Baltimore, and also at St. Vincent's in New York; he attributed the latter to stress. In 2006 he was once again placed at Jackson Memorial. No details are available concerning these events.

## Course of Hospitalization:

It has been well documented and reported that at the time he was admitted here, Mr. Cohen exhibited symptoms of apparent mania. (It is perhaps noteworthy that at least some of what were initially interpreted as psychotically delusional claims have since been verified). Since the time o the most recent evaluation of his competency to proceed, his progress has been remarkable primarily for his revelation to Dr. Abel in early March that he had been secretly not taking his prescribed psychoactive medications (Abilify for psychotic symptoms and Depakote for mood stabilization) for perhaps as long as two months. He has been compliant with ward rules and procedures, and has attended scheduled activities, including those intended to improve his adjudicative competence. He has progressed well in the ward's privileging system, and there have been no untoward behavioral episodes.

## Current Clinical Observations:

Solomon Ben-Tov Cohen is a well-nourished White male of average stature who appears perhaps somewhat younger than his stated age. (There is some discrepancy on the issue of his age, in that official records indicate he was born in 1965, making him 42 years old. However, he has consistently asserted that in fact he was born in 1960.) He was appropriately clad in casual clothing for the interview session, and grooming and hygiene were good. Physical movements, including gait and posture, were within normal limits. He spoke with a distinct British accent, his

COHEN, SOLOMON BEN-TOV
93373   B12/24/1960   M
02/21/08   RC-DENVER
EP005
DENVER   COMP EXAM   02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT                                    150

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 4 of 7

speech was normal for pace, tone, and volume, he was fluent and articulate, and could be readily understood. Mood was stable throughout our meeting. He reported he was "a little bit nervous," and cited concerns about his immigration status. He nevertheless denied any problems with sleep or appetite, although complained of having gained 30 pounds since he was detained on the current charges; he attributed this to medications he had been taking. No signs or symptoms of serious mood disturbance such as depression or mania were identified. He firmly denied any history of suicidal thinking or behavior.

Mr. Solomon's thought processes were broadly logical and coherent. He showed a marked tendency to provide responses to questions that included excessive and unsolicited detail, and at times seemed to wander off-topic; however, he typically reached the point of the question, albeit sometimes after a notable amount of time. He denied ever experiencing any symptoms of psychosis, such as serious perceptual disturbances (e.g., hearing voices, seeing things others cannot), maintaining odd or untenable beliefs (e.g., possessing special powers), or attributing inappropriately personalized meaning to ordinary events.

He was well oriented: he knew who and where he was, he knew the date and day of the week, and he understood his current situation quite well. Memory, attention and concentration were intact on screening. Intellectual functioning was estimated to fall in the average to high average range, based on use of grammar and vocabulary, as well as his fund of knowledge. Abstracting abilities were intact as evaluated by proverb interpretation. Judgment for everyday social situations was good, although the extent of his insight was perhaps rather limited.

**DSM-IV-TR Diagnoses:**

Axis I:     Bipolar Disorder versus Amphetamine-Induced Psychotic Disorder
            Amphetamine Dependence
Axis II:    Deferred

**Current Competency Assessment:**
The following information is organized according to the definition of "Incompetent to proceed," found at C.R.S.A. § 16-8-102(3), which includes three elements:

COHEN, SOLOMON BEN-TOV
93373    B12/24/1960    M
02/21/08    RC-DENVER
EP005
DENVER    COMP EXAM    02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT                                    150

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 5 of 7

## Capability of understanding the nature and course of the proceedings against him:

- Mr. Cohen correctly named the charges he faces, and gave a description of what he is alleged to have done that seemed to have been taken almost verbatim from available police records. He considered this a serious matter, he recognized that his charges are variously of felony or misdemeanor status, and was aware of the potential penalties he could face if convicted. He also discussed at some length the various contingencies that enter into his specific situation.
- He gave a good description of what constitutes appropriate courtroom behavior ("smartly dressed if possible, respectful of the court, pay attention"). He denied ever having conducted himself improperly during prior court appearances, and was aware that he could face additional consequences if he were to violate established standards of decorum
- He understood the role of his attorney as a primary conduit by which he is to communicate with the court.
- His explanations of the roles played by various key courtroom personnel were complete and accurate. He understood the opposing goals of the two attorneys, and the neutral position of the judge in the proceedings. He was aware that he is involved in an adversaria process.
- Mr. Cohen spontaneously named the four possible pleas available to him in the State of Colorado, and demonstrated his understanding of the meanings and consequences associated with each. He also revealed his awareness of the nature of the judicial process.
- He gave a brief but accurate explanation of a plea bargain, citing specific advantages and disadvantages to engaging in the process. He also spontaneously commented on rights tha are sacrificed if one chooses to enter into such an agreement.
- He was well aware of the protections afforded him by his Fifth Amendment rights.

## Capability of participating or assisting in his defense:

- During the course of our conversation, Mr. Cohen made several statements indicating clearly that he is well aware of the nature of the evidence against him. He further stated tha Dr. Kelly has reviewed the relevant discovery materials with him. He demonstrated an ability to measure the quality of that evidence.
- He identified a specific strategy that he is strongly considering implementing in an effort t resolve the current matter, but declined to discuss this in detail with me, stating, "That's fo me to discuss with my public defender." With this statement, as well as others he made, he indicated he is intent to consider carefully the input of his attorney.

COHEN, SOLOMON BEN-TOV
93373    B12/24/1960    M
02/21/08    RC-DENVER
EP005
DENVER    COMP EXAM    02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT

150

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 6 of 7

- As he discussed his situation, he also made mention of specific points that he would consider quite important in evaluating a potential plea offer. This strongly suggested better than adequate ability to make rational decisions from amongst legal alternatives.
- ~~As noted above, Mr. Cohen was prone to engaging in length statements, often seeming to~~ drift off-topic, and provide excessive and unnecessary detail. He was nevertheless able to respond meaningfully to questions posed to him, and was reasonably responsive to redirection when necessary. At no time did he become so affectively energized as to make it impossible for him to speak rationally and reasonably. It therefore seemed likely that he would be able to provide relevant testimony, should that be required.

**Capability of cooperating with his defense counsel:**

- Mr. Cohen indicated that the defense attorney of record has stepped away from his case, and has asked a colleague to assume responsibility for his defense. When I expressed surprise at this, he readily produced a letter documenting this transfer. He acknowledged having had difficulties with the public defender who initially represented him, although made a positive comment concerning her performance during a prior court appearance. He stated he has not yet met the woman who has been reassigned to his case, but stated, "I will work with any attorney."
- He outlined expectations that he has of an attorney, specifically stating that communication confined to brief consultation immediately prior to entering a trial is unacceptable to him. He indicated his awareness of procedures he could follow should he find it necessary to request alternate counsel.
- He was aware that his communications with defense counsel are protected by privilege.

**Summary:**

Solomon Ben-Tov Cohen was remanded to CMHIP for another evaluation of competency to proceed on a felony and a misdemeanor charge in Denver County. Mr. Cohen was first evaluated by Dr. Timothy Foster in October 2007, and was thought to be exhibiting a "well-formed and intricate delusional system [that] clearly impaired his ability to rationally understand factual and strategic matters related to the case at hand, and to rationally work with an attorney provided to him in his own defense." It is noteworthy that many of Mr. Cohen's claims that initially seemed delusional in nature have since been shown to be accurate. ████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ Regardless of the specific origin of

COHEN, SOLOMON BEN-TOV
93373    B12/24/1960    M
02/21/08    RC-DENVER
EP005
DENVER  COMP EXAM    02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT                                    150

Solomon Ben-Tov Cohen
CMHIP No. 83373
COMPETENCY EXAMINATION
B. Thomas Gray, Ph.D., ABPP
March 19, 2008
Page 7 of 7

his psychiatric difficulties, he has become stabilized in a therapeutic environment that earlier on included administration of psychoactive medications; he voluntarily (and secretly) stopped taking those medications several weeks prior to the evaluation reported here, with no discernible change in his comportment. More to the point, he appears to clearly meet the functional requirements requisite to adjudicative competency. It must be noted, however, that Dr. Abel has detected what may be signs of returning mania; if so, his prognosis would be more guarded, particularly if he continues to refuse to take medications.

**Statutory Opinion:**
It is my clinical opinion, with a reasonable degree of scientific certainty, that Mr. Solomon Ben-Tov Cohen is not currently suffering from a mental disease or defect which renders him incapable of understanding the nature and course of the proceedings against him, or of participating or assisting in his defense or cooperating with his defense counsel.

It is therefore my opinion that Mr. Cohen is currently **competent to proceed** to adjudication.

Please feel free to contact me at (719) 546-4087 should you have any questions or if I can be of further assistance in this case.

B. Thomas Gray, Ph.D., ABPP
Diplomate in Forensic Psychology
American Board of Professional Psychology
Clinical Coordinator, Court Evaluation Services
Institute for Forensic Psychiatry
CMHIP

/reg
03/24/2008

COHEN, SOLOMON BEN-TOV
93373    B12/24/1960    M
02/21/08    RC-DENVER
EP005
DENVER    COMP EXAM    02/08

Colorado Mental Health Institute at Pueblo
OBSERVATION REPORT                                    150

*Trujillo* **PD**

District Court, City and County of Denver, Colorado
City and County Building, Room 256
1437 Bannock Street
Denver, CO 80202

Plaintiff:    The People of the State of Colorado

Defendant: **SOLOMON BON-TOV COHEN (DOB: ~~12/24/1965~~)**

| σ    COURT USE ONLY    σ |
| --- |
| Case Number: 07CR04282 |
| Div.: Criminal Ctrm 13 |

## ORDER TO DISMISS CASE

The Court, having read the People's **MOTION TO DISMISS CASE**, and being fully advised therein:

[X]    Hereby Grants the People's Motion

[ ]    Hereby Denies the People's Motion

Done at Denver, Colorado this date: _____*May 16*_____, 2008

BY THE COURT:

_____
JUDGE

# EXHIBIT 3

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
AURORA, CO

FILE: A77-309-675

IN THE MATTER OF:

COHEN, SOLOMON BEN-TOI

RESPONDENT

IN ASYLUM ONLY PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE
WITH RESPECT TO CUSTODY

Request having been made for a change in the custody status of respondent pursuant to 8 CFR 236.1(c), and full consideration having been given to the representations of the Department of Homeland Security and the respondent, it is hereby

_____ ORDERED that the request for a change in custody status be denied.

___X___ ORDERED that the request be granted and that respondent be:

_____ released from custody on his own recognizance

___X___ released from custody under bond of $ 10,000

_____ OTHER _____

Copy of this decision has been served on the respondent and the Department of Homeland Security.

APPEAL: waived -- reserved

AURORA -- AURORA, COLORADO

Date: Jun 25, 2008

_____
J. P. VANDELLO
Immigration Judge

XS

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
DENVER, COLORADO

FILE: A77 309 675 – Aurora, CO

IN THE MATTER OF: )
)
)
Solomon Ben-Tov COHEN ) IN ASYLUM-ONLY PROCEEDINGS
)
RESPONDENT )
)

## MINUTE ORDER

Earlier today, I issued a bond order granting the respondent bond in the amount of $10,000. After reviewing this file, I am not convinced that the case cited by respondent's counsel (*Matter of Gallardo*, 21 I&N Dec. 210 (BIA 1995)) controls this case. It is noted that regulations promulgated after *Gallardo* may limit the effects of that ruling. *See* 8 C.F.R. § 208.2(c).

Therefore, I will withdraw my order and allow the parties to brief the issue. The deadline for briefing is July 10, 2008. I will take the issue under advisement and issue a new order at the next regularly-scheduled hearing.

ORDER: The bond order dated June 25, 2008, is hereby vacated.

June 25, 2008

J. P. Vandello
Immigration Judge

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
AURORA, CO

FILE: A77-309-675

IN THE MATTER OF:

COHEN, SOLOMON BEN-TOV

RESPONDENT

IN ASYLUM ONLY PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE
WITH RESPECT TO CUSTODY

Request having been made for a change in the custody status of respondent pursuant to 8 CFR 236.1(d) and full consideration having been given to the representations of the Department of Homeland Security and the respondent, it is hereby

_____ ORDERED that the request for a change in custody status be denied.

__X__ ORDERED that the request be granted and that respondent be:

_____ released from custody on his own recognizance

__X__ released from custody under bond of $ 10,000

_____ OTHER _____

Copy of this decision has been served on the respondent and the Department of Homeland Security.

APPEAL: waived -- reserved

AURORA -- AURORA, COLORADO

Date: Jun 25, 2008

_____
J. P. VANDELLO
Immigration Judge

XS

# EXHIBIT 4

*(iv) Stowaways.* — If a stowaway expresses a fear of persecution or torture, he or she is placed into credible fear proceedings. See INA § 235 (a)(2), subsection (d), below.

*(v) Others.* — In certain circumstances, the aliens listed below may be placed into asylum-only proceedings. See subsection (g), below.

- crewmembers (D visa applicants)

- certain cooperating witnesses and informants (S visa applicants)

- visa waiver applicants and visa waiver overstays

- aliens subject to removal under INA § 235(c) on security grounds

*(c) Custody in limited proceedings.* — An alien subject to limited proceedings may be detained during the proceedings. Immigration Judges have no jurisdiction over custody decisions for these aliens.

*(d) Credible fear proceedings.* — Credible fear proceedings involve stowaways and aliens subject to expedited removal under INA § 235(b)(1). See subsections (b)(i), (b)(iii), above. If such an alien expresses a fear of persecution or torture to the Department of Homeland Security (DHS) immigration officer upon being detained by DHS or applying to enter the United States, the alien is interviewed by a DHS asylum officer who evaluates whether the alien possesses a credible fear of persecution or torture. See generally INA § 235(b)(1)(B).

*(i) Credible fear standard.* — "Credible fear of persecution" means that there is a significant possibility that the alien can establish eligibility for asylum under INA § 208 or withholding of removal ("restriction on removal") under INA § 241(b)(3). The credibility of the alien's statements in support of the claim, and other facts known to the reviewing official, are taken into account. 8 C.F.R. §§ 208.30(e)(2), 1003.42(d).

"Credible fear of torture" means there is a significant possibility that the alien is eligible for withholding of removal ("restriction on removal") or deferral of removal under the Convention Against Torture pursuant to 8 C.F.R. §§ 208.16 or 208.17. 8 C.F.R. §§ 208.30(e)(3), 1003.42(d).

# EXHIBIT 5

# U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

Matter of

File A 077 309 675

)
)
SOLOMON BEN-TOV COHEN              )    In ASYLUM ONLY Proceedings
)
)
            Respondent            )        Transcript of Hearing

Before JOHN MILO BRYANT, Immigration Judge

Date:  March 26, 2004                    Place:  Arlington, Virginia

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

    For the Department of
    Homeland Security:              For the Respondent:

    Michael Metzgar                 Nadia Ezzalarah

(TAPE 1)

JUDGE FOR THE RECORD

We are on the record in the United States Immigration Court sitting in Arlington, Virginia on Friday, March 26, 2004, Judge John Milo Bryant presiding in asylum only proceedings in the matter of Solomon Cohen, 77 309 675. Would counsel state their names?

MS. EZZALARAH TO JUDGE

Nadia Ezzalarah, Your Honor.

MR. METZGAR TO JUDGE

Michael Metzgar for the Government, Your Honor. I'm sorry.

JUDGE TO MR. METZGAR

Okay.

JUDGE TO MS. EZZALARAH

The respondent seeks asylum obviously.

MS. EZZALARAH TO JUDGE

That's correct, Your Honor.

JUDGE TO MS. EZZALARAH

That's the only issue we addressed. My question to you is whether you have a petition or do you need time to prepare it?

MS. EZZALARAH TO JUDGE

I need time to prepare. We are seeking a bond too.

JUDGE TO MS. EZZALARAH

No jurisdiction, asylum only. There is no issue of removability. That has been decided because when he attempted to

A 077 309 675                     11                    March 26, 2004

enter under the Visa Waiver Program or whatever, he was placed in these asylum only proceedings. So I have no jurisdiction over bond, no jurisdiction over removability. The only thing I can do is hear his asylum, withholding, and CAT claim.

MS. EZZALARAH TO JUDGE

Okay, Your Honor.

JUDGE TO MS. EZZALARAH

You need to go see the District Director.

MS. EZZALARAH TO JUDGE

Yes.

JUDGE TO MS. EZZALARAH

The DHS official.

MR. METZGAR TO JUDGE

The FOD.

JUDGE TO MR. METZGAR

The what?

MR. METZGAR TO JUDGE

The FOD, the Field Office Director.

JUDGE TO MR. METZGAR

Thank you.

MS. EZZALARAH TO JUDGE

The Field Office Director. Thank you, Your Honor.

JUDGE TO MS. EZZALARAH

Go see him and see if he will --

MS. EZZALARAH TO JUDGE

A 077 309 675                    12                    March 26, 2004

# EXHIBIT 6

9/16/2008 Form

# Hourly Fee Agreement

Date: 9-10-08

Client Name:  Solomon Cohen

Client Address: GEO Detention Facility

Contact Info:

Emergency Contact Person: Miles Howarth  011-442078395505

Persons to have access to your information:
1.
2.

_____ Please initial indicating that the address, telephone number, emergency contact person, and persons to have access listed above are true and correct.

## CONTRACT

I, the undersigned client, herby retain <u>Bull & Davies PC</u> to represent me.  This hourly fee agreement confirms my understanding and agreement concerning the services to be rendered as follows:

Representation on behalf client to include any bond redetermination hearing and defense of asylum application.  Any appeal process is not included in this contract.

Retainer:                    $   6,000.00

*Retainer is to be replenished monthly until the end of the litigation or legal services rendered as per this agreement.*

I understand and agree that there are significant and substantial tasks that must be performed by the above-signed counsel and his associates at the very beginning of my case in the nature of legal research, factual research, document review, document gathering, and execution of applications, forms and legal pleadings.  Legal research and fact investigation requirements vary depending on the type and complexity of each matter and whether criminal aspects, disputed facts or legal theory is at issue.  I agree to pay all cost related to my case including, but not limited to, filing fees, discovery, transcripts, interpreters postage and couriers.  It is my practice to engage independent contract personnel when I deem it in the clients for these purposes.

9/16/2008 Form

The "beginning costs" in this matter are agreed to be:
1) Filing Fees: $
2) Copy Costs:$
3) Postage Costs: $
4) Contact Labor: $
5) Expert Cost: $

In the event that, prior to the completion of the services described above, I terminate the service of the Bull & Davies, P.C., I understand that I will be charged for the work that has been completed and all costs incurred. Payments made pursuant to the Fee Agreement will be considered a retainer and any unbilled fees will be refunded. The following is the hourly fee charged by the firm:

$175.00/hour Attorney
$75.00/Hour Paralegal
$20.00/hour law clerk

It is understood and agrees that **no guarantees** have been made to the outcome nor me as to the time the case will take to complete. I have agreed to cooperate with Brett J. Davies and Catharine A. Bull and will keep the office address and/or telephone number, employment or other circumstances bearing on the case. I will truthfully execute applications as required and obtain as soon as possible any and all documents that may be necessary to complete and effectuate the conclusion of the case.

Any dispute with respect to the contents of this agreement or to the outcome in a particular case subject to binding arbitration with the American Arbitration Association at the option of Brett Davies or Catharine A. Bull. This provision does not pertain to the collection of payments.

My signature at the bottom of this page indicates that I have read this document and understand it fully and agree to its contents.

DATED this _23rd_ day of _September_, 20_08_ in Denver, Colorado.

Client: _____

Attorney: _____

Bull & Davies, PC

812 Santa Fe Dr.
Denver, CO 80204

# Invoice

| Invoice Date: | Invoice #: |
|---|---|
| 11/6/2008 | 12497 |

| Bill To: |
|---|
| Cohen Solomon<br>GEO Detention Facility |

| Due Date: | Case: |
|---|---|
| 11/6/2008 | Cohen, Solomon |

| Serviced | Item | Description | Hours/Qty | Rate | Case Type | Amount |
|---|---|---|---|---|---|---|
| 10/1/2008 | Normal (Default Ra... | Postage and delivery Fee $2.52 Postage and delivery Fee $0.42 Postage and delivery Fee $4.20 | 0.3 | 23.80 | Quinones (), ... | 7.14 |
| 10/1/2008 | Normal (Default Ra... | TC with client | 1.3 | 175.00 | Hyman, Jon | 227.50 |
| 10/2/2008 | Normal (Default Ra... | Postage and delivery Fee $4.20 | 0.1 | 42.00 | Quinones (), ... | 4.20 |
| 10/2/2008 | Normal (Default Ra... | Draft Bond Request | 0.8 | 175.00 | Hyman, Jon | 140.00 |
| 10/6/2008 | Normal (Default Ra... | mailed out bond motion, copy of asylum book | 0.6 | 175.00 | Hyman, Jon | 105.00 |
| 10/6/2008 | Normal (Default Ra... | make copies of bond motion and send to court and district counsel; | 0.3 | 25.00 | Davies, Sandy | 7.50 |
| 10/7/2008 | Normal (Default Ra... | write letter re: hrg. | 0.2 | 25.00 | Davies, Sandy | 5.00 |
| 10/16/2008 | Normal (Default Ra... | TC with Cohen | 1.4 | 175.00 | Hyman, Jon | 245.00 |
| 10/17/2008 | Normal (Default Ra... | BJD to jail picked up releases that client executed. | 0.3 | 175.00 | Brett J Davies | 52.50 |
| 10/19/2008 | Normal (Default Ra... | File review. Route to get med records now that we have release. Research on challenge to jurisdiction. It appears that issuance of an I-163 is now proper under 8 CFR 208.2(b). | 2.1 | 175.00 | Brett J Davies | 367.50 |
| 10/20/2008 | Normal (Default Ra... | make copies and send Motion to terminate to GEO send copy to district counsel and client FWD file to JMH | 0.3 | 25.00 | Davies, Sandy | 7.50 |

| Total | |
|---|---|
| Payments/Credits | |
| Customer Balance Total | |

| Phone # | Fax: |
|---|---|
| 303-996-9815 | 303-996-9819 |

Bull & Davies, PC

812 Santa Fe Dr.
Denver, CO 80204

# Invoice

| Invoice Date: | Invoice #: |
|---|---|
| 11/6/2008 | 12497 |

| Bill To: |
|---|
| Cohen Solomon<br>GEO Detention Facility |

| Due Date: | Case: |
|---|---|
| 11/6/2008 | Cohen, Solomon |

| Serviced | Item | Description | Hours/Qty | Rate | Case Type | Amount |
|---|---|---|---|---|---|---|
| 10/21/2008 | Normal (Default Ra... | Research on asylum cases and review of mental health law | 2.0 | 175.00 | Hyman, Jon | 350.00 |
| 10/28/2008 | Normal (Default Ra... | Review of letters sent by client | 0.5 | 175.00 | Hyman, Jon | 87.50 |

| | |
|---|---|
| **Total** | $1,606.34 |
| **Payments/Credits** | $0.00 |
| **Customer Balance Total** | $-1,890.70 |

| Phone # | Fax: |
|---|---|
| 303-996-9815 | 303-996-9819 |

4:38 PM

11/30/08

Accrual Basis

# Bull & Davies, PC
## Customer Open Balance
### All Transactions

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|------|------|-----|------|----------|-------------|--------|
| **Solomon, Cohen** | | | | | | |
| **Cohen, Solomon** | | | | | | |
| Invoice | 10/8/2008 | 12336 | | 10/8/2008 | 2,489.84 | 2,489.84 |
| Invoice | 11/6/2008 | 12497 | | 11/6/2008 | 1,606.34 | 1,606.34 |
| Total Cohen, Solomon | | | | | 4,096.18 | 4,096.18 |
| **Solomon, Cohen - Other** | | | | | | |
| Payment | 9/18/2008 | | | | -6,000.00 | -6,000.00 |
| Stmt Charge | 11/17/2008 | | | | 13.12 | 13.12 |
| Total Solomon, Cohen - Other | | | | | -5,986.88 | -5,986.88 |
| Total Solomon, Cohen | | | | | -1,890.70 | -1,890.70 |
| **TOTAL** | | | | | **-1,890.70** | **-1,890.70** |

Page 1

Bull & Davies, PC

812 Santa Fe Dr.
Denver, CO 80204

# Invoice

| Invoice Date: | Invoice #: |
|---|---|
| 10/8/2008 | 12336 |

| Bill To: |
|---|
| Cohen Solomon<br>GEO Detention Facility |

| Due Date: | Case: |
|---|---|
| 10/8/2008 | Cohen, Solomon |

| Serviced | Item | Description | Hours/Qty | Rate | Case Type | Amount |
|---|---|---|---|---|---|---|
| 9/8/2008 | Normal (Default Ra... | Postage and Delivery $4.84 | 0.2 | 24.20 | Quinones (), ... | 4.84 |
| 9/9/2008 | Normal (Default Ra... | met with client review of Court transcripts | 3.2 | 175.00 | Hyman, Jon | 560.00 |
| 9/10/2008 | Normal (Default Ra... | Motion to Continue Hearing | 1.6 | 175.00 | Hyman, Jon | 280.00 |
| 9/17/2008 | Normal (Default Ra... | BJD to jail met with Salomon Cohen. Review of his materials. | 1.5 | 175.00 | Brett J Davies | 262.50 |
| 9/18/2008 | Normal (Default Ra... | Review of clients immigration filings and documents | 2.0 | 175.00 | Hyman, Jon | 350.00 |
| 9/19/2008 | Normal (Default Ra... | draft bond motion | 3.5 | 175.00 | Hyman, Jon | 612.50 |
| 9/22/2008 | Normal (Default Ra... | TC to superior Court in San Francisco, Letter to SF Police Records | 0.7 | 175.00 | Hyman, Jon | 122.50 |
| 9/23/2008 | Normal (Default Ra... | TC to VA and UT to obtain dispos | 1.0 | 175.00 | Hyman, Jon | 175.00 |
| 9/24/2008 | Normal (Default Ra... | TC with Solomon Lm with CA PD | 0.7 | 175.00 | Hyman, Jon | 122.50 |

| | |
|---|---|
| **Total** | $2,489.84 |
| **Payments/Credits** | $0.00 |
| **Customer Balance Total** | $-1,890.70 |

| Phone # | Fax: |
|---|---|
| 303-996-9815 | 303-996-9819 |

# EXHIBIT 7

Bull & Davies. P.C.
Brett J. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver, Colorado 80204

DETAINED
Alien Number: 77-309-375

## RESPONDENT'S BRIEF IN SUPPORT OF RELEASE ON BOND

The Respondent, through his attorney, moves this Court to schedule a hearing in this matter for the purpose of addressing the Respondent's release on bond: In support he offers the following:

### LEGAL AUTHORITY AND JURISDICTION

1. That the Respondent has been in the custody of the United States since June 1, 2008. He is entitled to a bond determination or a re-determination under the law when he is in custody of the government. 8 C.F.R. § 1003.19; 8 C.F.R. § 1236.1 (2007).

2. He requests that a hearing be set for the purposes of re-determining his bond.

3. The Department of Homeland Security's June 1, 2008 I-213 recommended no bond for the Respondent and that the Respondent would be processed as an NTA. Please see copy of DHS June 1, 2008 I-213, attached hereto as Exhibit A.

4. The Respondent should have been served an I-863.

5. The Respondent stated that he feared persecution if he was to be returned to the United Kingdom. However, deport officer Clemens incorrectly stated that the Respondent did not fear persecution.

6. The Respondent entered the United States in 2002 as a nonimmigrant WBWT Visa Waiver Program.

7. The basic terms of the Visa Waiver Program appear in INA § 217.

8. An alien may contest an action for deportation when he has filed an application for asylum. INA § 217(b).

2

Bull & Davies, P.C.
Bren J. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver, Colorado 80204

DETAINED
Alien Number: 77-309-675

9.    Where an alien presents himself as an applicant for admission under section 217 of the INA and has applied for Asylum in the United States he *must* be referred to an Immigration Judge for further inquiry. 8 CFR § 217.4(b)(1).

10.    Where an alien has applied for asylum and a subsequent filing of an OSC by the INS has occurred, the alien is eligible for standard deportations entitlements, such as bond redetermination hearing. In re Gallardo, Int., Dec. 3263 (BIA 1996).

11.    On June 25, 2008, the Court granted the Respondent a bond of $10,000.00 under *Gallardo* but later withdrew the Order and requested the parties brief the matter by July 10, 2008.

12.    On July 18, 2008, the Respondent's attorney was granted a withdrawal from the case.

13.    To date, the Respondent has not been issued an I-221, Order to Show Cause and Notice to Appear.

14.    The Respondent's case is very similar to the Respondent in *Gallardo*. Respondent Gallardo applied for asylum and INS detained the Respondent without bond. The Court held that Respondent Gallardo was entitled to bond redetermination hearing under 8 CFR § 242. The *Gallardo* Court stated in their opinion, "We do not find that Congress ever intended for section 217 of the Act to deny the respondent the opportunity to request a bond redetermination hearing. Rather, the regulations specifically state that asylum applicants, such as the respondent, shall be brought under proceedings consistent with the provisions set forth in Section 242 of the Act." Gallardo *at* 211.

15.    Although the Gallardo decision referred to section 242 of the Act, the applicable law is found in 8 CFR § 217.4(b)(1) which states:

3

Bull & Davies, P.C.
Brett J. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver, Colorado 80204

DETAINED
Alien Number: 77-300-075

"An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Form I-863 for a proceeding in accordance with § 208.2(b)(1) and (2) of this chapter."

16. Immigration judges shall have exclusive jurisdiction over asylum applications who has been served Form I-862. 8 CFR § 208.2(b).

17. After an I-863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 2997, by an alien who has been admitted to the United States pursuant to a Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has violated his or her immigration status. 8 CFR 208.2(c)(iii).

18. The Service should have issued the Respondent an I-863, Referral to the Immigration Judge, but failed to do so. The service of the I-863 is required under 8 CFR § 217.4 and failure to do so could result in the Court terminating the removal proceedings. This is not a matter of function over form. The existing regulations mandate that those aliens who apply for admission under section 217 of the Act who apply for Asylum "must" be issued

-4-

Bull & Davies, P.C.
Brett J. Davies
Catharine A. Bull
312 Santa Fe Drive
Denver, Colorado 80204

DETAINED
Alien Number: _____

a Form I-863 in accordance to 8 CFR 208.2(b)(1 and (2). In re Kanagasundram, 22 I&N Dec. 963 (BIA 1999). Deportation Officer Clemens failed to accurately state that the Respondent feared persecution upon returning to the United Kingdom. This failure may have resulted in an OSC or an I-863 not being issued in the case.

19. Under the current circumstances, the government failed to serve Form I-863 and the Respondent, in the alternative, requests the court terminate the case. In re Kanagasundram, 22 I&N Dec. 963 (BIA 1999).

20. The regulations allow the respondent to have a custody determination hearing. The Attorney General may release a detained non-citizen on bond. INA §236. Pursuant to INA § 236(a), the INS should not detain him unless there is a risk he will abscond, he poses a danger to persons or property, or he poses a risk to national security. Matter of Adenji, Int. Dec. # 3417 (BIA 1999); Matter of Patel, 15 I & N Dec. 666 (BIA-1976).

21. In Matter of Spiliopoulos, 16 I&N 561 (BIA 1978), the BIA recognized employment history, length of residence, family ties, absence of criminal history; absence of immigration violations as bond factors because they are indicators of whether a person is likely to appear. In Matter of Leon-Perez, 15 I&N 235 (BIA 1975), the BIA held that eligibility for relief from deportation was also a bond factor.

22. As set forth in Zadvydas v. Davis, 533 U.S. 678 (2001), 8 U.S.C. §1231 has two main purposes: first, it is to ensure the appearance of aliens at future immigration proceedings; and second, preventing the release of persons who pose *real threat* to the community. Id., 533 U.S. at 690 (*emphasis added*). Generally, an alien is not and should not be detained or required to post bond except on a finding that he is a *threat to the national*

5

Bull & Davies, P.C.
Brent J. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver, Colorado 40204

DETAINED
Alien Number: 7-400-073

*security*, or that he is a *poor bail risk*. Matter of Patel, 15 I & N. Dec. 666 (1976), emphasis added.

23. The 5th Circuit Court of Appeals has recently held that "the amount of bond must be reasonable and 'appropriate under the circumstances." Shokeh v. Thompson, 2004 U.S. App. LEXIS 9087 (5th Cir., 2004). Serious issues and questions "arise concerning the reasonableness of the amount of bond if it has the affect of preventing the alien's release." Doan v. INS, 311 F.3d 1160 (9th Cir. 2002); and *citing for authority*, the Due Process Clause of the 5th Amendment of the US Constitution and Excessive Bail Clause of the 8th Amendment.

24. This reasonableness requirement must be shown here because of physical confinement, whether criminal or civil, it implies a "fundamental liberty interest" because of the potential length of confinement, and the limited access to information that could have potentially assisted in the defense of his case (issues that have been brought on appeal).

25. According to Zadvydas, a bond must be low enough that the immigrant is able to meet it.

26. Thus, Shokeh held that a bond that has the effect of preventing an immigrant's release because of an inability to pay, and that results in "potentially permanent" detention, is presumptively unreasonable. *See also*, Williams v. Illinois, 399 U.S. at 243.

27. There is no current bail set in this case, however the case law states that the Respondent is entitled to a bond because he entered the country under the visa waiver program and filed for asylum. In consideration, the Respondent has provided his criminal history and biographical information to prove that he is not a danger to society or a flight risk.

## BIOGRAPHIC INFORMATION

28. The Respondent is 48 years old.

6

Bull & Davies, P.C.
Brett J. Davies
Catharine A. Bull
312 Santa Fe Drive
Denver, Colorado 80204

DETAINED
Alien Number: 7-ju-44-x

29. The Respondent is a national and citizen of the United Kingdom.

30. The Respondent first came to the United States in 1987 on a B1 visa. He has continued living in the United States on a B1 or H1-B visa from 1989 to 1999. He was living in the United States all but thirty days a year in the years 1991 to 1998.

31. The Respondent came to the United States as an investment consultant for CK Partners, Inc. and was granted a specialty occupation visa.

32. His criminal history does not reflect he is a danger to society. The Respondent has been diagnosed with Attention Deficit Disorder and has a legal prescription to amphetamines and their derivatives. See attached CVS prescription receipt, attached hereto as Exhibit B. The Respondent has been detained several times by police for possession of amphetamines but no convictions as he obtains a legal prescription for the medication.

## CRIMINAL HISTORY

| Tab | Arrest Date Case Number | Charges | Disposition | Immigration Consequences |
|-----|-------------------------|---------|-------------|--------------------------|
| | 4-17-00 San Francisco, CA | Disorderly Conduct under the Influence of Drugs | No Charges filed | None |
| | 7-06-03 San Diego, CA | Driving under the Influence of Alcohol/Drugs Possession of a Schedule II Controlled Substance | No Information | None |
| | 7-18-03 Santa Ana, CA Related to San Diego, CA case | Driving under the Influence of Alcohol/Drugs Possession of a Schedule II Controlled Substance | No Charges filed Detained for failure to provide sample in San Diego case | None |
| C | 9-02-03 Salt Lake City, UT | Fleeing | No Charges filed | None |

7

Bull & Davies. P.c.
Brett I. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver. Colorado 86204

DETAINED
Alien Number: ***-309-675

35.    The Respondent has applied for and is eligible for asylum.

## RELIEF REQUESTED

36.    The Respondent would respectfully request that this Court set a bond in this matter.

37.    The regulations entitle the Respondent to a bond where he has entered under the visa program and has filed for asylum. The only issue is what documents should have been served upon the Respondent at the time he was processed. The Respondent has not been served an I-221, Order to Show Cause as in *Gallardo* but has been served an I-862 and under 8 CFR § 208.2(b), the service of an I-862 renders jurisdiction of asylum applications with the Court. Furthermore, 8 CFR § 208.2(c)(1)(iii) states that an immigration judge shall have exclusive jurisdiction over an asylum application filed after an I-863 has been filed with the immigration court for an alien who is an applicant for admission under the Visa Waiver Pilot Program. The Respondent was not served an I-863 and under *Kanagasundram* the case may be terminated. Termination of the case would result in the Respondent's release and the Service having to reserve the Respondent charges and an NTA. Where as here, the Respondent was served with a Notice to Appear and has a scheduled Credible Fear Determination hearing, the notice requirement to the immigration court has been fulfilled as if the Court received an OSC. As such, the Respondent should be granted a bond. The alternative, in reading the strict requirements of the responsibilities of the Service and their failure to serve upon the Respondent an I-863 instead of the I-862 would result in the termination of the Respondent's case before the Court and the Respondent's immediate release.

9

Bull & Davies, P.C.
Brett J. Davies
Catharine A. Bull
812 Santa Fe Drive
Denver, Colorado 80204

DETAINED
alien Number: ___

38.    The Respondent's detention in Aurora, Colorado has caused significant absences that

affect his continual medical care as well as his ability to prepare for his Credible Fear

Determination hearing.

39.    The Respondent respectfully requests a bond be set in this matter.

*Attached and incorporated herein, please find forms I-862 and I-286.*

WHEREFORE, Respondent moves that the Immigration Court set a hearing in this matter to consider bond.

Respectfully submitted by his attorney,

Jonathan M. Hyamn
Brett J. Davies
Catharine A. Bull

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing MOTION REQUESTING BOND and/or SETTING on the __3__ day of __October 2008__ via U.S. Mail Postage Prepaid or hand delivery to opposing counsel, the government to:

Office of District Counsel
ICE/Denver
4730 Paris Street
Denver, Colorado 80239.

Jonathan Hyman
(print agent's name)

10

Matter of PATEL
In Bond Proceedings
A-20284161
Board of Immigration Appeals
decision, May 7, 1976
15 I. & N. Dec. 666 (BIA 1976); Interim Decision #2491

## Editorial Information: Disposition

Order: The appeal is sustained, and the respondent shall be released from custody of his own recognizance.

## Editorial information: syllabus

(1) Generally, an alien is not and should not be detained or required to post bond except on a finding that he is a threat to the national security, or that he is a poor bail risk.

(2) Where it appeared from the record that respondent was living with his wife and United States citizen child, had worked for the same employer for almost two years and had kept the Immigration and Naturalization Service informed of his address changes; and that respondent had never been arrested or convicted of any crime and had never been involved with narcotics or involved in any subversive or immoral activities, there was no reason to justify holding respondent under even a minimal bond, and respondent was ordered released from custody of his own recognizance.

## Counsel

ON BEHALF OF RESPONDENT: Samuel D. Myers, Esquire Freedman, Freedman & Myers, Ltd. Suite 2812 230 West Monroe Street Chicago, Illinois 60606

## Opinion

## Opinion

The respondent appeals from the February 18, 1976 decision of the immigration judge in which he granted a reduction in bond from the $1,000 set by the district director to $500. The appeal will be sustained.

The statute provides that, pending a determination of deportability, an alien may, upon warrant of the Attorney General, be arrested and taken into custody. Such alien may then, in the discretion of the Attorney General, be continued in custody, released under not less than $500 bond, or released on

Matter of LEON-PEREZ
In Bond Proceedings
A-19570639
Board of Immigration Appeals
decision, April 8, 1975
15 I. & N. Dec. 239 (BIA 1975); Interim Decision #2365

### Editorial Information: Disposition

Order: The record is remanded to the immigration judge for reconsideration and further proceedings consistent with the above opinion.

### Editorial information: syllabus

>8 CFR 103.6(a)(2) provides, in an appropriate case, for a condition of a bond prohibiting unauthorized employment by an alien. The immigration judge denied respondent's request for removal of the employment condition and respondent appealed from that denial. The case is remanded, with general guidelines that the record of proceedings include among other things: written evidence of the bond condition and the Regional Commissioner's approval thereof; evidence of the impact and dislocation of American workers caused by the alien's employment; if applicable, the numbers of aliens working illegally for the particular employer; Service records or other specific information showing dates of prior unauthorized employment by the respondent; and specific information relating to prior orders of deportation against the alien.

### Counsel

ON BEHALF OF RESPONDENT: J. C. Codias, Esquire 1252 W. Peachtree Street, N.W. Atlanta, Georgia 30309

### Opinion

### Opinion

In a decision dated February 18, 1975, the immigration judge denied the respondent's request for removal of the bond condition prohibiting his unauthorized employment in the United States. The respondent has appealed from that decision. The record will be remanded to the immigration judge.

The respondent does not contest the amount of his bond. The only issue on appeal involves the nonemployment rider. Counsel makes various contentions that the imposition of that bond condition violates the due process clause and other provisions of the Constitution.

Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

The authority of the Service to impose a bond condition prohibiting unauthorized employment was at issue in Matter of Toscano-Rivas, >14 I. & N. Dec. 523 (A.G. 1974). In that case, the Attorney General found that section 242 and >section 103 of the Immigration and Nationality Act gave the Service authority, in some circumstances, to impose a bond condition prohibiting unauthorized employment. The Attorney General expressed a concern, however, that there be appropriate substantive safeguards with respect to the imposition of a condition prohibiting employment. He stated that 'before a condition of that nature is imposed, there should be a regulation of the Service dealing specifically with the subject' (p. 61). Since there was no such regulation in existence at the time the bond condition in Toscano-Rivas was imposed, the Attorney General did not sustain that bond condition.

The Attorney General mentioned several reasons why a specific regulation governing nonemployment riders was necessary: (1) in light of the prior history of nonuse of employment conditions by the Service, a regulation would provide a formal basis for the new action, (2) the regulation would provide guidance for Service personnel in imposing bond conditions and would safeguard against abuse of discretion and undue utilization of such bonds conditions, (3) the regulation would provide a standard for administrative and judicial review, (4) the regulation would provide notice of the nonemployment condition to aliens and employers, and (5) promulgation of the regulation would give the Service an opportunity to obtain the views of interested parties and would thereby help to assure the consideration of various points of view.

In response to the Attorney General's opinion in Matter of Toscano-Rivas, the Service has promulgated >8 CFR 103.6(a)(2) . 1    This regulation provides for prior approval by the Regional Commissioner of any condition barring unauthorized employment, and it sets forth nine factors to be considered in connection with the imposition of such a condition. Those factors are considered as examples only and are not exclusive. We are satisfied that the regulations set forth in >8 CFR 103.6(a)(2) are in compliance with the opinion of the Attorney General in Matter of Toscano-Rivas.

Since the present case arose after the effective date of >8 CFR 103.6(a)(2) , the only remaining question is whether that regulation was properly applied here. In considering this question, we are mindful of the fact that bond proceedings, by their very nature, demand flexible procedures in order to prompt determinations may be reached. Consequently, we have always attempted to avoid setting forth rigid procedural or evidentiary requirements which would lessen the ability to arrive at prompt and equitable bond determinations.

On the other hand, we cannot ignore the serious concerns expressed by the Attorney General, and reflected in the regulations, that the utmost care be taken in imposing bond conditions prohibiting employment. Consequently, we are unable to approve of the type of record made below in this case.

Initially, we note that the record contains no copy of the bond condition involved, nor does it contain evidence, other than the trial attorney's oral representation, that the condition has been approved by the Regional Commissioner as specified in >8 CFR 103.6(a)(2) (i) and (ii). While we would not remand the present case for this reason along, we believe that it would be highly desirable to have the record contain extrinsic evidence of the bond condition and the Regional Commissioner's approval.

Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

At the hearing before the immigration judge, the trial attorney discussed the various factors set forth in >8 CFR 103.6(a)(2) (iii). With respect to safeguarding the employment opportunities of United States citizens and lawful permanent residents, and also with respect to the impact and dislocation of American workers caused by the alien's employment, the trial attorney merely asked the immigration judge to take notice of the general state of unemployment in the United States.   2   This does not comply with our reading of the requirements of >8 CFR 103.6(a)(2) (iii). The regulation evidently contemplates that some effort will be made by the Service to show the employment situation in the particular geographic area involved, and what impact the employment of the alien in question area involved, and what impact the employment of the alien in question may be expected to have on that situation. Without intending to limit the manner in which such impact might be demonstrated, we note that employment information obtained from federal, state, or local governments would be particularly convincing.

As to the number of aliens involved, the trial attorney alleged that the respondent's employer, Grief Brothers Company, had a long record of hiring illegal aliens extending over the previous seven years. The trial attorney also alleged that over this period as many as 36, and as few as one, of Grief Brothers' total employment had been made up of illegal aliens, and that 'e very time we go there Grief Brothers, we have found illegal aliens.' The purpose of the regulations governing employment conditions in bonds is not to punish employers for past action in hiring illegal aliens, nor is it to punish aliens for the past action of employers. We construe the regulation's reference to 'the number of aliens involved in performing the unauthorized employment' to relate to the adverse effect on American labor if the respondent is, was, or is likely to become one of a large number of aliens performing unauthorized employment within a particular factory or within a particular industry in a specific geographic location.   3   If the Service has specific information concerning the number of aliens found performing unauthorized employment in a particular factory or industry, it would be helpful if this information were placed in the record to the extent feasible.

The regulation also refers to prior immigration violations by a particular alien relating to acceptance of unauthorized employment, to the likelihood of continued violations by the alien with the same employer and to the acceptance of unauthorized employment shortly after an alien's arrival in the United States. The trial attorney stated that on two prior occasions the respondent had been apprehended working for the same employer. The trial attorney argued that this demonstrated a pattern of illegal employment with the same employer and a likelihood of continuing illegal employment. Although counsel apparently does not dispute the trial attorney's contentions, the present record should, to the extent possible, contain copies of Service records or other specific information showing prior unauthorized employment by this respondent with particular reference to the date of such employment. It would also be appropriate to have the record contain specific information relating to prior orders of deportation entered against the respondent, since this might have a bearing on apparent eligibility for discretionary relief from deportation, another of the factors listed in  >8 CFR 103.6(a)(2) (iii).

Finally, the trial attorney stated that the respondent had no dependents residing in this country and that there were no equities or other factors to consider in the respondent's case. While conceding that the respondent's dependents reside in Mexico, counsel has raised a claim of hardship to the respondent based on the facts of this case. Counsel points out that the respondent is presently also under a $2,000 delivery bond on a criminal charge. Since the criminal charge is apparently not scheduled for determination in the immediate future, and since the Government evidently does not intend to proceed with deportation proceedings until the criminal charges are determined, counsel contends that the respondent will be placed in an untenable position. He will have to choose between violating the employment condition of his immigration bond in order to maintain himself, seeking social assistance, or

Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

absconding and returning to Mexico, thereby forfeiting the bonds in both the criminal and deportation cases. We believe that counsel's contention should have received greater consideration from the immigration judge.

The foregoing comments are designed to deal with the present case and are not necessarily applicable to bond determinations not involving a condition barring employment. No attempt has been made to lay down inflexible rules governing the information to be placed in the record when a nonemployment condition is in issue. However, in a case of this type the record should facilitate prompt and fair review on both administrative and judicial levels. The record will be remanded to the immigration judge for reconsideration in light of the preceding comments.

1  >8 CFR 103.6(a)(2) provides: Bond riders -- (i) General. Bond riders shall be prepared on Form I-351 and attached to Form I-352. If a condition to be included in a bond is not on Form I-351, a rider containing the condition shall be executed and forwarded with Form I-352 to the regional commissioner for approval. (ii) Condition against unauthorized employment. In the discretion of the district director and with the prior approval of the regional commissioner, a condition barring unauthorized employment may be included in an appearance and delivery bond in connection with a deportation proceeding. (iii) Factors to be considered. Among the factors to be considered in connection with the imposition of the bond condition barring unauthorized employment are: Safeguarding employment opportunities for United States citizens and legal resident aliens; impact on and dislocation of American workers by alien's employment; the number of aliens involved in performing the unauthorized employment; prior immigration violations relating to acceptance of unauthorized employment by the alien; the likelihood of continued violations with the same employer; the recentness of the alien's arrival in the United States; the acceptance of the unauthorized employment shortly after such arrival; whether there is a reasonable basis for consideration of discretionary relief; whether a spouse or children are dependent on the alien for support, or other equities exist. These factors are intended as examples only and are not exclusive.

2  We note that counsel maintained that there were no citizens or permanent residents in the locality who were willing to perform the work that the respondent evidently was performing.

3  In Matter of Toscano-Rivas, the Attorney General emphasized that `a basic purpose of the immigration laws is to protect against the displacement of workers in the United States' (p. 58). The specific fact situation at issue in Toscano-Rivas was a `flagrant violation of the immigration laws' by a group of at least ten illegal aliens.

Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

**Matter of SPILIOPOULOS**
**In Bond Proceedings**
**A-21137443**
**Board of Immigration Appeals**
**decision, July 20, 1978**
**16 I. & N. Dec. 561 (BIA 1978); Interim Decision #2661**

### Editorial Information: Disposition

Order: The appeal from the immigration judge's determination setting bond at $2,500 is sustained.

FURTHER ORDER: The motion to release the respondent on his own recognizance is denied.

FURTHER ORDER: The respondent shall be released from custody under the posting of a bond in the amount of $1,500.

### Editorial information: syllabus

(1) The jurisdiction conferred upon an immigration judge under 8 C. F.R. 242.2(b) to redetermine the custody status of a detained alien includes the authority to increase the amount of bond initially set by the District Director.

(2) An alien should not be detained or required to post bond unless there is a finding that he is a threat to national security or a poor bail risk.

(3) Where respondent, an airlines employee, resided in this country a relatively brief period of time (one year), exhibited a disregard for our laws by beginning to work shortly after he was admitted as a nonimmigrant visitor for pleasure, has a wife and child who are here illegally, and does not have the family ties that would entitle him to reside here permanently at some future date, a bond was appropriate.

(4) Reduction in amount of bond found warranted by Board, where there was a lack of any prior immigration or criminal record or history of nonappearance at court proceedings and respondent has a fixed place of residence.

### Counsel

ON BEHALF OF RESPONDENT: Ira J. Kurzban, Esquire Kurzban & Kurzban, P.A. 444 Brickell Avenue, Suite 1101 Miami, Florida 33131

### Judges

Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

BY: Milhollan, Chairman; Appleman, Maguire, and Farb, Board Members

**Opinion**

BY: Milhollan, Chairman; Appleman, Maguire, and Farb, Board Members

**Opinion**

The respondent has appealed from a June 16, 1978, decision of an immigration judge increasing the amount of bond set by the District Director from $1,000 to $2,500. The appeal will be dismissed in part and sustained in part.

In a supplemental memorandum filed in support of the appeal, the respondent raises a threshold legal issue concerning whether an immigration judge (special inquiry offier)  1   has the authority to increase the amount of bond set by the District Director in the first instance.

Under 8 C.F.R. 242.2(b), a respondent who is in custody pursuant to an order of the District Director or one acting on his behalf may, at any time before a deportation order becomes administratively final, apply to an immigration judge for a redetermination of his custody status. See 8 C.F.R. 242.2(b). This regulation provides inter alia that:

A special inquiry officer may exercise the authority contained in  section 242 of the Act to continue or detain a respondent in, or release him from custody, and to determine whether a respondent shall be released under bond, and the amount thereof, if any....

In our opinion, nothing in 8 C.F.R. 242.2(b) precludes an immigration judge from increasing the amount of bond initially set by the District Director where deemed appropriate under the circumstances. To hold otherwise would prevent a full and independent assessment of the necessity for detention and the amount of bond, if any, to insure the presence of the respondent at the deportation hearing. For example, situations may arise where new facts come to light at the bond redetermination hearing that warrant an increase in the amount of bond. Similarly, the immigration judge, as the reviewing authority, may disagree with the District Director with regard to the importance of existing factors. Consequently, we reject the contention advanced by the respondent that the immigration judge lacked the authority to increase the amount of bond initially set by the District Director.  2

The only other issue  3   to be resolved on appeal is whether bond in the amount of $2,500 is appropriate in this particular case. The following facts appear in the record: the respondent, a native and citizen of Argentina, was admitted to the United States approximately one year ago as a nonimmigrant visitor for pleasure; he is employed by Aviateca Airlines in Miami, Florida, having commenced that employment shortly after being admitted as a nonimmigrant visitor; and he has a wife and child in this country with whom he is residing. According to the immigration judge, the respondent's wife and child are in the United States in violation of our immigration laws. There is no evidence that the respondent has a criminal record, a history of immigration violations, or a record of nonappearance at court proceedings.

Immigration (BIA, AAO, etc.) Precedent Decisions                                                    2
Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

An alien should not be detained or required to post bond pending a determination of deportability unless there is a finding that he is a threat to national security or a poor bail risk. See generally Matter of Patel, Interim Decision 2491 (BIA 1976). In determining the necessity for, and the amount of, bond, such factors as a stable employment history, length of residence in the community, the existence of family ties, a record of nonappearance at court proceedings, and previous criminal or immigration law violations are properly considered. See Matter of Patel, supra; Matter of San Martin, Interim Decision 2340 (BIA 1974); Matter of Moise, 12 I. & N. Dec. 102 (BIA 1967); Matter of S Y L, 9 I. & N. Dec. 575 (BIA 1962). (BIA 1962).

Our review of the record leads us to conclude that bond is necessary in this case and that the respondent should not be released on his own recognizance. He has been in this country a relatively brief period of time and has exhibited a disregard for our laws by beginning to work shortly after his arrival. His wife and child are neither United States citizens nor lawful permanent residents. These are not the family ties that entitle the respondent to reside here permanently at some future date. Compare Matter of Patel, supra.

At the same time, we find that the amount of bond set by the immigration judge is excessive under the circumstances of this particular case. The respondent has no prior immigration or criminal record or history of nonappearance at court proceedings and he does appear to have a fixed place of residence, however brief. We are of the opinion that a $1,500 bond is sufficient to insure the respondent's presence at the deportation hearing.

The following orders shall therefore be entered.

1   Under 8 C.F.R. 1.1(1), the terms `immigration judge' and `special inquiry officer' are synonymous.

2   The only reported decision in which an immigration judge reversed a custody determination by the District Director, to the alien's detriment, is Matter of San Martin, Interim Decision 2340 (BIA 1974). Bond had been set initially at $15,000; the immigration judge ordered that the respondent be held without bond. On appeal to the Board, we held that bond in the amount of $15,000 was sufficient. Although we reversed the determination of the immigration judge in this regard, our decision was based solely on the facts of the case. There was no finding that his more restrictive determination was improper.

3   The respondent also contends that the order of the immigration judge must be overturned because it was not accompanied by a memorandum setting forth the reasons for the bond redetermination as required by 8 C.F.R. 242.2(b). A memorandum signed by the immigration judge is of record. However, we note that it is dated June 19, 1978, three days after issuance of the Form I-342, ordering that bond be set at $2,500. It is not apparent that the respondent received a copy of the memorandum. In view of the importance of expeditious resolution of custody matters, it appears to us that the memorandum should be issued contemporaneously with

Immigration (BIA, AAO, etc.) Precedent Decisions                                                      3
Copyright 2008 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All Rights Reserved.

---

**Mousa Elias Salameh SHOKEH, Petitioner-Appellant, v. Caryl THOMPSON; David Venturella; James W. Ziglar; Bureau of Immigration and Customs Enforcement; John Ashcroft, Respondents-Appellees.**
**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**
**375 F.3d 351;2004 U.S. App. LEXIS 14636**
**No. 03-30859**
**June 22, 2004, Decided**

---

**Editorial Information: Prior History**

Appeal from the United States District Court for the Western District of Louisiana, Patricia H. Minaldi, Judge. Shokeh v. Thompson, 369 F.3d 865, 375 F.3d 351, 2004 U.S. App. LEXIS 9087 (5th Cir. La., 2004)

**Disposition:** Vacated and dismissed.

**Counsel**     MOUSA ELIAS SALAMEH SHOKEN, Petitioner - Appellant, Pro se, Lake Charles, LA.

For CARYL THOMPSON, DAVID VENTURELLA, JAMES W ZIGLAR, BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT, JOHN ASHCROFT, Respondents - Appellees: Thomas Burton Thompson, Assistant US Attorney, US Attorney's Office, Western District of Louisiana, Lafayette, LA.

**Judges:** Before HIGGINBOTHAM, DENNIS and CLEMENT, Circuit Judges.

**Opinion**

{375 F.3d 351} PER CURIAM:

Mousa Elias Salameh Shokeh ("Shokeh") appeals the district court's denial of his *pro se* 28 U.S.C. § 2241 habeas petition, arguing that the district court erred in holding that his post-removal-order release was permissibly conditioned on his posting $ 5,000 bond. An opinion in this case was filed on May 10, 2004. Before the mandate was issued, however, facts became available to the Court that renders the case moot: on March 12, 2004, Shokeh was released without bond. As a result, we VACATE the previously filed opinion in this case. *See United States v. Miller,* 685 F.2d 123, 124 (5th Cir.1982). Further, we VACATE the district court's ruling, and DISMISS the action. *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39, 71{375 F.3d 352} S. Ct. 104, 95 L. Ed. 36 (1950); *Murphy v. Fort Worth Indep. Sch. Dist.,* 334 F.3d 470, 471 (5th Cir.2003).

KESTUTIS ZADVYDAS, PETITIONER v. CHRISTINE G. DAVIS AND IMMIGRATION AND NATURALIZATION SERVICE; JOHN D. ASHCROFT, ATTORNEY GENERAL, ET AL., PETITIONERS v. KIM HO MA
SUPREME COURT OF THE UNITED STATES
533 U.S. 678;121 S. Ct. 2491;150 L. Ed. 2d 653;2001 U.S. LEXIS 4912;69 U.S.L.W. 4626;2001 Cal. Daily Op. Service 5455;2001 Daily Journal DAR 6671;2001 Colo. J. C.A.R. 3494;14 Fla. L. Weekly Fed. S 442
Nos. 99-7791 and 00-38
February 21, 2001, Argued
June 28, 2001, Decided

**Editorial Information: Prior History**

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 185 F.3d 279 and 208 F.3d 815, vacated and remanded. Summary

Under 8 USCS 1231(a)(6), the United States Attorney General is authorized to further detain an alien, who has been found to be unlawfully present in the United States, beyond a 90-day statutory removal period during which the government ordinarily secures an alien's removal. Two consolidated cases concerned resident aliens further detained following the 90-day removal period. The first alien--who had been born, apparently of Lithuanian parents, in a displaced-persons camp in Germany--was ordered deported based on his criminal record. However, both Germany and Lithuania refused to accept the alien, on the ground that he was not a citizen of their countries, and efforts to send the alien to the Dominican Republic--the country of his wife--also failed. When the alien remained in custody after the 90-day removal period expired, he filed a habeas corpus action in the United States District Court for the Eastern District of Louisiana and challenged his continued detention. The District Court granted the writ and ordered the alien released under supervision (986 F Supp 1011). However, the United States Court of Appeals for the Fifth Circuit, in reversing, expressed the view that the alien's detention did not violate the Federal Constitution, because (1) his eventual deportation was not impossible, (2) good-faith efforts to remove him from the United States continued, and (3) his detention was subject to periodic administrative review (185 F3d 279). The second alien in question, who had been born in Cambodia, was ordered removed based on his conviction for an aggravated felony. When the second alien remained in custody after the 90-day removal period expired, he filed a federal habeas corpus petition in the United States District Court for the Western District of Washington, which (1) ordered the second alien's release; and (2) expressed the view that (a) the Constitution forbade post-removal-period detention unless there was a realistic chance that an alien would be removed, and (b) no such chance existed in the case of the second alien, because Cambodia had no repatriation treaty with the United States (56 F Supp 2d 1149). The United States Court of Appeals for the Ninth Circuit, in affirming, expressed the view that detention was not authorized for more than a reasonable time beyond the 90-day period (208 F3d 815).
On certiorari, the United States Supreme Court vacated both decisions of the Courts of Appeals and remanded both cases for further proceedings. In an opinion by Breyer, J., joined by Stevens, O'Connor, Souter, and Ginsburg, JJ., it was held that (1) the Attorney General was authorized to detain aliens such as the two in question only for a period reasonably necessary to secure the aliens' removal, as (a)

indefinite detention of such aliens would raise serious concerns under the due process clause of the Constitution's Fifth Amendment, and (b) there was no clear indication of congressional intent to grant the Attorney General the power to hold an alien ordered removed in confinement indefinitely; (2) federal habeas corpus proceedings were available as a forum for the aliens' federal statutory and constitutional challenges to the aliens' detentions; (3) in such a proceeding, a federal court did not have to accept the government's view about whether the implicit statutory limitation contained in 1231(a)(6) was satisfied; (4) in answering the question whether such an alien's detention was, or was not, pursuant to statutory authority, a federal court ought (a) to ask whether the particular circumstances amounted to detention within, or beyond, a period reasonably necessary to secure removal, and (b) to measure reasonableness primarily in terms of the statute's purpose of assuring the alien's presence at the moment of removal; and (5) for the sake of uniform administration in the federal courts, a presumptively reasonable period of detention of 6 months would be recognized.

Scalia, J., joined by Thomas, J., dissenting, expressed the view that (1) the Attorney General had clear statutory authority to detain criminal aliens with no specified time limit; and (2) there are no situations in which the courts can order release, as a criminal alien under final order of removal, who allegedly will not be accepted by any other country in the reasonably foreseeable future, has no right under the Constitution to supervised release into the United States.

Kennedy, J., joined by Rehnquist, Ch. J., and joined in part (as to points 1 and 2 below) by Scalia and Thomas, JJ., dissenting, expressed the view that (1) the statute's authorization of the Attorney General to detain beyond the removal period was not subject to an implied and nontextual limitation that the detention had to be no longer than reasonably necessary to effect removal to another country; (2) the Supreme Court's contrary interpretation of 1231(a)(6) had no basis in the language or structure of the statute and in fact contradicted and defeated the purpose set forth in the express terms of the statutory text; and (3) if judicial review in such cases were to be available, then the inquiry required by the Supreme Court (a) focused on the wrong factors, (b) would require the Executive Branch to surrender its primacy in foreign affairs and to submit reports to the courts respecting its ongoing negotiations in the international sphere, (c) seriously misconceived the proper judicial function, and (d) provided a rule which was not what Congress enacted.

## Syllabus

After a final removal order is entered, an alien ordered removed is held in custody during a 90-day removal period. If the alien is not removed in those 90 days, the post-removal-period detention statute authorizes further detention or supervised release, subject to administrative review. Kestutis Zadvydas, petitioner in No. 99-7791 -- a resident alien born, apparently of Lithuanian parents, in a German displaced persons camp -- was ordered deported based on his criminal record. Germany and Lithuania refused to accept him because he was not a citizen of their countries; efforts to send him to his wife's native country also failed. When he remained in custody after the removal period expired, he filed a habeas action under 28 U.S.C. § 2241. The District Court granted the writ, reasoning that, because the Government would never remove him, his confinement would be permanent, in violation of the Constitution. In reversing, the Fifth Circuit concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not impossible, good faith efforts to remove him continued, and his detention was subject to administrative review. Kim Ho Ma, respondent in No. 00-38, is a resident alien born in Cambodia who was ordered removed based on his aggravated felony conviction. When he remained in custody after the removal period expired, he filed a § 2241 habeas petition. In ordering his release, the District Court held that the Constitution forbids post-removal-period detention unless there is a realistic chance that an alien will be removed, and that no such chance existed here because Cambodia has no repatriation treaty with the United States. The Ninth Circuit affirmed, concluding that detention was not authorized for more than a reasonable time beyond the 90-day period, and that, given the lack of a repatriation agreement, that time

had expired.

*Held:*

1. Section 2241 habeas proceedings are available as a forum for statutory and constitutional challenges to post-removal-period detention. Statutory changes in the immigration law left habeas untouched as the basic method for obtaining review of continued custody after a deportation order becomes final, and none of the statutory provisions limiting judicial review of removal decisions applies here. Pp. 6-8.

2. The post-removal-period detention statute, read in light of the Constitution's demands, implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States, and does not permit indefinite detention. Pp. 8-19.

(a) A statute permitting indefinite detention would raise serious constitutional questions. Freedom from imprisonment lies at the heart of the liberty protected by the Due Process Clause. Government detention violates the Clause unless it is ordered in a criminal proceeding with adequate procedural safeguards or a special justification outweighs the individual's liberty interest. The instant proceedings are civil and assumed to be nonpunitive, and the Government proffers no sufficiently strong justification for indefinite civil detention under this statute. The first justification -- preventing flight -- is weak or nonexistent where removal seems a remote possibility. Preventive detention based on the second justification -- protecting the community -- has been upheld only when limited to specially dangerous individuals and subject to strong procedural protections. When preventive detention is potentially indefinite, this dangerousness rationale must also be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. The civil confinement here is potentially permanent, and once the flight risk justification evaporates, the only special circumstance is the alien's removable status, which bears no relation to dangerousness. Moreover, the sole procedural protections here are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (according to the Government) significant later judicial review. The Constitution may well preclude granting an administrative body unreviewable authority to make determinations implicating fundamental rights. Pp. 8-12.

(b) *Shaughnessy* v. *United States ex rel. Mezei,* 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 -- in which an alien was indefinitely detained as he attempted to reenter the country -- does not support the Government's argument that alien status itself can justify indefinite detention. Once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent. Nor do cases holding that, because Congress has plenary power to create immigration law, the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area help the Government, because that power is subject to constitutional limits. Finally, the aliens' liberty interest is not diminished by their lack of a legal right to live at large, for the choice at issue here is between imprisonment and supervision under release conditions that may not be violated and their liberty interest is strong enough to raise a serious constitutional problem with indefinite detention. Pp. 12-16.

(c) Despite the constitutional problem here, if this Court were to find a clear congressional intent to grant the Attorney General the power to indefinitely detain an alien ordered removed, the Court would be required to give it effect. But this Court finds no clear indication of such intent. The statute's use of "may" is ambiguous and does not necessarily suggest unlimited discretion. Similar related statutes requiring

---

Immigration Cases Disc 2                                                                 3

detention of criminal aliens during removal proceedings and the removal period do not show that Congress authorized indefinite detention here. Finally, nothing in the statute's legislative history clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Pp. 16-19.

3. The application of the "reasonable time" limitation is subject to federal-court review. The basic federal habeas statute grants the federal courts authority to determine whether post-removal-period detention is pursuant to statutory authority. In answering that question, the court must ask whether the detention exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's purpose of assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized. If it is foreseeable, the court should consider the risk of the alien's committing further crimes as a factor potentially justifying continued confinement. Without abdicating their responsibility to review the detention's lawfulness, the courts can take appropriate account of such matters as the Executive Branch's greater immigration-related expertise, the Immigration and Naturalization Service's administrative needs and concerns, and the Nation's need to speak with one voice on immigration. In order to limit the occasions when courts will need to make the difficult judgments called for by the recognition of this necessary Executive leeway, it is practically necessary to recognize a presumptively reasonable period of detention. It is unlikely that Congress believed that all reasonably foreseeable removals could be accomplished in 90 days, but there is reason to believe that it doubted the constitutionality of more than six months' detention. Thus, for the sake of uniform administration in the federal courts, six months is the appropriate period. After the 6-month period, once an alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must furnish evidence sufficient to rebut that showing. Pp. 19-22.

4. The standard that the Fifth Circuit applied in holding Zadvydas' continued detention lawful seems to require an alien seeking release to show the absence of *any* prospect of removal -- no matter how unlikely or unforeseeable -- and thus demands more than the statute can bear. The Ninth Circuit's conclusion that Ma should be released may have rested solely upon the absence of a repatriation agreement without giving due weight to the likelihood of successful future negotiations. P. 22.

185 F.3d 279 and 208 F.3d 815, vacated and remanded.

**Counsel**                    Robert F. Barnard argued the cause for petitioner Zadvydas.
                               Jay W. Stansell argued the cause for respondent Ma.
                               Edwin S. Kneedler argued the cause for respondents in No 99-7791 and petitioners in No. 00-38.
**Judges:** BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, and in which SCALIA and THOMAS, JJ., joined as to Part I.

**Opinion**

**Opinion by:**          **BREYER**

**Opinion**

{121 S. Ct. 2494} {150 L. Ed. 2d 662} {533 U.S. 682} *JUSTICE BREYER* delivered the opinion of the Court.

{150 L. Ed. 2d LEdHR1A} [1A]When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90-day statutory "removal period," during which time the alien normally is held in custody.

{121 S. Ct. 2495} A special statute authorizes further detention if the Government fails to remove the alien during those 90 days. It says:

"An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . . ." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

In these cases, we must decide whether this post-removal-period statute authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal. We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question. See *infra*, at 12-14. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit "reasonable time" limitation, the application of which is subject to federal court review.

{533 U.S. 683} I

A

The post-removal-period detention statute is one of a related set of statutes and regulations that govern detention during and after removal proceedings. While removal proceedings are in progress, most aliens may be released on bond or paroled. 66 Stat. 204, as added and amended, 110 Stat. 3009-585, 8 U.S.C. §§ 1226 (a)(2), (c) (1994 ed., Supp. V). After entry of a final removal order and during the 90-day removal period, however, aliens must be held in custody. § 1231(a)(2). Subsequently, as the post-removal-period statute provides, the Government "may" continue to detain an alien who still remains here or release that alien under supervision. § 1231(a)(6).

Related Immigration and Naturalization Service (INS) regulations add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90-day removal period expires. 8 CFR §§ 241.4(c)(1), (h), (k)(1)(i) (2001). If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3-month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, {150 L. Ed. 2d 663} between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight. {533 U.S. 684} § 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).

---

B

1

We consider two separate instances of detention. The first concerns Kestutis Zadvydas, a resident alien who was born, apparently of Lithuanian parents, in a displaced persons camp in Germany in 1948. When he was eight years old, Zadvydas immigrated to the United States with his {121 S. Ct. 2496} parents and other family members, and he has lived here ever since.

Zadvydas has a long criminal record, involving drug crimes, attempted robbery, attempted burglary, and theft. He has a history of flight, from both criminal and deportation proceedings. Most recently, he was convicted of possessing, with intent to distribute, cocaine; sentenced to 16 years' imprisonment; released on parole after two years; taken into INS custody; and, in 1994, ordered deported to Germany. See 8 U.S.C. § 1251(a)(2) (1988 ed., Supp. V) (delineating crimes that make alien deportable).

In 1994, Germany told the INS that it would not accept Zadvydas because he was not a German citizen. Shortly thereafter, Lithuania refused to accept Zadvydas because he was neither a Lithuanian citizen nor a permanent resident. In 1996, the INS asked the Dominican Republic (Zadvydas' wife's country) to accept him, but this effort proved unsuccessful. In 1998, Lithuania rejected, as inadequately documented, Zadvydas' effort to obtain Lithuanian citizenship based on his parents' citizenship; Zadvydas' reapplication is apparently still pending.

The INS kept Zadvydas in custody after expiration of the removal period. In September 1995, Zadvydas filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging {533 U.S. 685} his continued detention. In October 1997, a Federal District Court granted that writ and ordered him released under supervision. Zadvydas v. Caplinger, 986 F. Supp. 1011, 1027-1028 (ED La.). In its view, the Government would never succeed in its efforts to remove Zadvydas from the United States, leading to his permanent confinement, contrary to the Constitution. Id. at 1027.

The Fifth Circuit reversed this decision. Zadvydas v. Underdown, 185 F.3d 279 (1999). It concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not "impossible," good faith efforts to remove him from the United States continued, and his detention was subject to periodic {150 L. Ed. 2d 664} administrative review. Id. at 294, 297. The Fifth Circuit stayed its mandate pending potential review in this Court.

2

The second case is that of Kim Ho Ma. Ma was born in Cambodia in 1977. When he was two, his family fled, taking him to refugee camps in Thailand and the Philippines and eventually to the United States, where he has lived as a resident alien since the age of seven. In 1995, at age 17, Ma was involved in a gang-related shooting, convicted of manslaughter, and sentenced to 38 months' imprisonment. He served two years, after which he was released into INS custody.

In light of his conviction of an "aggravated felony," Ma was ordered removed. See 8 U.S.C. §§ 1101(a)(43)(F) (defining certain violent crimes as aggravated felonies), 1227(a)(2)(A)(iii) (1994 ed., Supp. IV) (aliens convicted of aggravated felonies are deportable). The 90-day removal period expired in early 1999, but the INS continued to keep Ma in custody, because, in light of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike, it was "unable to conclude that {533 U.S. 686} Mr. Ma would remain nonviolent and not violate the conditions of release." App. to Pet. for Cert. in No. 00-38, p. 87a.

In 1999 Ma filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. A panel of five judges in the Federal District Court for the Western District of Washington, considering Ma's and about 100 similar cases together, issued a joint order holding that the Constitution forbids post-removal-period

detention unless there is "a realistic chance that [the] alien will be deported" (thereby permitting classification of the detention as "in aid of deportation"). *Binh Phan* v. *Reno,* 56 F. Supp. 2d 1149, 1156 (1999). The District Court then held an evidentiary hearing, decided that there was no "realistic chance" that Cambodia {121 S. Ct. 2497} (which has no repatriation treaty with the United States) would accept Ma, and ordered Ma released. App. to Pet. for Cert. in No. 00-38, at 60a-61a.

The Ninth Circuit affirmed Ma's release. *Kim Ho Ma* v. *Reno,* 208 F.3d 815 (2000). It concluded, based in part on constitutional concerns, that the statute did not authorize detention for more than a "reasonable time" beyond the 90-day period authorized for removal. Id. at 818. And, given the lack of a repatriation agreement with Cambodia, that time had expired upon passage of the 90 days. Id. at 830-831.

Zadvydas asked us to review the decision of the Fifth Circuit authorizing his continued detention. The Government asked us to review the decision of the Ninth Circuit forbidding Ma's continued detention. We granted writs in both cases, agreeing to consider both statutory and related constitutional questions. See also *Duy Dac Ho* v. *Greene,* 204 F.3d 1045, 1060 (CA10 2000) (upholding Attorney General's statutory and constitutional authority to detain alien indefinitely). We consolidated the two cases for argument; and we now decide them together.

{533 U.S. 687} II

{150 L. Ed. 2d LEdHR2} [2]We note at the outset that the {150 L. Ed. 2d 665} primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases. See § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States"). Before 1952, the federal courts considered challenges to the lawfulness of immigration-related detention, including challenges to the validity of a deportation order, in habeas proceedings. See *Heikkila* v. *Barber,* 345 U.S. 229, 230, 235-236, 97 L. Ed. 972, 73 S. Ct. 603 (1953). Beginning in 1952, an alternative method for review of *deportation orders,* namely actions brought in federal district court under the Administrative Procedure Act (APA), became available. See *Shaughnessy* v. *Pedreiro,* 349 U.S. 48, 51-52, 99 L. Ed. 868, 75 S. Ct. 591 (1955). And in 1961 Congress replaced district court APA review with initial *deportation order* review in courts of appeals. See Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U.S.C. § 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts were also available to hear statutory and constitutional challenges to *deportation* (and exclusion) *orders.* See 8 U.S.C. §§ 1105a(a)(10), (b) (repealed 1996). These statutory changes left habeas untouched as the basic method for obtaining review of continued *custody after* a deportation order had become final. See *Cheng Fan Kwok* v. *INS,* 392 U.S. 206, 212, 215-216, 20 L. Ed. 2d 1037, 88 S. Ct. 1970 (1968) (holding that § 1105a(a) applied only to challenges to determinations made during deportation proceedings and motions to reopen those proceedings).

More recently, Congress has enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available. But none applies here. One provision, 8 U.S.C. § 1231(h) (1994 ed., Supp. V), simply forbids courts to construe *that section* "to create any . . . procedural right or benefit that is legally enforceable"; {533 U.S. 688} it does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority.

Another provision, 8 U.S.C. § 1252 (a)(2)(B)(ii) (1994 ed., Supp. V), says that "no court shall have jurisdiction to review" decisions "specified . . . to be in the discretion of the Attorney General." The aliens here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion. See also, *e.g.,* § 1226(e) (applicable to certain detention-related decisions *in period preceding* {121 S. Ct. 2498} *entry* of final

removal order); § 1231(a)(4)(D) (applicable to assertion of causes or claims *under § 1231(a)(4)*, which is not at issue here); §§ 1252(a)(1), (a)(2)(C) (applicable to judicial review of "final orders of removal"); § 1252(g) (applicable to decisions "to commence proceedings, adjudicate cases, or execute removal orders").

We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional {150 L. Ed. 2d 666} challenges to post-removal-period detention. And we turn to the merits of the aliens' claims.

III

{150 L. Ed. 2d LEdHR1B} [1B]The post-removal-period detention statute applies to certain categories of aliens who have been ordered removed, namely inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V); see also 8 CFR § 241.4(a) (2001). It says that an alien who falls into one of these categories {533 U.S. 689} "may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

The Government argues that the statute means what it literally says. It sets no "limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained." Brief for Petitioners in No. 00-38, p. 22. Hence, "whether to continue to detain such an alien and, if so, in what circumstances and for how long" is up to the Attorney General, not up to the courts.

{150 L. Ed. 2d LEdHR1C} [1C]{150 L. Ed. 2d LEdHR3} [3]*Ibid.*

"It is a cardinal principle" of statutory interpretation, however, that when an Act of Congress raises "a serious doubt" as to its constitutionality, "this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285 (1932); see also *United States* v. *X-Citement Video, Inc.,* 513 U.S. 64, 78, 130 L. Ed. 2d 372, 115 S. Ct. 464 (1994); *United States* v. *Jin Fuey Moy,* 241 U.S. 394, 401, 60 L. Ed. 1061, 36 S. Ct. 658 (1916); cf. *Almendarez-Torres* v. *United States,* 523 U.S. 224, 238, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998) (construction of statute that avoids invalidation best reflects congressional will). We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation. See *United States* v. *Witkovich,* 353 U.S. 194, 195, 202, 1 L. Ed. 2d 765, 77 S. Ct. 779 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deems fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For similar reasons, we read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

{533 U.S. 690} A{150 L. Ed. 2d LEdHR1D} [1D]{150 L. Ed. 2d LEdHR4}[4]A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to "deprive" any "person . . . of . . . liberty . . . without due process of law." Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that {150 L. Ed. 2d 667} Clause protects. See *Foucha* v. *Louisiana,* 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). And this Court has said that government {121 S. Ct. 2499} detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, see *United States* v. *Salerno,* 481 U.S.

739, 746, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987), or, in certain special and "narrow" non-punitive "circumstances," *Foucha, supra,* at 80, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint." *Kansas* v. *Hendricks,* 521 U.S. 346, 356, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). {150 L. Ed. 2d LEdHR1E} [1E]The proceedings at issue here are civil, not criminal, and we assume that they are nonpunitive in purpose and effect. There is no sufficiently strong special justification here for indefinite civil detention -- at least as administered under this statute. The statute, says the Government, has two regulatory goals: "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." Brief for Respondents in No. 99-7791, p. 24. But by definition the first justification -- preventing flight -- is weak or nonexistent where removal seems a remote possibility at best. As this Court said in *Jackson* v. *Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972), where detention's goal is no longer practically attainable, detention no longer "bears [a] reasonable relation to the purpose for which the individual [was] committed." Id. at 738.

The second justification -- protecting the community -- does not necessarily diminish in force over time. But we have {533 U.S. 691} upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections. Compare *Hendricks, supra,* at 368 (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards") and *Salerno, supra,* at 747, 750-752 (in upholding pretrial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards), with *Foucha, supra,* at 81-83 (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness). In cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. See *Hendricks, supra,* at 358, 368.

The civil confinement here at issue is not limited, but potentially permanent. Cf. *Salerno, supra,* at 747 (noting that "maximum length of pretrial detention is limited" by "stringent" requirements); *Carlson* v. *Landon,* 342 U.S. 524, 545-546, 96 L. Ed. 547, 72 S. Ct. 525 (1952) (upholding temporary detention of alien during deportation proceeding while noting that "problem of . . . unusual delay" was {150 L. Ed. 2d 668} not present). The provision authorizing detention does not apply narrowly to "a small segment of particularly dangerous individuals," *Hendricks, supra,* at 368, say suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations. See 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V) (referencing § 1227(a)(1)(C)); cf. *Hendricks,* 521 U.S. at 357-358 (only individuals with "past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future" may be detained). And, once the flight risk justification evaporates, the only special circumstance {533 U.S. 692} present is the alien's removable status itself, which bears no relation to a detainee's dangerousness. Cf. id. at 358; *Foucha, supra,* at 82.

Moreover, the sole procedural protections available to the alien are found in {121 S. Ct. 2500} administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (in the Government's view) significant later judicial review. Compare 8 CFR § 241.4(d)(1) (2001) (imposing burden of proving nondangerousness upon alien) with *Foucha, supra,* at 82 (striking down insanity-related detention for that very reason). This Court has suggested, however, that the Constitution may well preclude granting "an administrative body the unreviewable authority to make determinations implicating fundamental rights." *Superintendent, Mass. Correctional Institution at Walpole* v. *Hill,* 472 U.S. 445, 450, 86 L. Ed. 2d 356, 105 S. Ct. 2768 (1985) (O'CONNOR, J.); see also *Crowell,* 285 U.S. at 87 (Brandeis, J., dissenting) ("Under certain circumstances, the constitutional requirement of due process is a requirement of judicial process"). The Constitution

demands greater procedural protection even for property. See *South Carolina* v. *Regan,* 465 U.S. 367, 393, 79 L. Ed. 2d 372, 104 S. Ct. 1107 (1984) (O'CONNOR, J., concurring in judgment); *Phillips* v. *Commissioner,* 283 U.S. 589, 595-597, 75 L. Ed. 1289, 51 S. Ct. 608 (1931) (Brandeis, J.). The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious.

The Government argues that, from a constitutional perspective, alien status itself can justify indefinite detention, and points to *Shaughnessy* v. *United States ex rel. Mezei,* 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), as support. That case involved a once lawfully admitted alien who left the United States, returned after a trip abroad, was refused admission, and was left on Ellis Island, indefinitely detained there because the Government could not find another country to accept him. The Court held that Mezei's detention did not violate the Constitution. Id. at 215-216.

{533 U.S. 693} Although *Mezei,* like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was {150 L. Ed. 2d 669} "treated," for constitutional purposes, "as if stopped at the border." Id. at 213, 215. And that made all the difference.{150 L. Ed. 2d LEdHR1F} [1F]{150 L. Ed. 2d LEdHR5}[5]{150 L. Ed. 2d LEdHR6}[6]The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. See *Kaplan* v. *Tod,* 267 U.S. 228, 230, 69 L. Ed. 585, 45 S. Ct. 257 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Leng May Ma* v. *Barber,* 357 U.S. 185, 188-190, 2 L. Ed. 2d 1246, 78 S. Ct. 1072 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"). It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. See *United States* v. *Verdugo-Urquidez,* 494 U.S. 259, 269, 108 L. Ed. 2d 222, 110 S. Ct. 1056 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson* v. *Eisentrager,* 339 U.S. 763, 784, 94 L. Ed. 1255, 70 S. Ct. 936 (1950) (same). But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. See *Plyler* v. *Doe,* 457 U.S. 202, 210, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982); *Mathews* v. *Diaz,* 426 U.S. 67, 77, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976); *Kwong Hai Chew* v. *Colding,* 344 U.S. 590, 596-598, 97 L. Ed. 576, 73 S. Ct. 472, and n. 5 (1953); *Yick Wo* v. *Hopkins,* 118 U.S. 356, 369, 30 L. Ed. {121 S. Ct. 2501} 220, 6 S. Ct. 1064 (1886); cf. *Mezei, supra,* at 212 ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Indeed, this Court has held that the Due Process {533 U.S. 694} Clause protects an alien subject to a final order of deportation, see *Wong Wing* v. *United States,* 163 U.S. 228, 238, 41 L. Ed. 140, 16 S. Ct. 977 (1896), though the nature of that protection may vary depending upon status and circumstance, see *Landon* v. *Plasencia,* 459 U.S. 21, 32-34, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982); *Johnson, supra,* at 770.{150 L. Ed. 2d LEdHR1G} [1G]In *Wong Wing, supra,* the Court held unconstitutional a statute that imposed a year of hard labor upon aliens subject to a final deportation order. That case concerned substantive protections for aliens who had been ordered removed, not procedural protections for aliens whose removability was being determined. Compare *post,* at 2-3 (SCALIA, J., dissenting). The Court held that punitive measures could not be imposed upon aliens ordered removed because "all persons within the territory of the United States are entitled to the protection" of the Constitution. 163 U.S. at 238 (citing *Yick Wo, supra,* at 369 (holding that equal protection guarantee applies to Chinese aliens)); see also *Witkovich,* 353 U.S. at 199, 201 (construing statute which applied to aliens ordered deported in order to avoid substantive constitutional problems). And contrary to JUSTICE SCALIA's characterization, see *post,* at 2-4, in

*Mezei* {150 L. Ed. 2d 670} itself, both this Court's rejection of Mezei's challenge to the procedures by which he was deemed excludable and its rejection of his challenge to continued detention rested upon a basic territorial distinction. See *Mezei, supra*, at 215 (holding that Mezei's presence on Ellis Island was not "considered a landing" and did "not affect" his legal or constitutional status (internal quotation marks omitted)).

In light of this critical distinction between *Mezei* and the present cases, *Mezei* does not offer the Government significant support, and we need not consider the aliens' claim that subsequent developments have undermined *Mezei*'s legal authority. See Brief for Petitioner in No. 99-7791, p. 23; Brief for Respondent in No. 00-38, pp. 16-17; Brief for Lawyers' Committee for Human Rights as *Amicus Curiae* in No. 00-38, pp. 15-20. Nor are we aware of any other authority that would support JUSTICE KENNEDY's limitation of {533 U.S. 695} due process protection for removable aliens to freedom from detention that is arbitrary or capricious. See *post*, at 14-18 (dissenting opinion).

The Government also looks for support to cases holding that Congress has "plenary power" to create immigration law, and that the judicial branch must defer to executive and legislative branch decisionmaking in that area. Brief for Respondents in No. 99-7791, at 17, 20 (citing *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589, 96 L. Ed. 586, 72 S. Ct. 512 (1952)). But that power is subject to important constitutional limitations. See *INS* v. *Chadha*, 462 U.S. 919, 941-942, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983) (Congress must choose "a constitutionally permissible means of implementing" that power); *The Chinese Exclusion Case*, 130 U.S. 581, 604, 32 L. Ed. 1068, 9 S. Ct. 623 (1889) (congressional authority limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). In these cases, we focus upon those limitations. In doing so, we nowhere deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions. See 8 U.S.C. § 1231(a)(3) (1994 ed., Supp. V) (granting authority to Attorney General to prescribe regulations governing supervision of aliens not removed within 90 days); § 1253 (imposing penalties for failure to comply with {121 S. Ct. 2502} release conditions). The question before us is not one of "'conferring on those admitted the right to remain against the national will'" or "'sufferance of aliens'" who should be removed. *Post*, at 2 (SCALIA, J., dissenting) (quoting *Mezei*, 345 U.S. at 222-223 (Jackson, J., dissenting)). Rather, the issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.

Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no "unprotected spot in the Nation's {533 U.S. 696} armor." *Kwong Hai Chew, supra*, at 602. Neither do we consider terrorism or other special circumstances where {150 L. Ed. 2d 671} special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security. The sole foreign policy consideration the Government mentions here is the concern lest courts interfere with "sensitive" repatriation negotiations. Brief for Respondents in No. 99-7791, at 21. But neither the Government nor the dissents explain how a habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect. See *infra*, at 18-19.

Finally, the Government argues that, whatever liberty interest the aliens possess, it is "greatly diminished" by their lack of a legal right to "live at large in this country." Brief for Respondents in No. 99-7791, at 47; see also *post*, at 2-3 (SCALIA, J., dissenting) (characterizing right at issue as "right of release into this country"). The choice, however, is not between imprisonment and the alien "living at large." Brief for Respondents in No. 99-7791, at 47. It is between imprisonment and supervision under release conditions that may not be violated. See *supra*, at 14 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V)); 8 CFR § 241.5 (2001) (establishing conditions of release after removal period).

And, for the reasons we have set forth, we believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, cf. *post*, at 18-21 (KENNEDY, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent.

B

Despite this constitutional problem, if "Congress has made its intent" in the statute "clear, 'we must give effect to that intent.'" *Miller* v. *French,* 530 U.S. 327, 336, 147 L. Ed. 2d 326, 120 S. Ct. 2246 (2000) (quoting *Sinclair Refining Co.* v. *Atkinson,* 370 U.S. 195, 215, 8 L. Ed. 2d 440, 82 S. Ct. 1328 (1962)). {533 U.S. 697} We cannot find here, however, any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed. And that is so whether protecting the community from dangerous aliens is a primary or (as we believe) secondary statutory purpose. Cf. *post*, at 4, 5-6 (KENNEDY, J., dissenting). After all, the provision is part of a statute that has as its basic purpose effectuating an alien's removal. Why should we assume that Congress saw the alien's dangerousness as unrelated to this purpose?

{150 L. Ed. 2d LEdHR7} [7]The Government points to the statute's word "may." But while "may" suggests discretion, it does not necessarily suggest unlimited discretion. In that respect the word "may" is ambiguous. Indeed, if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms. Compare 8 U.S.C. § 1537(b)(2)(C) (1994 ed., Supp. V) ("If no country is willing to receive" a terrorist alien ordered removed, "the Attorney General may, notwithstanding any other provision of law, retain the alien in {121 S. Ct. 2503} {150 L. Ed. 2d 672} custody" and must review the detention determination every six months).

{150 L. Ed. 2d LEdHR1H} [1H]The Government points to similar related statutes that *require* detention of criminal aliens during removal proceedings and the removal period, and argues that these show that mandatory detention is the rule while discretionary release is the narrow exception. See Brief for Petitioners in No. 00-38, at 26-28 (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)). But the statute before us applies not only to terrorists and criminals, but also to ordinary visa violators, see *supra*, at 11; and, more importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point.

The Government also points to the statute's history. That history catalogs a series of changes, from an initial period (before 1952) when lower courts had interpreted statutory {533 U.S. 698} silence, Immigration Act of 1917, ch. 29, §§ 19, 20, 39 Stat. 889, 890, to mean that deportation-related detention must end within a reasonable time, *Spector* v. *Landon,* 209 F.2d 481, 482 (CA9 1954) (collecting cases); *United States ex rel. Doukas* v. *Wiley,* 160 F.2d 92, 95 (CA7 1947); *United States ex rel. Ross* v. *Wallis,* 279 F. 401, 403-404 (CA2 1922), to a period (from the early 1950's through the late 1980's) when the statutes permitted, but did not require, post-deportation-order detention for up to six months, Immigration and Nationality Act of 1952, § 242(c), 66 Stat. 210, 8 U.S.C. §§ 1252(c),(d) (1982 ed.); *Witkovich,* 353 U.S. at 198, to more recent statutes that have at times mandated and at other times permitted the post-deportation-order detention of aliens falling into certain categories such as aggravated felons, Anti-Drug Abuse Act of 1988, § 7343(a), 102 Stat. 4470, 8 U.S.C. § 1252(a)(2) (mandating detention); Immigration Act of 1990, § 504(a), 104 Stat. 5049-5050, 8 U.S.C. §§ 1252(a)(2)(A), (B) (permitting release under certain circumstances); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), 105 Stat. 1751, 8 U.S.C. § 1252(a)(2)(B) (same).

In early 1996, Congress explicitly expanded the group of aliens subject to mandatory detention, eliminating provisions that permitted release of criminal aliens who had at one time been lawfully admitted to the United States. Antiterrorism and Effective Death Penalty Act of 1996, § 439(c), 110 Stat. 1277. And later that year Congress enacted the present law, which liberalizes pre-existing law by

shortening the removal period from six months to 90 days, mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90-day removal period, and adds the post-removal-period provision here at issue. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, §§ 303, 305, 110 Stat. 3009-585, 3009-598 to 3009-599; 8 U.S.C. §§ 1226(c), 1231(a) (1994 ed., Supp. V).

{533 U.S. 699} We have found nothing in the history of these statutes that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently, {150 L. Ed. 2d 673} interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute. See 1 E. Coke, Institutes *70b ("Cessante ratione legis cessat ipse lex") (the rationale of a legal rule no longer being applicable, that rule itself no longer applies).

IV

{150 L. Ed. 2d LEdHR8} [8]The Government seems to argue that, even under our interpretation of the statute, a federal habeas court would have to accept the Government's view about whether the implicit statutory limitation is satisfied in a particular case, conducting little or no independent review of the matter. In our view, that is not so. Whether {121 S. Ct. 2504} a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority. The basic federal habeas corpus statute grants the federal courts authority to answer that question. See 28 U.S.C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of the . . . laws . . . of the United States"). In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely "to relieve detention by executive authorities without judicial trial." Brown v. Allen, 344 U.S. 443, 533, 97 L. Ed. 469, 73 S. Ct. 397 (1953) (Jackson, J., concurring in result).

In answering that basic question, the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no {533 U.S. 700} longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions. See supra, at 14 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V); 8 CFR § 241.5 (2001)). And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period. See supra, at 10-11.

We recognize, as the Government points out, that review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to "speak with one voice" in immigration matters. Brief for Respondents in No. 99-7791, at 19. But we believe that courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention.

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert {150 L. Ed. 2d 674} agencies decisionmaking leeway in matters that invoke their expertise. See Pension Benefit Guaranty Corporation v. LTV Corp., 496 U.S. 633, 651-652, 110 L. Ed. 2d 579, 110 S. Ct. 2668 (1990). They recognize Executive Branch primacy in foreign policy matters. See Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 196, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations,

are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit {533 U.S. 701} the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention. We have adopted similar presumptions in other contexts to guide lower court determinations. See *Chefl* v. *Schnackenberg,* 384 U.S. 373, 379-380, 16 L. Ed. 2d 629, 86 S. Ct. 1523 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside* v. *McLaughlin,* 500 U.S. 44, 56-58, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991) (O'CONNOR, J.) (adopting presumption, {121 S. Ct. 2505} based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. See Juris. Statement of United States in *United States* v. *Witkovich* , O. T. 1956, No. 295, pp. 8-9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

{533 U.S. 702} V{150 L. Ed. 2d LEdHR1l} [1l]{150 L. Ed. 2d LEdHR9}[9]The Fifth Circuit held Zadvydas' continued detention lawful as long as "good faith efforts to effectuate . . . deportation continue" and Zadvydas failed to show that deportation will prove "impossible." 185 F.3d at 294, 297.But this standard would seem to require an alien seeking release to show the absence of *any* prospect of removal -- no matter how unlikely or unforeseeable -- {150 L. Ed. 2d 675} which demands more than our reading of the statute can bear. The Ninth Circuit held that the Government was required to release Ma from detention because there was no reasonable likelihood of his removal in the foreseeable future. 208 F.3d at 831. But its conclusion may have rested solely upon the "absence" of an "extant or pending" repatriation agreement without giving due weight to the likelihood of successful future negotiations. See id. at 831, and n. 30. Consequently, we vacate the decisions below and remand both cases for further proceedings consistent with this opinion.

It is so ordered.

## Dissent

**Dissent by:**        SCALIA; KENNEDY
*JUSTICE SCALIA*, with whom JUSTICE THOMAS joins, dissenting.
I join Part I of JUSTICE KENNEDY's dissent, which establishes the Attorney General's clear statutory authority to detain criminal aliens with no specified time limit. I write separately because I do not believe that, as JUSTICE KENNEDY suggests in Part II of his opinion, there may be some situations in which the courts can order release. I believe that in both *Zadvydas* v. *Davis,* No. 99-7791, and *Ashcroft* v. *Ma,* No. 00-38, a "careful description" of the substantive right claimed, *Reno* v. *Flores,* 507 U.S. 292, 302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993), suffices categorically to refute its existence. A

criminal alien under final order of removal who allegedly will not be accepted by any other country in the reasonably foreseeable future claims a constitutional right of supervised release into the United States. This claim can be repackaged as freedom {533 U.S. 703} from "physical restraint" or freedom from "indefinite detention," *ante*, at 9, but it is at bottom a claimed right of release into this country by an individual who *concededly* has no legal right to be here. There is no such constitutional right. Like a criminal alien under final order of removal, an inadmissible alien at the border has no right to be in the United States. *The Chinese Exclusion Case*, 130 U.S. 581, 603, 32 L. Ed. 1068, 9 S. Ct. 623 (1889). In *Shaughnessy* v. *United States ex rel. Mezei*, {121 S. Ct. 2506} 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), we upheld potentially indefinite detention of such an inadmissible alien whom the Government was unable to return anywhere else. We said that "we [did] not think that respondent's continued exclusion deprives him of any statutory or constitutional right." Id. at 215. While four members of the Court thought that Mezei deserved greater procedural protections (the Attorney General had refused to divulge any information as to why Mezei was being detained, id. at 209), no Justice asserted that Mezei had a substantive constitutional right to release into this country. And Justice Jackson's dissent, joined by Justice Frankfurter, affirmatively asserted the opposite, with no contradiction from the Court: "Due process does not invest any alien with a right to enter the United States, *nor confer on those admitted the right to remain against the national will*. Nothing in the Constitution requires admission *or sufferance* of aliens hostile to our scheme of government." Id. at 222-223 (emphasis added). {150 L. Ed. 2d 676} Insofar as a claimed legal right to release into this country is concerned, an alien under final order of removal stands on an equal footing with an inadmissible alien at the threshold of entry: He has no such right.

The Court expressly declines to apply or overrule *Mezei*, *ante*, at 14, but attempts to distinguish it -- or, I should rather say, to obscure it in a legal fog. First, the Court claims that "the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Ante*, at 13. True enough, but only where that distinction makes perfect {533 U.S. 704} sense: with regard to the question of what *procedures* are necessary to prevent entry, as opposed to what *procedures* are necessary to eject a person already in the United States. See, *e.g.*, *Landon* v. *Plasencia*, 459 U.S. 21, 32, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982) ("Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing *when threatened with deportation*" (emphasis added)). The Court's citation of *Wong Wing* v. *United States*, 163 U.S. 228, 41 L. Ed. 140, 16 S. Ct. 977 (1896), for the proposition that we have "held that the Due Process Clause protects an alien subject to a final order of deportation," *ante*, at 13, is arguably relevant. That case at least involved aliens under final order of deportation. * But all it held is that they could not be subjected to the punishment of hard labor without a judicial trial. I am sure they cannot be tortured, as well -- but neither prohibition has anything to do with their right to be released into the United States. Nor does *Wong Wing* show that the rights of detained aliens subject to final order of deportation are different from the rights of aliens arrested and detained at the border -- unless the Court believes that the detained alien in *Mezei could* have been set to hard labor.
*

The Court also cites *Landon* v. *Plasencia*, 459 U.S. 21, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982), as oblique support for the claim that the due process protection afforded aliens under final order of removal "may vary depending upon status and circumstance." *Ante*, at 13. But that case is entirely inapt because it did not involve an alien subject to a final order of deportation. The Court also cites *Johnson* v. *Eisentrager*, 339 U.S. 763, 770, 94 L. Ed. 1255, 70 S. Ct. 936 (1950), ante, at 13, but that case is doubly irrelevant: because it dealt not with deportation but with the military's detention of enemy aliens outside the territorial jurisdiction of the United States, and because it rejected habeas corpus jurisdiction anyway.

*Mezei* thus stands unexplained and undistinguished by the Court's opinion. We are offered no justification why an alien under a valid and final order of removal -- which has *totally extinguished* whatever right to presence in this country he possessed -- has any greater due process right to be

---

released into the country than an alien at the border seeking entry. {533 U.S. 705} Congress undoubtedly thought that both groups of aliens -- inadmissible aliens at the threshold and criminal aliens under final order of removal -- could be constitutionally {121 S. Ct. 2507} detained on the same terms, since it provided the authority to detain both groups in the very same statutory provision, see 8 U.S.C. § 1231(a)(6). Because I believe *Mezei* controls these cases, and, like the Court, I also see no reason to reconsider *Mezei*, I find no constitutional {150 L. Ed. 2d 677} impediment to the discretion Congress gave to the Attorney General. JUSTICE KENNEDY's dissent explains the clarity of the detention provision, and I see no obstacle to following the statute's plain meaning.

*JUSTICE KENNEDY*, with whom The CHIEF JUSTICE joins, and with whom JUSTICE SCALIA and JUSTICE THOMAS join as to Part I, dissenting.

The Court says its duty is to avoid a constitutional question. It deems the duty performed by interpreting a statute in obvious disregard of congressional intent; curing the resulting gap by writing a statutory amendment of its own; committing its own grave constitutional error by arrogating to the Judicial Branch the power to summon high officers of the Executive to assess their progress in conducting some of the Nation's most sensitive negotiations with foreign powers; and then likely releasing into our general population at least hundreds of removable or inadmissible aliens who have been found by fair procedures to be flight risks, dangers to the community, or both. Far from avoiding a constitutional question, the Court's ruling causes systemic dislocation in the balance of powers, thus raising serious constitutional concerns not just for the cases at hand but for the Court's own view of its proper authority. Any supposed respect the Court seeks in not reaching the constitutional question is outweighed by the intrusive and erroneous exercise of its own powers. In the guise of judicial restraint the Court ought not to intrude upon the other branches. The constitutional question the statute presents, it must be acknowledged, {533 U.S. 706} may be a significant one in some later case; but it ought not to drive us to an incorrect interpretation of the statute. The Court having reached the wrong result for the wrong reason, this respectful dissent is required.

I

The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* (1994 ed. and Supp. V), is straightforward enough. It provides:

"An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp V).

By this statute, Congress confers upon the Attorney General discretion to detain an alien ordered removed. It gives express authorization to detain "beyond the removal period." *Ibid.* The class of removed aliens detainable under the section includes aliens who were inadmissible and aliens subject to final orders of removal, provided they are a risk to the community or likely to flee. The issue to be determined is whether the authorization to detain beyond the removal period is subject to the implied, nontextual limitation that the detention be no longer than reasonably necessary to effect removal to another country. The majority invokes the canon of constitutional {150 L. Ed. 2d 678} doubt to read that implied term into the statute. One can accept the premise that a substantial constitutional question is presented by the prospect of lengthy, even unending, detention in some instances; but the statutory construction the Court adopts should be rejected in any event. The interpretation has no basis in the language {533 U.S. 707} or structure of the INA and in fact contradicts and defeats the purpose set forth in the express terms of the statutory text.

{121 S. Ct. 2508} The Court, it is submitted, misunderstands the principle of constitutional avoidance which it seeks to invoke. The majority gives a brief bow to the rule that courts must respect the intention of Congress, *ante*, at 16, but then waltzes away from any analysis of the language, structure, or purpose of the statute. Its analysis is not consistent with our precedents explaining the limits of the constitutional doubt rule. The rule allows courts to choose among constructions which are "fairly