possible," *Crowell* v. *Benson,* 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285 (1932), not to "'press statutory construction to the point of disingenuous evasion even to avoid a constitutional question,'" *Salinas* v. *United States,* 522 U.S. 52, 60, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997) (quoting *Seminole Tribe of Fla.* v. *Florida,* 517 U.S. 44, 57, n. 9, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996)). Were a court to find two interpretations of equal plausibility, it should choose the construction that avoids confronting a constitutional question. The majority's reading of the statutory authorization to "detain beyond the removal period," however, is not plausible. An interpretation which defeats the stated congressional purpose does not suffice to invoke the constitutional doubt rule, for it is "plainly contrary to the intent of Congress." *United States* v. *X-Citement Video, Inc.,* 513 U.S. 64, 78, 130 L. Ed. 2d 372, 115 S. Ct. 464 (1994). The majority announces it will reject the Government's argument "that the statute means what it literally says," *ante,* at 8, but then declines to offer any other acceptable textual interpretation. The majority does not demonstrate an ambiguity in the delegation of the detention power to the Attorney General. It simply amends the statute to impose a time limit tied to the progress of negotiations to effect the aliens' removal. The statute cannot be so construed. The requirement the majority reads into the law simply bears no relation to the text; and in fact it defeats the statutory purpose and design.

{533 U.S. 708} Other provisions in § 1231 itself do link the requirement of a reasonable time period to the removal process. See, *e.g.,* § 1231(c)(1)(A) (providing that an alien who arrives at a port of entry "shall be removed immediately on a vessel or aircraft" unless "it is impracticable" to do so "within a *reasonable* time" (emphasis added)); § 1231(c)(3)(A)(ii)(II) (requiring the "owner of a vessel or aircraft bringing an alien to the United States [to] pay the costs of detaining and maintaining the alien . . . for the period of time *reasonably necessary* for the owner to arrange for repatriation" (emphasis added)). That Congress chose to impose the limitation in these sections and not in § 1231(a)(6) is evidence of its intent to measure the detention period by other standards. When Congress has made express provisions for the contingency that repatriation might be difficult or prolonged in other portions {150 L. Ed. 2d 679} of the statute, it should be presumed that its omission of the same contingency in the detention section was purposeful. Indeed, the reasonable time limits in the provisions just mentioned simply excuse the duty of early removal. They do not mandate release. An alien within one of these categories, say, a ship stowaway, would be subject as well to detention beyond the removal period under § 1231(a)(6), if the statute is read as written. Under the majority's view, however, it appears the alien must be released in six months even if presenting a real danger to the community.

The 6-month period invented by the Court, even when modified by its sliding standard of reasonableness for certain repatriation negotiations, see *ante,* at 21, makes the statutory purpose to protect the community ineffective. The risk to the community exists whether or not the repatriation negotiations have some end in sight; in fact, when the negotiations end, the risk may be greater. The authority to detain beyond the removal period is to protect the community, not to negotiate the aliens' return. The risk to the community {121 S. Ct. 2509} survives repatriation negotiations. To a more limited, but still significant, extent, so does the concern with flight. It {533 U.S. 709} is a fact of international diplomacy that governments and their policies change; and if repatriation efforts can be revived, the Attorney General has an interest in ensuring the alien can report so the removal process can begin again.

Congress, moreover, was well aware of the difficulties confronting aliens who are removable but who cannot be repatriated. It made special provisions allowing them to be employed, a privilege denied to other deportable aliens. See § 1231(a)(7) (providing an "alien [who] cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien" still remains eligible for employment in the United States). Congress' decision to ameliorate the condition of aliens subject to a final order of removal who cannot be repatriated, but who need not be detained, illustrates a balance in the statutory design. Yet the Court renders the other side of the balance meaningless. The risk to the community posed by a removable alien is a function of a variety of circumstances, circumstances that do not diminish just because the alien cannot be deported within some

foreseeable time. Those circumstances include the seriousness of the alien's past offenses, his or her efforts at rehabilitation, and some indication from the alien that, given the real prospect of detention, the alien will conform his or her conduct. This is the purpose for the periodic review of detention status provided for by the regulations. See 8 CFR § 241.4 (2001). The Court's amendment of the statute reads out of the provision the congressional decision that dangerousness alone is a sufficient basis for detention, see *ante*, at 19 (citing 1 E. Coke, Institutes *70b), and reads out as well any meaningful structure for supervised release.

The majority is correct to observe that in *United States* v. *Witkovich,* 353 U.S. 194, 1 L. Ed. 2d 765, 77 S. Ct. 779 (1957), the Court "read significant limitations into" a statute, *ante*, at 9, but that does not permit us to avoid the proper reading of the enactment now before us. In *Witkovich*, the Court {150 L. Ed. 2d 680} construed former § 1252(d), which required an alien under a final order of deportation {533 U.S. 710} "to give information under oath . . . as the Attorney General may deem fit and proper." 353 U.S. at 195. The Court held that although the plain language "appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens whose deportation has not been effected within six months," id. at 199, the constitutional doubt this interpretation would raise meant the language would be construed as limited to the provision of information "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue," id. at 202. In *Witkovich* the interpretation of the text was in aid of the statutory purpose; in the instant cases the interpretation nullifies the statutory purpose. Here the statute by its own terms permits the Attorney General to consider factors the Court now makes irrelevant.

The majority's unanchored interpretation ignores another indication that the Attorney General's detention discretion was not limited to this truncated period. Section 1231(a)(6) permits continued detention not only of removable aliens but also of inadmissible aliens, for instance those stopped at the border before entry. Congress provides for detention of both categories within the same statutory grant of authority. Accepting the majority's interpretation, then, there are two possibilities, neither of which is sustainable. On the one hand, it may be that the majority's rule applies to both categories of aliens, in which case we are asked to assume that Congress intended to restrict the discretion it could confer upon the Attorney General so that all inadmissible aliens {121 S. Ct. 2510} must be allowed into our community within six months. On the other hand, the majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility. As a result, it is difficult to see why "aliens who have not yet gained initial admission {533 U.S. 711} to this country would present a very different question." *Ante*, at 2.

Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters. See, *e.g.*, *Wong Wing* v. *United States,* 163 U.S. 228, 235, 41 L. Ed. 140, 16 S. Ct. 977 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation"). It is reasonable to assume, then, and it is the proper interpretation of the INA and § 1231(a)(6), that when Congress provided for detention "beyond the removal period," it exercised its considerable power over immigration and delegated to the Attorney General the discretion to detain inadmissible and other removable aliens for as long as they are determined to be either a flight risk or a danger to the Nation. The majority's interpretation, moreover, defeats the very repatriation goal in which it professes such {150 L. Ed. 2d 681} interest. The Court rushes to substitute a judicial judgment for the Executive's discretion and authority. As the Government represents to us, judicial orders requiring release of removable aliens, even on a temporary basis, have the potential to undermine the obvious necessity that the Nation speak with one voice on immigration and foreign affairs matters. Brief for Respondents in No. 99-7791, p. 49. The result of the Court's rule is that, by refusing to accept repatriation of their own nationals, other countries can effect the release of these individuals back into the American

community. *Ibid.* If their own nationals are now at large in the United States, the nation of origin may ignore or disclaim responsibility to accept their return. *Ibid.* The interference with sensitive foreign relations becomes even more acute where hostility or tension characterizes the relationship, for other countries can use the fact of judicially mandated release to their strategic advantage, refusing the return of their nationals {533 U.S. 712} to force dangerous aliens upon us. One of the more alarming aspects of the Court's new venture into foreign affairs management is the suggestion that the district court can expand or contract the reasonable period of detention based on its own assessment of the course of negotiations with foreign powers. The Court says it will allow the Executive to perform its duties on its own for six months; after that, foreign relations go into judicially supervised receivership. The cases which the Court relies upon to support the imposition of presumptions are inapposite. The rule announced in *Chefl* v. *Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S. Ct. 1523 (1966) -- "that sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial" -- was based on the definition of a "petty offense" that was still operable in the United States Code, and was proper "under the peculiar power of the federal courts to revise sentences in contempt cases." Id. at 380. The majority can point to no similar statutory or judicial source for its authority to create its own time-based rule in these cases. It cites only an observation in a brief filed by the Government in *United States* v. *Witkovich,* O. T. 1956, No. 295, pp. 8-9, see *ante,* at 21, relying, in turn, on doubts expressed in a 1952 Senate Report concerning detention for longer than six months under an Act with standards different, and far less precise, than those applicable here. In *County of Riverside* v. *McLaughlin,* 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991), our {121 S. Ct. 2511} reasonableness presumption for delays of less than 48 hours between an arrest and a probable cause hearing was, as the majority recognizes, *ante,* at 21, based on the "Court of Appeals' determination of the time required to complete those procedures." 500 U.S. at 57. Here, as far as we know, the 6-month period bears no particular relationship to how long it now takes to deport any group of aliens, or, for that matter, how long it took in the past to remove. Zadvydas' case itself demonstrates that the repatriation process may often take years to {533 U.S. 713} negotiate, involving difficult issues of establishing citizenship and the like. See Brief for Petitioner in No. 99-7791, pp. 17-20.

It is to be expected that from time {150 L. Ed. 2d 682} to time a foreign power will adopt a truculent stance with respect to the United States and other nations. Yet the Court by its time limit, or presumptive time limit, goes far to undercut the position of the Executive in repatriation negotiations, thus ill serving the interest of all foreign nationals of the country concerned. Law-abiding aliens might wish to return to their home country, for instance, but the strained relationship caused by the difficult repatriation talks might prove to be a substantial obstacle for these aliens as well.

In addition to weakening the hand of our Government, court ordered release cannot help but encourage dilatory and obstructive tactics by aliens who, emboldened by the Court's new rule, have good reason not to cooperate by making their own repatriation or transfer seem foreseeable. An alien ordered deported also has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an Immigration and Naturalization Service (INS) detention facility. Neither the alien nor his family would find any urgency in assisting with a petition to other countries to accept the alien back if the alien could simply remain in the United States indefinitely.

The risk to the community posed by the mandatory release of aliens who are dangerous or a flight risk is far from insubstantial; the motivation to protect the citizenry from aliens determined to be dangerous is central to the immigration power itself. The Government cites statistical studies showing high recidivism rates for released aliens. One Government Accounting Office study cited by Congress in floor debates on the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, put the figure as high as 77 percent. 142 Cong. Rec. 7972 (1996); Brief for Respondents in {533 U.S. 714} No. 99-7791, at 27, n. 13. It seems evident a criminal record accumulated by an admitted alien during his or her time in the United States is likely to be a better indicator of risk than factors relied upon

---

during the INS's initial decision to admit or exclude. Aliens ordered deported as the result of having committed a felony have proved to be dangerous.

Any suggestion that aliens who have completed prison terms no longer present a danger simply does not accord with the reality that a significant risk may still exist, as determined by the many factors set forth in the regulations. See 8 CFR § 241.4(f) (2001). Underworld and terrorist links are subtle and may be overseas, beyond our jurisdiction to impose felony charges. Furthermore, the majority's rationale seems to apply to an alien who flees prosecution or escapes from custody in some other country. The fact an alien can be deemed inadmissible because of fraud at the time of entry does not necessarily distinguish his or her case from an alien whose entry was legal. Consider, for example, a fugitive alien who enters by fraud or stealth and resides here for five years with significant ties to the community, though still presenting a danger; contrast him with an alien who entered lawfully but a month later committed an act making him removable. Why the Court's rationale should apply to the second alien but not the first is not apparent.

{121 S. Ct. 2512} The majority cannot come to terms with these distinctions under its own {150 L. Ed. 2d 683} rationale. The rule the majority creates permits consideration of nothing more than the reasonable foreseeability of removal. See *ante*, at 19-20. That standard is not only without sound basis in the statutory structure, but also is not susceptible to customary judicial inquiry. Cf. *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 425, 143 L. Ed. 2d 590, 119 S. Ct. 1439 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions"). The majority does say that the release of terrorists or other "special circumstances" might justify "heightened deference to the judgments of the political {533 U.S. 715} branches with respect to matters of national security." *Ante*, at 15-16. Here the Court appears to rely on an assessment of risk, but this is the very premise it finds inadequate to sustain the natural reading of the statute. The Court ought not to reject a rationale in order to deny power to the Attorney General and then invoke the same rationale to save its own analysis.

This rule of startling breadth invites potentially perverse results. Because other nations may refuse to admit aliens who have committed certain crimes -- see, *e.g.,* Brief for Petitioner in No. 99-7791, at 19 ("Lithuanian law precludes granting of citizenship to persons who, before coming to Lithuania, have been sentenced in another state to imprisonment for a deliberate crime for which criminal liability is imposed by the laws of the Republic of Lithuania" (citations and internal quotation marks omitted)) -- often the aliens who have committed the most serious crimes will be those who may be released immediately under the majority's rule. An example is presented in the case of Saroeut Ourk, a Cambodian alien determined to be removable and held pending deportation. See *Ourk* v. *INS,* No. 00-35645 (CA9, Sept. 18, 2000), cert. pending, No. 00-987. Ourk was convicted of rape by use of drugs in conjunction with the kidnaping of a 13-year-old girl; after serving 18 months of his prison term, he was released on parole but was returned to custody twice more for parole violations. Pet. for Cert. in No. 00-987, pp. 4-5. When he was ordered deported and transferred to the custody of the INS, it is no surprise the INS determined he was both a flight risk and a danger to the community. Yet the Court of Appeals for the Ninth Circuit concluded, based on its earlier decision in *Kim Ho Ma* v. *Reno,* 208 F.3d 815 (2000), that Ourk could no longer be held pending deportation, since removal to Cambodia was not reasonably foreseeable. App. to Pet. for Cert. in No. 00-987, pp. 3a-4a. See also *Phetsany* v. *INS,* No. 00-16286 (CA9, Sept. 18, 2000), cert. pending, No. 00-986 (requiring release of a native and {533 U.S. 716} citizen of Laos convicted of attempted, premeditated murder); *Mounsaveng* v. *INS,* No. 00-15309 (CA9, Aug. 11, 2000), cert. pending, No. 00-751 (releasing a citizen of Laos convicted of rape of a 15-year-old girl and reckless endangerment for involvement in a fight in which gunshots were fired); *Lim* v. *Reno,* No. 99-36191 (CA9, Aug. 14, 2000), cert. pending, No. 00-777 (releasing a Cambodian convicted of rape and robbery); *Phuong Phuc Le* v. *INS,* No. 00-16095 (CA9, Sept. 18, 2000), cert. pending, No. 00-1001 (releasing a Vietnamese citizen convicted of voluntary manslaughter {150 L. Ed. 2d 684} in a crime involving the attempted murder of two other persons). Today's result will ensure these dangerous individuals, and hundreds more like them, will

---

remain free while the Executive Branch tries to secure their removal. By contrast, aliens who violate mere tourist visa requirements, *ante*, at 11, can in the typical case be held pending deportation on grounds that a minor offender is more likely to be removed. There is no reason to suppose Congress intended this odd result.

The majority's rule is not limited to aliens once lawfully admitted. Today's result may well mandate the release of those {121 S. Ct. 2513} aliens who first gained entry illegally or by fraud, and, indeed, is broad enough to require even that inadmissible and excludable aliens detained at the border be set free in our community. In *Rosales-Garcia* v. *Holland*, 238 F.3d 704, 725 (CA6 2001), for example, Rosales, a Cuban citizen, arrived in this country during the 1980 Mariel boatlift. Id. at 707. Upon arrival in the United States, Rosales was released into the custody of a relative under the Attorney General's authority to parole illegal aliens,  see 8 U.S.C. § 1182(d)(5)(A), and there he committed multiple crimes for which he was convicted and imprisoned. 238 F.3d at 707-708. While serving a sentence for burglary and grand larceny, Rosales escaped from prison, another of the offenses {533 U.S. 717} for which he ultimately served time. Id. at 708. The INS eventually revoked Rosales' immigration parole, ordered him deported, and held him pending deportation, subject to periodic consideration for parole under the Cuban Review Plan. See 8 CFR § 212.12(g)(2) (2001). In reasoning remarkably similar to the majority's, the Court of Appeals for the Sixth Circuit held that the indefinite detention of Rosales violated Fifth Amendment due process rights, because "the government offered . . . no credible proof that there is any possibility that Cuba may accept Rosales's return anytime in the foreseeable future." 238 F.3d at 725. This result -- that Mariel Cubans and other illegal, inadmissible aliens will be released notwithstanding their criminal history and obvious flight risk -- would seem a necessary consequence of the majority's construction of the statute.

The majority's confidence that the Judiciary will handle these matters "with appropriate sensitivity," *ante*, at 16, 20, allows no meaningful category to confine or explain its own sweeping rule, provides no justification for wresting this sovereign power away from the political branches in the first place, and has no support in judicially manageable standards for deciding the foreseeability of removal.

It is curious that the majority would approve of continued detention beyond the 90-day period, or, for that matter, during the 90-day period, where deportation is not reasonably foreseeable. If the INS cannot detain an alien because he is dangerous, it would seem irrelevant to the Constitution or to the majority's presumption that the INS has detained the alien for only a little while. The reason detention is permitted at all is that a removable alien does not have the same liberty interest as a citizen does. The Court cannot bring itself to acknowledge this established proposition. Likewise, {150 L. Ed. 2d 685} it is far from evident under the majority's theory why the INS can condition and supervise the release of aliens who are not removable in the reasonably foreseeable future, or why "the alien may no doubt be returned to custody upon {533 U.S. 718} a violation of those conditions." Id. at 20. It is true that threat of revocation of supervised release is necessary to make the supervised release itself effective, a fact even counsel for Zadvydas acknowledged. Brief for Petitioner in No. 99-7791, at 20-21. If that is so, however, the whole foundation for the Court's position collapses.

The Court today assumes a role in foreign relations which is unprecedented, unfortunate, and unwise. Its misstep results in part from a misunderstanding of the liberty interests these aliens retain, an issue next to be discussed.

II

The aliens' claims are substantial; their plight is real. They face continued detention, perhaps for life, unless it is shown they no longer present a flight risk or a danger to the community. In a later case the specific circumstances of a detention may present a substantial constitutional question. That is not a reason, however, for framing a rule which ignores the law governing alien status.

{121 S. Ct. 2514} As persons within our jurisdiction, the aliens are entitled to the protection of the Due Process Clause. Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention. The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens, however. See, *e.g.*, *Mathews* v. *Diaz*, 426 U.S. 67,

79-80, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens"). No party to this proceeding contests the initial premise that the aliens have been determined to be removable after a fair hearing under lawful and proper procedures. Section 1229a sets forth the proceedings required for deciding the inadmissibility or removability of an alien, including a hearing before an immigration judge, at which the INS carries "the burden of establishing by clear and convincing evidence that . . . the alien is deportable." 8 U.S.C. § 1229a(c)(3)(A); {533 U.S. 719} see also *Berenyi* v. *District Director, INS,* 385 U.S. 630, 636, 17 L. Ed. 2d 656, 87 S. Ct. 6661 (1967) ("When the Government seeks to . . . deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by clear, unequivocal, and convincing evidence" (internal quotation marks and footnotes omitted)). Aliens ordered removed pursuant to these procedures are given notice of their right to appeal the decision, 8 U.S.C. § 1229a(c)(4), may move the immigration judge to reconsider, § 1229a(c)(5), can seek discretionary cancellation of removal, § 1229b, and can obtain habeas review of the Attorney General's decision not to consider waiver of deportation. See *INS* v. *St. Cyr, ante,* at __ (2001) (slip op., at 24). As a result, aliens like Zadvydas and Ma do not arrive at their removable status without thorough, substantial procedural safeguards.

The majority likely is correct to {150 L. Ed. 2d 686} say that the distinction between an alien who entered the United States, as these aliens did, and one who has not, "runs throughout immigration law." *Ante,* at 13. The distinction is not so clear as it might seem, however, and I doubt it will suffice to confine the rationale adopted by the majority. The case which often comes to mind when one tests the distinction is *Shaughnessy* v. *United States ex rel. Mezei,* 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), where the Court considered the situation of an alien denied entry and detained on Ellis Island. The detention had no foreseeable end, for though Mezei was inadmissible to the United States it seemed no other country would have him. Id. at 209. The case presented a line-drawing problem, asking whether the alien was in our country; or whether his situation was the same as if he were still on foreign shores; or whether he fell in a legal category somewhere in between, though if this were true, it still would not be clear how to resolve the case. The Court held the alien had no right to a hearing to secure his release. Id. at 212-213. (Approximately 17 months after this Court denied Mezei relief, the Attorney General released him on parole. It appears Mezei {533 U.S. 720} never returned to INS custody, though he was not admitted to the United States as a citizen or lawful permanent resident. See Weisselberg, The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L. Rev. 933, 979-984 (1995)).

Here the majority says the earlier presence of these aliens in the United States distinguishes the cases from *Mezei.* For reasons given here it is submitted the majority is incorrect in its major conclusions in all events, so even if it were assumed these aliens are in a class with more rights than *Mezei,* it makes no difference. For purposes of this dissent it is not necessary to rely upon *Mezei.* That said, it must be made clear these aliens are in a position far different from aliens with a lawful right to remain here. {121 S. Ct. 2515} They are removable, and their rights must be defined in accordance with that status. The due process analysis must begin with a "careful description of the asserted right." *Reno* v. *Flores,* 507 U.S. 292, 302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). We have "long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon* v. *Plasencia,* 459 U.S. 21, 32, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982). The same is true for those aliens like Zadvydas and Ma, who face a final order of removal. When an alien is removable, he or she has no right under the basic immigration laws to remain in this country. The removal orders reflect the determination that the aliens' ties to this community are insufficient to justify their continued presence in the United States. An alien's admission to this country is conditioned upon compliance with our laws, and removal is the consequence of a breach of that understanding.

It is true the Court has accorded more procedural protections to those aliens admitted to the country than those stopped at the border, observing that "a continuously present alien is entitled to a fair

hearing {150 L. Ed. 2d 687} when threatened with {533 U.S. 721} deportation." Ibid.; *Mezei, supra*, at 212 ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law . . . . But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned'" (quoting *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 544, 94 L. Ed. 317, 70 S. Ct. 309 (1950))). Removable and excludable aliens are situated differently before an order of removal is entered; the removable alien, by virtue of his continued presence here, possesses an interest in remaining, while the excludable alien seeks only the privilege of entry.

Still, both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish. See *Wong Wing* v. *United States,* 163 U.S. 228, 41 L. Ed. 140, 16 S. Ct. 977 (1896). This accords with international views on detention of refugees and asylum seekers. See Report of the United Nations Working Group on Arbitrary Detention, U. N. Doc. E/CN.4/2000/4 (Dec. 28, 1999); United Nations High Commissioner for Refugees, Guidelines on Applicable Criteria and Standards Relating to the Detention on Asylum-Seekers (Feb. 10, 1999). It is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community.

Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large. The procedures {533 U.S. 722} to determine and to review the status-required detention go far toward this objective.

By regulations, promulgated after notice and comment, the Attorney General has given structure to the discretion delegated by the INA in order to ensure fairness and regularity in INS detention decisions. First, the INS provides for an initial postcustody review, before the expiration of the 90-day removal period, at which a district director conducts a record review. 8 CFR § 241.4 (2001). The alien is entitled to present any relevant information in {121 S. Ct. 2516} support of release, and the district director has the discretion to interview the alien for a personal evaluation. § 241.4(h)(1). At the end of the 90-day period, the alien, if held in custody, is transferred to a postorder detention unit at INS headquarters, which in the ordinary course will conduct an initial custody review within three months of the transfer. § 241.4(k)(2)(ii). If the INS determines the alien should remain in detention, a two-member panel of INS officers interviews the alien and makes a recommendation to INS headquarters. §§ 241.4(i)(1)-(3). The regulations provide an extensive, {150 L. Ed. 2d 688} nonexhaustive list of factors that should be considered in the recommendation to release or further detain. Those include: "the nature and number of disciplinary infractions"; "the detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history"; "psychiatric and psychological reports pertaining to the detainee's mental health"; "evidence of rehabilitation"; "favorable factors, including ties to the United States such as the number of close relatives"; "prior immigration violations and history"; "the likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes"; and any other probative information. § 241.4(f). Another review must occur within one year, with mandatory evaluations each year thereafter; if the alien requests, {533 U.S. 723} the INS has the discretion to grant more frequent reviews. § 241.4(k)(2)(iii). The INS must provide the alien 30-days advance, written notice of custody reviews; and it must afford the alien an opportunity to submit any relevant materials for consideration. § 241.4(i)(3)(ii). The alien may be assisted by a representative of his choice during the review, §§ 241.4(i)(3)(i), (ii), and the INS must provide the alien with a copy of its decision, including a brief statement of the reasons for any continued detention, § 241.4(d).

KESTUTIS ZADVYDAS, PETITIONER v. CHRISTINE G. DAVIS AND IMMIGRATION AND NATURALIZATION SERVICE; JOHN D. ASHCROFT, ATTORNEY GENERAL, ET AL., PETITIONERS v. KIM HO MA
SUPREME COURT OF THE UNITED STATES
533 U.S. 678;121 S. Ct. 2491;150 L. Ed. 2d 653;2001 U.S. LEXIS 4912;69 U.S.L.W. 4626;2001 Cal. Daily Op. Service 5455;2001 Daily Journal DAR 6671;2001 Colo. J. C.A.R. 3494;14 Fla. L. Weekly Fed. S 442
Nos. 99-7791 and 00-38
February 21, 2001, Argued
June 28, 2001, Decided

**Editorial Information: Prior History**

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 185 F.3d 279 and 208 F.3d 815, vacated and remanded.  Summary

Under 8 USCS 1231(a)(6), the United States Attorney General is authorized to further detain an alien, who has been found to be unlawfully present in the United States, beyond a 90-day statutory removal period during which the government ordinarily secures an alien's removal. Two consolidated cases concerned resident aliens further detained following the 90-day removal period. The first alien--who had been born, apparently of Lithuanian parents, in a displaced-persons camp in Germany--was ordered deported based on his criminal record. However, both Germany and Lithuania refused to accept the alien, on the ground that he was not a citizen of their countries, and efforts to send the alien to the Dominican Republic--the country of his wife--also failed. When the alien remained in custody after the 90-day removal period expired, he filed a habeas corpus action in the United States District Court for the Eastern District of Louisiana and challenged his continued detention. The District Court granted the writ and ordered the alien released under supervision (986 F Supp 1011). However, the United States Court of Appeals for the Fifth Circuit, in reversing, expressed the view that the alien's detention did not violate the Federal Constitution, because (1) his eventual deportation was not impossible, (2) good-faith efforts to remove him from the United States continued, and (3) his detention was subject to periodic administrative review (185 F3d 279). The second alien in question, who had been born in Cambodia, was ordered removed based on his conviction for an aggravated felony. When the second alien remained in custody after the 90-day removal period expired, he filed a federal habeas corpus petition in the United States District Court for the Western District of Washington, which (1) ordered the second alien's release; and (2) expressed the view that (a) the Constitution forbade post-removal-period detention unless there was a realistic chance that an alien would be removed, and (b) no such chance existed in the case of the second alien, because Cambodia had no repatriation treaty with the United States (56 F Supp 2d 1149). The United States Court of Appeals for the Ninth Circuit, in affirming, expressed the view that detention was not authorized for more than a reasonable time beyond the 90-day period (208 F3d 815).
On certiorari, the United States Supreme Court vacated both decisions of the Courts of Appeals and remanded both cases for further proceedings. In an opinion by Breyer, J., joined by Stevens, O'Connor, Souter, and Ginsburg, JJ., it was held that (1) the Attorney General was authorized to detain aliens such as the two in question only for a period reasonably necessary to secure the aliens' removal, as (a)

indefinite detention of such aliens would raise serious concerns under the due process clause of the Constitution's Fifth Amendment, and (b) there was no clear indication of congressional intent to grant the Attorney General the power to hold an alien ordered removed in confinement indefinitely; (2) federal habeas corpus proceedings were available as a forum for the aliens' federal statutory and constitutional challenges to the aliens' detentions; (3) in such a proceeding, a federal court did not have to accept the government's view about whether the implicit statutory limitation contained in 1231(a)(6) was satisfied; (4) in answering the question whether such an alien's detention was, or was not, pursuant to statutory authority, a federal court ought (a) to ask whether the particular circumstances amounted to detention within, or beyond, a period reasonably necessary to secure removal, and (b) to measure reasonableness primarily in terms of the statute's purpose of assuring the alien's presence at the moment of removal; and (5) for the sake of uniform administration in the federal courts, a presumptively reasonable period of detention of 6 months would be recognized.

Scalia, J., joined by Thomas, J., dissenting, expressed the view that (1) the Attorney General had clear statutory authority to detain criminal aliens with no specified time limit; and (2) there are no situations in which the courts can order release, as a criminal alien under final order of removal, who allegedly will not be accepted by any other country in the reasonably foreseeable future, has no right under the Constitution to supervised release into the United States.

Kennedy, J., joined by Rehnquist, Ch. J., and joined in part (as to points 1 and 2 below) by Scalia and Thomas, JJ., dissenting, expressed the view that (1) the statute's authorization of the Attorney General to detain beyond the removal period was not subject to an implied and nontextual limitation that the detention had to be no longer than reasonably necessary to effect removal to another country; (2) the Supreme Court's contrary interpretation of 1231(a)(6) had no basis in the language or structure of the statute and in fact contradicted and defeated the purpose set forth in the express terms of the statutory text; and (3) if judicial review in such cases were to be available, then the inquiry required by the Supreme Court (a) focused on the wrong factors, (b) would require the Executive Branch to surrender its primacy in foreign affairs and to submit reports to the courts respecting its ongoing negotiations in the international sphere, (c) seriously misconceived the proper judicial function, and (d) provided a rule which was not what Congress enacted.

### Syllabus

After a final removal order is entered, an alien ordered removed is held in custody during a 90-day removal period. If the alien is not removed in those 90 days, the post-removal-period detention statute authorizes further detention or supervised release, subject to administrative review. Kestutis Zadvydas, petitioner in No. 99-7791 – a resident alien born, apparently of Lithuanian parents, in a German displaced persons camp -- was ordered deported based on his criminal record. Germany and Lithuania refused to accept him because he was not a citizen of their countries; efforts to send him to his wife's native country also failed. When he remained in custody after the removal period expired, he filed a habeas action under 28 U.S.C. § 2241. The District Court granted the writ, reasoning that, because the Government would never remove him, his confinement would be permanent, in violation of the Constitution. In reversing, the Fifth Circuit concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not impossible, good faith efforts to remove him continued, and his detention was subject to administrative review. Kim Ho Ma, respondent in No. 00-38, is a resident alien born in Cambodia who was ordered removed based on his aggravated felony conviction. When he remained in custody after the removal period expired, he filed a § 2241 habeas petition. In ordering his release, the District Court held that the Constitution forbids post-removal-period detention unless there is a realistic chance that an alien will be removed, and that no such chance existed here because Cambodia has no repatriation treaty with the United States. The Ninth Circuit affirmed, concluding that detention was not authorized for more than a reasonable time beyond the 90-day period, and that, given the lack of a repatriation agreement, that time

had expired.

*Held:*

1. Section 2241 habeas proceedings are available as a forum for statutory and constitutional challenges to post-removal-period detention. Statutory changes in the immigration law left habeas untouched as the basic method for obtaining review of continued custody after a deportation order becomes final, and none of the statutory provisions limiting judicial review of removal decisions applies here. Pp. 6-8.

2. The post-removal-period detention statute, read in light of the Constitution's demands, implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States, and does not permit indefinite detention. Pp. 8-19.

(a) A statute permitting indefinite detention would raise serious constitutional questions. Freedom from imprisonment lies at the heart of the liberty protected by the Due Process Clause. Government detention violates the Clause unless it is ordered in a criminal proceeding with adequate procedural safeguards or a special justification outweighs the individual's liberty interest. The instant proceedings are civil and assumed to be nonpunitive, and the Government proffers no sufficiently strong justification for indefinite civil detention under this statute. The first justification -- preventing flight -- is weak or nonexistent where removal seems a remote possibility. Preventive detention based on the second justification -- protecting the community -- has been upheld only when limited to specially dangerous individuals and subject to strong procedural protections. When preventive detention is potentially indefinite, this dangerousness rationale must also be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. The civil confinement here is potentially permanent, and once the flight risk justification evaporates, the only special circumstance is the alien's removable status, which bears no relation to dangerousness. Moreover, the sole procedural protections here are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (according to the Government) significant later judicial review. The Constitution may well preclude granting an administrative body unreviewable authority to make determinations implicating fundamental rights. Pp. 8-12.

(b) *Shaughnessy* v. *United States ex rel. Mezei,* 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 -- in which an alien was indefinitely detained as he attempted to reenter the country -- does not support the Government's argument that alien status itself can justify indefinite detention. Once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent. Nor do cases holding that, because Congress has plenary power to create immigration law, the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area help the Government, because that power is subject to constitutional limits. Finally, the aliens' liberty interest is not diminished by their lack of a legal right to live at large, for the choice at issue here is between imprisonment and supervision under release conditions that may not be violated and their liberty interest is strong enough to raise a serious constitutional problem with indefinite detention. Pp. 12-16.

(c) Despite the constitutional problem here, if this Court were to find a clear congressional intent to grant the Attorney General the power to indefinitely detain an alien ordered removed, the Court would be required to give it effect. But this Court finds no clear indication of such intent. The statute's use of "may" is ambiguous and does not necessarily suggest unlimited discretion. Similar related statutes requiring

detention of criminal aliens during removal proceedings and the removal period do not show that Congress authorized indefinite detention here. Finally, nothing in the statute's legislative history clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Pp. 16-19.

3. The application of the "reasonable time" limitation is subject to federal-court review. The basic federal habeas statute grants the federal courts authority to determine whether post-removal-period detention is pursuant to statutory authority. In answering that question, the court must ask whether the detention exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's purpose of assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized. If it is foreseeable, the court should consider the risk of the alien's committing further crimes as a factor potentially justifying continued confinement. Without abdicating their responsibility to review the detention's lawfulness, the courts can take appropriate account of such matters as the Executive Branch's greater immigration-related expertise, the Immigration and Naturalization Service's administrative needs and concerns, and the Nation's need to speak with one voice on immigration. In order to limit the occasions when courts will need to make the difficult judgments called for by the recognition of this necessary Executive leeway, it is practically necessary to recognize a presumptively reasonable period of detention. It is unlikely that Congress believed that all reasonably foreseeable removals could be accomplished in 90 days, but there is reason to believe that it doubted the constitutionality of more than six months' detention. Thus, for the sake of uniform administration in the federal courts, six months is the appropriate period. After the 6-month period, once an alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must furnish evidence sufficient to rebut that showing. Pp. 19-22.

4. The standard that the Fifth Circuit applied in holding Zadvydas' continued detention lawful seems to require an alien seeking release to show the absence of *any* prospect of removal -- no matter how unlikely or unforeseeable -- and thus demands more than the statute can bear. The Ninth Circuit's conclusion that Ma should be released may have rested solely upon the absence of a repatriation agreement without giving due weight to the likelihood of successful future negotiations. P. 22.

185 F.3d 279 and 208 F.3d 815, vacated and remanded.

**Counsel**                    Robert F. Barnard argued the cause for petitioner Zadvydas.
                              Jay W. Stansell argued the cause for respondent Ma.
                              Edwin S. Kneedler argued the cause for respondents in No 99-7791 and petitioners in No. 00-38.

**Judges:** BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, and in which SCALIA and THOMAS, JJ., joined as to Part I.

**Opinion**

**Opinion by:**          BREYER

**Opinion**

{121 S. Ct. 2494} {150 L. Ed. 2d 662} {533 U.S. 682} *JUSTICE BREYER* delivered the opinion of the Court.

{150 L. Ed. 2d LEdHR1A} [1A]When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government ordinarily secures the alien's removal during a subsequent 90-day statutory "removal period," during which time the alien normally is held in custody.

{121 S. Ct. 2495} A special statute authorizes further detention if the Government fails to remove the alien during those 90 days. It says:

"An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . . ." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

In these cases, we must decide whether this post-removal-period statute authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal. We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question. See *infra*, at 12-14. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit "reasonable time" limitation, the application of which is subject to federal court review.

{533 U.S. 683} I

A

The post-removal-period detention statute is one of a related set of statutes and regulations that govern detention during and after removal proceedings. While removal proceedings are in progress, most aliens may be released on bond or paroled. 66 Stat. 204, as added and amended, 110 Stat. 3009-585, 8 U.S.C. §§ 1226 (a)(2), (c) (1994 ed., Supp. V). After entry of a final removal order and during the 90-day removal period, however, aliens must be held in custody. § 1231(a)(2). Subsequently, as the post-removal-period statute provides, the Government "may" continue to detain an alien who still remains here or release that alien under supervision. § 1231(a)(6).

Related Immigration and Naturalization Service (INS) regulations add that the INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90-day removal period expires. 8 CFR §§ 241.4(c)(1), (h), (k)(1)(i) (2001). If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3-month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, {150 L. Ed. 2d 663} between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight. {533 U.S. 684} § 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).

B

1

We consider two separate instances of detention. The first concerns Kestutis Zadvydas, a resident alien who was born, apparently of Lithuanian parents, in a displaced persons camp in Germany in 1948. When he was eight years old, Zadvydas immigrated to the United States with his {121 S. Ct. 2496} parents and other family members, and he has lived here ever since.

Zadvydas has a long criminal record, involving drug crimes, attempted robbery, attempted burglary, and theft. He has a history of flight, from both criminal and deportation proceedings. Most recently, he was convicted of possessing, with intent to distribute, cocaine; sentenced to 16 years' imprisonment; released on parole after two years; taken into INS custody; and, in 1994, ordered deported to Germany. See 8 U.S.C. § 1251(a)(2) (1988 ed., Supp. V) (delineating crimes that make alien deportable).

In 1994, Germany told the INS that it would not accept Zadvydas because he was not a German citizen. Shortly thereafter, Lithuania refused to accept Zadvydas because he was neither a Lithuanian citizen nor a permanent resident. In 1996, the INS asked the Dominican Republic (Zadvydas' wife's country) to accept him, but this effort proved unsuccessful. In 1998, Lithuania rejected, as inadequately documented, Zadvydas' effort to obtain Lithuanian citizenship based on his parents' citizenship; Zadvydas' reapplication is apparently still pending.

The INS kept Zadvydas in custody after expiration of the removal period. In September 1995, Zadvydas filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging {533 U.S. 685} his continued detention. In October 1997, a Federal District Court granted that writ and ordered him released under supervision. Zadvydas v. Caplinger, 986 F. Supp. 1011, 1027-1028 (ED La.). In its view, the Government would never succeed in its efforts to remove Zadvydas from the United States, leading to his permanent confinement, contrary to the Constitution. Id. at 1027.

The Fifth Circuit reversed this decision. Zadvydas v. Underdown, 185 F.3d 279 (1999). It concluded that Zadvydas' detention did not violate the Constitution because eventual deportation was not "impossible," good faith efforts to remove him from the United States continued, and his detention was subject to periodic {150 L. Ed. 2d 664} administrative review. Id. at 294, 297. The Fifth Circuit stayed its mandate pending potential review in this Court.

2

The second case is that of Kim Ho Ma. Ma was born in Cambodia in 1977. When he was two, his family fled, taking him to refugee camps in Thailand and the Philippines and eventually to the United States, where he has lived as a resident alien since the age of seven. In 1995, at age 17, Ma was involved in a gang-related shooting, convicted of manslaughter, and sentenced to 38 months' imprisonment. He served two years, after which he was released into INS custody.

In light of his conviction of an "aggravated felony," Ma was ordered removed. See 8 U.S.C. §§ 1101(a)(43)(F) (defining certain violent crimes as aggravated felonies), 1227(a)(2)(A)(iii) (1994 ed., Supp. IV) (aliens convicted of aggravated felonies are deportable). The 90-day removal period expired in early 1999, but the INS continued to keep Ma in custody, because, in light of his former gang membership, the nature of his crime, and his planned participation in a prison hunger strike, it was "unable to conclude that {533 U.S. 686} Mr. Ma would remain nonviolent and not violate the conditions of release." App. to Pet. for Cert. in No. 00-38, p. 87a.

In 1999 Ma filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. A panel of five judges in the Federal District Court for the Western District of Washington, considering Ma's and about 100 similar cases together, issued a joint order holding that the Constitution forbids post-removal-period

detention unless there is "a realistic chance that [the] alien will be deported" (thereby permitting classification of the detention as "in aid of deportation"). *Binh Phan* v. *Reno*, 56 F. Supp. 2d 1149, 1156 (1999). The District Court then held an evidentiary hearing, decided that there was no "realistic chance" that Cambodia {121 S. Ct. 2497} (which has no repatriation treaty with the United States) would accept Ma, and ordered Ma released. App. to Pet. for Cert. in No. 00-38, at 60a-61a.

The Ninth Circuit affirmed Ma's release. *Kim Ho Ma* v. *Reno,* 208 F.3d 815 (2000). It concluded, based in part on constitutional concerns, that the statute did not authorize detention for more than a "reasonable time" beyond the 90-day period authorized for removal. Id. at 818. And, given the lack of a repatriation agreement with Cambodia, that time had expired upon passage of the 90 days. Id. at 830-831.

3

Zadvydas asked us to review the decision of the Fifth Circuit authorizing his continued detention. The Government asked us to review the decision of the Ninth Circuit forbidding Ma's continued detention. We granted writs in both cases, agreeing to consider both statutory and related constitutional questions. See also *Duy Dac Ho* v. *Greene,* 204 F.3d 1045, 1060 (CA10 2000) (upholding Attorney General's statutory and constitutional authority to detain alien indefinitely). We consolidated the two cases for argument; and we now decide them together.

{533 U.S. 687} II

{150 L. Ed. 2d LEdHR2} [2]We note at the outset that the {150 L. Ed. 2d 665} primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases. See § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States"). Before 1952, the federal courts considered challenges to the lawfulness of immigration-related detention, including challenges to the validity of a deportation order, in habeas proceedings. See *Heikkila* v. *Barber,* 345 U.S. 229, 230, 235-236, 97 L. Ed. 972, 73 S. Ct. 603 (1953). Beginning in 1952, an alternative method for review of *deportation orders,* namely actions brought in federal district court under the Administrative Procedure Act (APA), became available. See *Shaughnessy* v. *Pedreiro,* 349 U.S. 48, 51-52, 99 L. Ed. 868, 75 S. Ct. 591 (1955). And in 1961 Congress replaced district court APA review with initial *deportation order* review in courts of appeals. See Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U.S.C. § 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts were also available to hear statutory and constitutional challenges to *deportation* (and exclusion) *orders.* See 8 U.S.C. §§ 1105a(a)(10), (b) (repealed 1996). These statutory changes left habeas untouched as the basic method for obtaining review of continued *custody after* a deportation order had become final. See *Cheng Fan Kwok* v. *INS,* 392 U.S. 206, 212, 215-216, 20 L. Ed. 2d 1037, 88 S. Ct. 1970 (1968) (holding that § 1105a(a) applied only to challenges to determinations made during deportation proceedings and motions to reopen those proceedings).

More recently, Congress has enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available. But none applies here. One provision, 8 U.S.C. § 1231(h) (1994 ed., Supp. V), simply forbids courts to construe *that section* "to create any . . . procedural right or benefit that is legally enforceable"; {533 U.S. 688} it does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority.

Another provision, 8 U.S.C. § 1252 (a)(2)(B)(ii) (1994 ed., Supp. V), says that "no court shall have jurisdiction to review" decisions "specified . . . to be in the discretion of the Attorney General." The aliens here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion. See also, e.g., § 1226(e) (applicable to certain detention-related decisions *in period preceding* {121 S. Ct. 2498} *entry* of final

removal order); § 1231(a)(4)(D) (applicable to assertion of causes or claims *under § 1231(a)(4)*, which is not at issue here); §§ 1252(a)(1), (a)(2)(C) (applicable to judicial review of "final orders of removal"); § 1252(g) (applicable to decisions "to commence proceedings, adjudicate cases, or execute removal orders").

We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional {150 L. Ed. 2d 666} challenges to post-removal-period detention. And we turn to the merits of the aliens' claims.

III

{150 L. Ed. 2d LEdHR1B} [1B]The post-removal-period detention statute applies to certain categories of aliens who have been ordered removed, namely inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V); see also 8 CFR § 241.4(a) (2001). It says that an alien who falls into one of these categories {533 U.S. 689} "may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

The Government argues that the statute means what it literally says. It sets no "limit on the length of time beyond the removal period that an alien who falls within one of the Section 1231(a)(6) categories may be detained." Brief for Petitioners in No. 00-38, p. 22. Hence, "whether to continue to detain such an alien and, if so, in what circumstances and for how long" is up to the Attorney General, not up to the courts.

{150 L. Ed. 2d LEdHR1C} [1C]{150 L. Ed. 2d LEdHR3} [3]*Ibid.*

"It is a cardinal principle" of statutory interpretation, however, that when an Act of Congress raises "a serious doubt" as to its constitutionality, "this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285 (1932); see also *United States* v. *X-Citement Video, Inc.,* 513 U.S. 64, 78, 130 L. Ed. 2d 372, 115 S. Ct. 464 (1994); *United States* v. *Jin Fuey Moy,* 241 U.S. 394, 401, 60 L. Ed. 1061, 36 S. Ct. 658 (1916); cf. *Almendarez-Torres* v. *United States,* 523 U.S. 224, 238, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998) (construction of statute that avoids invalidation best reflects congressional will). We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation. See *United States* v. *Witkovich,* 353 U.S. 194, 195, 202, 1 L. Ed. 2d 765, 77 S. Ct. 779 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deems fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For similar reasons, we read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

{533 U.S. 690} A{150 L. Ed. 2d LEdHR1D} [1D]{150 L. Ed. 2d LEdHR4}[4]A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to "deprive" any "person . . . of . . . liberty . . . without due process of law." Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that {150 L. Ed. 2d 667} Clause protects. See *Foucha* v. *Louisiana,* 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). And this Court has said that government {121 S. Ct. 2499} detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, see *United States* v. *Salerno,* 481 U.S.

739, 746, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987), or, in certain special and "narrow" non-punitive "circumstances," *Foucha, supra,* at 80, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint." *Kansas* v. *Hendricks,* 521 U.S. 346, 356, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). {**150 L. Ed. 2d LEdHR1E**} [1E]The proceedings at issue here are civil, not criminal, and we assume that they are nonpunitive in purpose and effect. There is no sufficiently strong special justification here for indefinite civil detention -- at least as administered under this statute. The statute, says the Government, has two regulatory goals: "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." Brief for Respondents in No. 99-7791, p. 24. But by definition the first justification -- preventing flight -- is weak or nonexistent where removal seems a remote possibility at best. As this Court said in *Jackson* v. *Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972), where detention's goal is no longer practically attainable, detention no longer "bears [a] reasonable relation to the purpose for which the individual [was] committed." Id. at 738.

The second justification -- protecting the community -- does not necessarily diminish in force over time. But we have {**533 U.S. 691**} upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections. Compare *Hendricks, supra,* at 368 (upholding scheme that imposes detention upon "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards") and *Salerno, supra,* at 747, 750-752 (in upholding pretrial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards), with *Foucha, supra,* at 81-83 (striking down insanity-related detention system that placed burden on detainee to prove nondangerousness). In cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger. See *Hendricks, supra,* at 358, 368.

The civil confinement here at issue is not limited, but potentially permanent. Cf. *Salerno, supra,* at 747 (noting that "maximum length of pretrial detention is limited" by "stringent" requirements); *Carlson* v. *Landon,* 342 U.S. 524, 545-546, 96 L. Ed. 547, 72 S. Ct. 525 (1952) (upholding temporary detention of alien during deportation proceeding while noting that "problem of . . . unusual delay" was {**150 L. Ed. 2d 668**} not present). The provision authorizing detention does not apply narrowly to "a small segment of particularly dangerous individuals," *Hendricks, supra,* at 368, say suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations. See 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V) (referencing § 1227(a)(1)(C)); cf. *Hendricks,* 521 U.S. at 357-358 (only individuals with "past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future" may be detained). And, once the flight risk justification evaporates, the only special circumstance {**533 U.S. 692**} present is the alien's removable status itself, which bears no relation to a detainee's dangerousness. Cf. id. at 358; *Foucha, supra,* at 82.

Moreover, the sole procedural protections available to the alien are found in {**121 S. Ct. 2500**} administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (in the Government's view) significant later judicial review. Compare 8 CFR § 241.4(d)(1) (2001) (imposing burden of proving nondangerousness upon alien) with *Foucha, supra,* at 82 (striking down insanity-related detention for that very reason). This Court has suggested, however, that the Constitution may well preclude granting "an administrative body the unreviewable authority to make determinations implicating fundamental rights." *Superintendent, Mass. Correctional Institution at Walpole* v. *Hill,* 472 U.S. 445, 450, 86 L. Ed. 2d 356, 105 S. Ct. 2768 (1985) (O'CONNOR, J.); see also *Crowell,* 285 U.S. at 87 (Brandeis, J., dissenting) ("Under certain circumstances, the constitutional requirement of due process is a requirement of judicial process"). The Constitution

demands greater procedural protection even for property. See *South Carolina* v. *Regan*, 465 U.S. 367, 393, 79 L. Ed. 2d 372, 104 S. Ct. 1107 (1984) (O'CONNOR, J., concurring in judgment); *Phillips* v. *Commissioner*, 283 U.S. 589, 595-597, 75 L. Ed. 1289, 51 S. Ct. 608 (1931) (Brandeis, J.). The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious.

The Government argues that, from a constitutional perspective, alien status itself can justify indefinite detention, and points to *Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), as support. That case involved a once lawfully admitted alien who left the United States, returned after a trip abroad, was refused admission, and was left on Ellis Island, indefinitely detained there because the Government could not find another country to accept him. The Court held that Mezei's detention did not violate the Constitution. Id. at 215-216.

{533 U.S. 693} Although *Mezei*, like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. As the Court emphasized, the alien's extended departure from the United States required him to seek entry into this country once again. His presence on Ellis Island did not count as entry into the United States. Hence, he was {150 L. Ed. 2d 669} "treated," for constitutional purposes, "as if stopped at the border." Id. at 213, 215. And that made all the difference.{150 L. Ed. 2d LEdHR1F} [1F]{150 L. Ed. 2d LEdHR5}[5]{150 L. Ed. 2d LEdHR6}[6]The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. See *Kaplan* v. *Tod*, 267 U.S. 228, 230, 69 L. Ed. 585, 45 S. Ct. 257 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Leng May Ma* v. *Barber*, 357 U.S. 185, 188-190, 2 L. Ed. 2d 1246, 78 S. Ct. 1072 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"). It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. See *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 269, 108 L. Ed. 2d 222, 110 S. Ct. 1056 (1990) (Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); *Johnson* v. *Eisentrager*, 339 U.S. 763, 784, 94 L. Ed. 1255, 70 S. Ct. 936 (1950) (same). But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. See *Plyler* v. *Doe*, 457 U.S. 202, 210, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982); *Mathews* v. *Diaz*, 426 U.S. 67, 77, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976); *Kwong Hai Chew* v. *Colding*, 344 U.S. 590, 596-598, 97 L. Ed. 576, 73 S. Ct. 472, and n. 5 (1953); *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369, 30 L. Ed. {121 S. Ct. 2501} 220, 6 S. Ct. 1064 (1886); cf. *Mezei*, supra, at 212 ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Indeed, this Court has held that the Due Process {533 U.S. 694} Clause protects an alien subject to a final order of deportation, see *Wong Wing* v. *United States*, 163 U.S. 228, 238, 41 L. Ed. 140, 16 S. Ct. 977 (1896), though the nature of that protection may vary depending upon status and circumstance, see *Landon* v. *Plasencia*, 459 U.S. 21, 32-34, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982); *Johnson*, supra, at 770.{150 L. Ed. 2d LEdHR1G} [1G]In *Wong Wing*, supra, the Court held unconstitutional a statute that imposed a year of hard labor upon aliens subject to a final deportation order. That case concerned substantive protections for aliens who had been ordered removed, not procedural protections for aliens whose removability was being determined. Compare *post*, at 2-3 (SCALIA, J., dissenting). The Court held that punitive measures could not be imposed upon aliens ordered removed because "all persons within the territory of the United States are entitled to the protection" of the Constitution. 163 U.S. at 238 (citing *Yick Wo*, supra, at 369 (holding that equal protection guarantee applies to Chinese aliens)); see also *Witkovich*, 353 U.S. at 199, 201 (construing statute which applied to aliens ordered deported in order to avoid substantive constitutional problems). And contrary to JUSTICE SCALIA's characterization, see *post*, at 2-4, in

*Mezei* {150 L. Ed. 2d 670} itself, both this Court's rejection of Mezei's challenge to the procedures by which he was deemed excludable and its rejection of his challenge to continued detention rested upon a basic territorial distinction. See *Mezei, supra,* at 215 (holding that Mezei's presence on Ellis Island was not "considered a landing" and did "not affect" his legal or constitutional status (internal quotation marks omitted)).

In light of this critical distinction between *Mezei* and the present cases, *Mezei* does not offer the Government significant support, and we need not consider the aliens' claim that subsequent developments have undermined *Mezei's* legal authority. See Brief for Petitioner in No. 99-7791, p. 23; Brief for Respondent in No. 00-38, pp. 16-17; Brief for Lawyers' Committee for Human Rights as *Amicus Curiae* in No. 00-38, pp. 15-20. Nor are we aware of any other authority that would support JUSTICE KENNEDY's limitation of {533 U.S. 695} due process protection for removable aliens to freedom from detention that is arbitrary or capricious. See *post,* at 14-18 (dissenting opinion).

The Government also looks for support to cases holding that Congress has "plenary power" to create immigration law, and that the judicial branch must defer to executive and legislative branch decisionmaking in that area. Brief for Respondents in No. 99-7791, at 17, 20 (citing *Harisiades* v. *Shaughnessy,* 342 U.S. 580, 588-589, 96 L. Ed. 586, 72 S. Ct. 512 (1952)). But that power is subject to important constitutional limitations. See *INS* v. *Chadha,* 462 U.S. 919, 941-942, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983) (Congress must choose "a constitutionally permissible means of implementing" that power); *The Chinese Exclusion Case,* 130 U.S. 581, 604, 32 L. Ed. 1068, 9 S. Ct. 623 (1889) (congressional authority limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations"). In these cases, we focus upon those limitations. In doing so, we nowhere deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions. See 8 U.S.C. § 1231(a)(3) (1994 ed., Supp. V) (granting authority to Attorney General to prescribe regulations governing supervision of aliens not removed within 90 days); § 1253 (imposing penalties for failure to comply with {121 S. Ct. 2502} release conditions). The question before us is not one of "'conferring on those admitted the right to remain against the national will'" or "'sufferance of aliens'" who should be removed. *Post,* at 2 (SCALIA, J., dissenting) (quoting *Mezei,* 345 U.S. at 222-223 (Jackson, J., dissenting)). Rather, the issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.

Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no "unprotected spot in the Nation's {533 U.S. 696} armor." *Kwong Hai Chew, supra,* at 602. Neither do we consider terrorism or other special circumstances where {150 L. Ed. 2d 671} special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security. The sole foreign policy consideration the Government mentions here is the concern lest courts interfere with "sensitive" repatriation negotiations. Brief for Respondents in No. 99-7791, at 21. But neither the Government nor the dissents explain how a habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect. See *infra,* at 18-19.

Finally, the Government argues that, whatever liberty interest the aliens possess, it is "greatly diminished" by their lack of a legal right to "live at large in this country." Brief for Respondents in No. 99-7791, at 47; see also *post,* at 2-3 (SCALIA, J., dissenting) (characterizing right at issue as "right of release into this country"). The choice, however, is not between imprisonment and the alien "living at large." Brief for Respondents in No. 99-7791, at 47. It is between imprisonment and supervision under release conditions that may not be violated. See *supra,* at 14 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V)); 8 CFR § 241.5 (2001) (establishing conditions of release after removal period).

And, for the reasons we have set forth, we believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, cf. *post*, at 18-21 (KENNEDY, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent.

B

Despite this constitutional problem, if "Congress has made its intent" in the statute "clear, 'we must give effect to that intent.'" *Miller* v. *French,* 530 U.S. 327, 336, 147 L. Ed. 2d 326, 120 S. Ct. 2246 (2000) (quoting *Sinclair Refining Co.* v. *Atkinson,* 370 U.S. 195, 215, 8 L. Ed. 2d 440, 82 S. Ct. 1328 (1962)). {533 U.S. 697} We cannot find here, however, any clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed. And that is so whether protecting the community from dangerous aliens is a primary or (as we believe) secondary statutory purpose. Cf. *post,* at 4, 5-6 (KENNEDY, J., dissenting). After all, the provision is part of a statute that has as its basic purpose effectuating an alien's removal. Why should we assume that Congress saw the alien's dangerousness as unrelated to this purpose?

{150 L. Ed. 2d LEdHR7} [7]The Government points to the statute's word "may." But while "may" suggests discretion, it does not necessarily suggest unlimited discretion. In that respect the word "may" is ambiguous. Indeed, if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms. Compare 8 U.S.C. § 1537(b)(2)(C) (1994 ed., Supp. V) ("If no country is willing to receive" a terrorist alien ordered removed, "the Attorney General may, notwithstanding any other provision of law, retain the alien in {121 S. Ct. 2503} {150 L. Ed. 2d 672} custody" and must review the detention determination every six months).

{150 L. Ed. 2d LEdHR1H} [1H]The Government points to similar related statutes that *require* detention of criminal aliens during removal proceedings and the removal period, and argues that these show that mandatory detention is the rule while discretionary release is the narrow exception. See Brief for Petitioners in No. 00-38, at 26-28 (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)). But the statute before us applies not only to terrorists and criminals, but also to ordinary visa violators, see *supra,* at 11; and, more importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point.

The Government also points to the statute's history. That history catalogs a series of changes, from an initial period (before 1952) when lower courts had interpreted statutory {533 U.S. 698} silence, Immigration Act of 1917, ch. 29, §§ 19, 20, 39 Stat. 889, 890, to mean that deportation-related detention must end within a reasonable time, *Spector* v. *Landon,* 209 F.2d 481, 482 (CA9 1954) (collecting cases); *United States ex rel. Doukas* v. *Wiley,* 160 F.2d 92, 95 (CA7 1947); *United States ex rel. Ross* v. *Wallis,* 279 F. 401, 403-404 (CA2 1922), to a period (from the early 1950's through the late 1980's) when the statutes permitted, but did not require, post-deportation-order detention for up to six months, Immigration and Nationality Act of 1952, § 242(c), 66 Stat. 210, 8 U.S.C. §§ 1252(c),(d) (1982 ed.); *Witkovich,* 353 U.S. at 198, to more recent statutes that have at times mandated and at other times permitted the post-deportation-order detention of aliens falling into certain categories such as aggravated felons, Anti-Drug Abuse Act of 1988, § 7343(a), 102 Stat. 4470, 8 U.S.C. § 1252(a)(2) (mandating detention); Immigration Act of 1990, § 504(a), 104 Stat. 5049-5050, 8 U.S.C. §§ 1252(a)(2)(A), (B) (permitting release under certain circumstances); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 306(a)(4), 105 Stat. 1751, 8 U.S.C. § 1252(a)(2)(B) (same).

In early 1996, Congress explicitly expanded the group of aliens subject to mandatory detention, eliminating provisions that permitted release of criminal aliens who had at one time been lawfully admitted to the United States. Antiterrorism and Effective Death Penalty Act of 1996, § 439(c), 110 Stat. 1277. And later that year Congress enacted the present law, which liberalizes pre-existing law by

shortening the removal period from six months to 90 days, mandates detention of certain criminal aliens during the removal proceedings and for the subsequent 90-day removal period, and adds the post-removal-period provision here at issue. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C, §§ 303, 305, 110 Stat. 3009-585, 3009-598 to 3009-599; 8 U.S.C. §§ 1226(c), 1231(a) (1994 ed., Supp. V).

{533 U.S. 699} We have found nothing in the history of these statutes that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently, {150 L. Ed. 2d 673} interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute. See 1 E. Coke, Institutes *70b ("Cessante ratione legis cessat ipse lex") (the rationale of a legal rule no longer being applicable, that rule itself no longer applies).

IV

{150 L. Ed. 2d LEdHR8} [8]The Government seems to argue that, even under our interpretation of the statute, a federal habeas court would have to accept the Government's view about whether the implicit statutory limitation is satisfied in a particular case, conducting little or no independent review of the matter. In our view, that is not so. Whether {121 S. Ct. 2504} a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority. The basic federal habeas corpus statute grants the federal courts authority to answer that question. See 28 U.S.C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of the . . . laws . . . of the United States"). In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely "to relieve detention by executive authorities without judicial trial." Brown v. Allen, 344 U.S. 443, 533, 97 L. Ed. 469, 73 S. Ct. 397 (1953) (Jackson, J., concurring in result).

In answering that basic question, the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no {533 U.S. 700} longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions. See supra, at 14 (citing 8 U.S.C. §§ 1231(a)(3), 1253 (1994 ed., Supp. V); 8 CFR § 241.5 (2001)). And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period. See supra, at 10-11.

We recognize, as the Government points out, that review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to "speak with one voice" in immigration matters. Brief for Respondents in No. 99-7791, at 19. But we believe that courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention.

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility. They counsel judges to give expert {150 L. Ed. 2d 674} agencies decisionmaking leeway in matters that invoke their expertise. See Pension Benefit Guaranty Corporation v. LTV Corp., 496 U.S. 633, 651-652, 110 L. Ed. 2d 579, 110 S. Ct. 2668 (1990). They recognize Executive Branch primacy in foreign policy matters. See Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 196, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983). And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations,

are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit {533 U.S. 701} the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention. We have adopted similar presumptions in other contexts to guide lower court determinations. See *Chefl* v. *Schnackenberg*, 384 U.S. 373, 379-380, 16 L. Ed. 2d 629, 86 S. Ct. 1523 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside* v. *McLaughlin*, 500 U.S. 44, 56-58, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991) (O'CONNOR, J.) (adopting presumption, {121 S. Ct. 2505} based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. See Juris. Statement of United States in *United States* v. *Witkovich* , O. T. 1956, No. 295, pp. 8-9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

{533 U.S. 702} V{150 L. Ed. 2d LEdHR1I} [1I]{150 L. Ed. 2d LEdHR9}[9]The Fifth Circuit held Zadvydas' continued detention lawful as long as "good faith efforts to effectuate . . . deportation continue" and Zadvydas failed to show that deportation will prove "impossible." 185 F.3d at 294, 297.But this standard would seem to require an alien seeking release to show the absence of *any* prospect of removal -- no matter how unlikely or unforeseeable -- {150 L. Ed. 2d 675} which demands more than our reading of the statute can bear. The Ninth Circuit held that the Government was required to release Ma from detention because there was no reasonable likelihood of his removal in the foreseeable future. 208 F.3d at 831. But its conclusion may have rested solely upon the "absence" of an "extant or pending" repatriation agreement without giving due weight to the likelihood of successful future negotiations. See id. at 831, and n. 30. Consequently, we vacate the decisions below and remand both cases for further proceedings consistent with this opinion.

It is so ordered.

## Dissent

**Dissent by:**         SCALIA; KENNEDY
*JUSTICE SCALIA,* with whom JUSTICE THOMAS joins, dissenting.
I join Part I of JUSTICE KENNEDY's dissent, which establishes the Attorney General's clear statutory authority to detain criminal aliens with no specified time limit. I write separately because I do not believe that, as JUSTICE KENNEDY suggests in Part II of his opinion, there may be some situations in which the courts can order release. I believe that in both *Zadvydas* v. *Davis*, No. 99-7791, and *Ashcroft* v. *Ma*, No. 00-38, a "careful description" of the substantive right claimed, *Reno* v. *Flores*, 507 U.S. 292, 302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993), suffices categorically to refute its existence. A

criminal alien under final order of removal who allegedly will not be accepted by any other country in the reasonably foreseeable future claims a constitutional right of supervised release into the United States. This claim can be repackaged as freedom {533 U.S. 703} from "physical restraint" or freedom from "indefinite detention," *ante*, at 9, but it is at bottom a claimed right of release into this country by an individual who *concededly* has no legal right to be here. There is no such constitutional right. Like a criminal alien under final order of removal, an inadmissible alien at the border has no right to be in the United States. *The Chinese Exclusion Case*, 130 U.S. 581, 603, 32 L. Ed. 1068, 9 S. Ct. 623 (1889). In *Shaughnessy* v. *United States ex rel. Mezei*, {121 S. Ct. 2506} 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), we upheld potentially indefinite detention of such an inadmissible alien whom the Government was unable to return anywhere else. We said that "we [did] not think that respondent's continued exclusion deprives him of any statutory or constitutional right." Id. at 215. While four members of the Court thought that Mezei deserved greater procedural protections (the Attorney General had refused to divulge any information as to why Mezei was being detained, id. at 209), no Justice asserted that Mezei had a substantive constitutional right to release into this country. And Justice Jackson's dissent, joined by Justice Frankfurter, affirmatively asserted the opposite, with no contradiction from the Court: "Due process does not invest any alien with a right to enter the United States, *nor confer on those admitted the right to remain against the national will.* Nothing in the Constitution requires admission *or sufferance* of aliens hostile to our scheme of government." Id. at 222-223 (emphasis added). {150 L. Ed. 2d 676} Insofar as a claimed legal right to release into this country is concerned, an alien under final order of removal stands on an equal footing with an inadmissible alien at the threshold of entry: He has no such right.

The Court expressly declines to apply or overrule *Mezei*, *ante*, at 14, but attempts to distinguish it -- or, I should rather say, to obscure it in a legal fog. First, the Court claims that "the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Ante*, at 13. True enough, but only where that distinction makes perfect {533 U.S. 704} sense: with regard to the question of what *procedures* are necessary to prevent entry, as opposed to what *procedures* are necessary to eject a person already in the United States. See, *e.g.*, *Landon* v. *Plasencia*, 459 U.S. 21, 32, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982) ("Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing *when threatened with deportation*" (emphasis added)). The Court's citation of *Wong Wing* v. *United States*, 163 U.S. 228, 41 L. Ed. 140, 16 S. Ct. 977 (1896), for the proposition that we have "held that the Due Process Clause protects an alien subject to a final order of deportation," *ante*, at 13, is arguably relevant. That case at least involved aliens under final order of deportation. * But all it held is that they could not be subjected to the punishment of hard labor without a judicial trial. I am sure they cannot be tortured, as well -- but neither prohibition has anything to do with their right to be released into the United States. Nor does *Wong Wing* show that the rights of detained aliens subject to final order of deportation are different from the rights of aliens arrested and detained at the border -- unless the Court believes that the detained alien in *Mezei could* have been set to hard labor.

*

The Court also cites *Landon* v. *Plasencia,* 459 U.S. 21, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982), as oblique support for the claim that the due process protection afforded aliens under final order of removal "may vary depending upon status and circumstance." *Ante*, at 13. But that case is entirely inapt because it did not involve an alien subject to a final order of deportation. The Court also cites *Johnson* v. *Eisentrager*, 339 U.S. 763, 770, 94 L. Ed. 1255, 70 S. Ct. 936 (1950), ante, at 13, but that case is doubly irrelevant: because it dealt not with deportation but with the military's detention of enemy aliens outside the territorial jurisdiction of the United States, and because it rejected habeas corpus jurisdiction anyway.

*Mezei* thus stands unexplained and undistinguished by the Court's opinion. We are offered no justification why an alien under a valid and final order of removal -- which has *totally extinguished* whatever right to presence in this country he possessed -- has any greater due process right to be

released into the country than an alien at the border seeking entry. {533 U.S. 705} Congress undoubtedly thought that both groups of aliens -- inadmissible aliens at the threshold and criminal aliens under final order of removal -- could be constitutionally {121 S. Ct. 2507} detained on the same terms, since it provided the authority to detain both groups in the very same statutory provision, see 8 U.S.C. § 1231(a)(6). Because I believe *Mezei* controls these cases, and, like the Court, I also see no reason to reconsider *Mezei*, I find no constitutional {150 L. Ed. 2d 677} impediment to the discretion Congress gave to the Attorney General. JUSTICE KENNEDY's dissent explains the clarity of the detention provision, and I see no obstacle to following the statute's plain meaning.

*JUSTICE KENNEDY*, with whom The CHIEF JUSTICE joins, and with whom JUSTICE SCALIA and JUSTICE THOMAS join as to Part I, dissenting.

The Court says its duty is to avoid a constitutional question. It deems the duty performed by interpreting a statute in obvious disregard of congressional intent; curing the resulting gap by writing a statutory amendment of its own; committing its own grave constitutional error by arrogating to the Judicial Branch the power to summon high officers of the Executive to assess their progress in conducting some of the Nation's most sensitive negotiations with foreign powers; and then likely releasing into our general population at least hundreds of removable or inadmissible aliens who have been found by fair procedures to be flight risks, dangers to the community, or both. Far from avoiding a constitutional question, the Court's ruling causes systemic dislocation in the balance of powers, thus raising serious constitutional concerns not just for the cases at hand but for the Court's own view of its proper authority. Any supposed respect the Court seeks in not reaching the constitutional question is outweighed by the intrusive and erroneous exercise of its own powers. In the guise of judicial restraint the Court ought not to intrude upon the other branches. The constitutional question the statute presents, it must be acknowledged, {533 U.S. 706} may be a significant one in some later case; but it ought not to drive us to an incorrect interpretation of the statute. The Court having reached the wrong result for the wrong reason, this respectful dissent is required.

I

The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* (1994 ed. and Supp. V), is straightforward enough. It provides:

"An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." 8 U.S.C. § 1231(a)(6) (1994 ed., Supp V).

By this statute, Congress confers upon the Attorney General discretion to detain an alien ordered removed. It gives express authorization to detain "beyond the removal period." *Ibid.* The class of removed aliens detainable under the section includes aliens who were inadmissible and aliens subject to final orders of removal, provided they are a risk to the community or likely to flee. The issue to be determined is whether the authorization to detain beyond the removal period is subject to the implied, nontextual limitation that the detention be no longer than reasonably necessary to effect removal to another country. The majority invokes the canon of constitutional {150 L. Ed. 2d 678} doubt to read that implied term into the statute. One can accept the premise that a substantial constitutional question is presented by the prospect of lengthy, even unending, detention in some instances; but the statutory construction the Court adopts should be rejected in any event. The interpretation has no basis in the language {533 U.S. 707} or structure of the INA and in fact contradicts and defeats the purpose set forth in the express terms of the statutory text.

{121 S. Ct. 2508} The Court, it is submitted, misunderstands the principle of constitutional avoidance which it seeks to invoke. The majority gives a brief bow to the rule that courts must respect the intention of Congress, *ante*, at 16, but then waltzes away from any analysis of the language, structure, or purpose of the statute. Its analysis is not consistent with our precedents explaining the limits of the constitutional doubt rule. The rule allows courts to choose among constructions which are "fairly

possible," *Crowell* v. *Benson*, 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285 (1932), not to "'press statutory construction to the point of disingenuous evasion even to avoid a constitutional question,'" *Salinas* v. *United States*, 522 U.S. 52, 60, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997) (quoting *Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 57, n. 9, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996)). Were a court to find two interpretations of equal plausibility, it should choose the construction that avoids confronting a constitutional question. The majority's reading of the statutory authorization to "detain beyond the removal period," however, is not plausible. An interpretation which defeats the stated congressional purpose does not suffice to invoke the constitutional doubt rule, for it is "plainly contrary to the intent of Congress." *United States* v. *X-Citement Video, Inc.*, 513 U.S. 64, 78, 130 L. Ed. 2d 372, 115 S. Ct. 464 (1994). The majority announces it will reject the Government's argument "that the statute means what it literally says," *ante*, at 8, but then declines to offer any other acceptable textual interpretation. The majority does not demonstrate an ambiguity in the delegation of the detention power to the Attorney General. It simply amends the statute to impose a time limit tied to the progress of negotiations to effect the aliens' removal. The statute cannot be so construed. The requirement the majority reads into the law simply bears no relation to the text; and in fact it defeats the statutory purpose and design.

{533 U.S. 708} Other provisions in § 1231 itself do link the requirement of a reasonable time period to the removal process. See, *e.g.,* § 1231(c)(1)(A) (providing that an alien who arrives at a port of entry "shall be removed immediately on a vessel or aircraft" unless "it is impracticable" to do so "within a *reasonable* time" (emphasis added)); § 1231(c)(3)(A)(ii)(II) (requiring the "owner of a vessel or aircraft bringing an alien to the United States [to] pay the costs of detaining and maintaining the alien . . . for the period of time *reasonably necessary* for the owner to arrange for repatriation" (emphasis added)). That Congress chose to impose the limitation in these sections and not in § 1231(a)(6) is evidence of its intent to measure the detention period by other standards. When Congress has made express provisions for the contingency that repatriation might be difficult or prolonged in other portions {150 L. Ed. 2d 679} of the statute, it should be presumed that its omission of the same contingency in the detention section was purposeful. Indeed, the reasonable time limits in the provisions just mentioned simply excuse the duty of early removal. They do not mandate release. An alien within one of these categories, say, a ship stowaway, would be subject as well to detention beyond the removal period under § 1231(a)(6), if the statute is read as written. Under the majority's view, however, it appears the alien must be released in six months even if presenting a real danger to the community.

The 6-month period invented by the Court, even when modified by its sliding standard of reasonableness for certain repatriation negotiations, see *ante*, at 21, makes the statutory purpose to protect the community ineffective. The risk to the community exists whether or not the repatriation negotiations have some end in sight; in fact, when the negotiations end, the risk may be greater. The authority to detain beyond the removal period is to protect the community, not to negotiate the aliens' return. The risk to the community {121 S. Ct. 2509} survives repatriation negotiations. To a more limited, but still significant, extent, so does the concern with flight. It {533 U.S. 709} is a fact of international diplomacy that governments and their policies change; and if repatriation efforts can be revived, the Attorney General has an interest in ensuring the alien can report so the removal process can begin again.

Congress, moreover, was well aware of the difficulties confronting aliens who are removable but who cannot be repatriated. It made special provisions allowing them to be employed, a privilege denied to other deportable aliens. See § 1231(a)(7) (providing an "alien [who] cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien" still remains eligible for employment in the United States). Congress' decision to ameliorate the condition of aliens subject to a final order of removal who cannot be repatriated, but who need not be detained, illustrates a balance in the statutory design. Yet the Court renders the other side of the balance meaningless. The risk to the community posed by a removable alien is a function of a variety of circumstances, circumstances that do not diminish just because the alien cannot be deported within some

foreseeable time. Those circumstances include the seriousness of the alien's past offenses, his or her efforts at rehabilitation, and some indication from the alien that, given the real prospect of detention, the alien will conform his or her conduct. This is the purpose for the periodic review of detention status provided for by the regulations. See 8 CFR § 241.4 (2001). The Court's amendment of the statute reads out of the provision the congressional decision that dangerousness alone is a sufficient basis for detention, see *ante*, at 19 (citing 1 E. Coke, Institutes *70b), and reads out as well any meaningful structure for supervised release.

The majority is correct to observe that in *United States* v. *Witkovich,* 353 U.S. 194, 1 L. Ed. 2d 765, 77 S. Ct. 779 (1957), the Court "read significant limitations into" a statute, *ante*, at 9, but that does not permit us to avoid the proper reading of the enactment now before us. In *Witkovich,* the Court {150 L. Ed. 2d 680} construed former § 1252(d), which required an alien under a final order of deportation {533 U.S. 710} "to give information under oath . . . as the Attorney General may deem fit and proper." 353 U.S. at 195. The Court held that although the plain language "appears to confer upon the Attorney General unbounded authority to require whatever information he deems desirable of aliens whose deportation has not been effected within six months," id. at 199, the constitutional doubt this interpretation would raise meant the language would be construed as limited to the provision of information "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue," id. at 202. In *Witkovich* the interpretation of the text was in aid of the statutory purpose; in the instant cases the interpretation nullifies the statutory purpose. Here the statute by its own terms permits the Attorney General to consider factors the Court now makes irrelevant.

The majority's unanchored interpretation ignores another indication that the Attorney General's detention discretion was not limited to this truncated period. Section 1231(a)(6) permits continued detention not only of removable aliens but also of inadmissible aliens, for instance those stopped at the border before entry. Congress provides for detention of both categories within the same statutory grant of authority. Accepting the majority's interpretation, then, there are two possibilities, neither of which is sustainable. On the one hand, it may be that the majority's rule applies to both categories of aliens, in which case we are asked to assume that Congress intended to restrict the discretion it could confer upon the Attorney General so that all inadmissible aliens {121 S. Ct. 2510} must be allowed into our community within six months. On the other hand, the majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility. As a result, it is difficult to see why "aliens who have not yet gained initial admission {533 U.S. 711} to this country would present a very different question." *Ante*, at 2.

Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters. See, *e.g.*, *Wong Wing* v. *United States,* 163 U.S. 228, 235, 41 L. Ed. 140, 16 S. Ct. 977 (1896) ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation"). It is reasonable to assume, then, and it is the proper interpretation of the INA and § 1231(a)(6), that when Congress provided for detention "beyond the removal period," it exercised its considerable power over immigration and delegated to the Attorney General the discretion to detain inadmissible and other removable aliens for as long as they are determined to be either a flight risk or a danger to the Nation. The majority's interpretation, moreover, defeats the very repatriation goal in which it professes such {150 L. Ed. 2d 681} interest. The Court rushes to substitute a judicial judgment for the Executive's discretion and authority. As the Government represents to us, judicial orders requiring release of removable aliens, even on a temporary basis, have the potential to undermine the obvious necessity that the Nation speak with one voice on immigration and foreign affairs matters. Brief for Respondents in No. 99-7791, p. 49. The result of the Court's rule is that, by refusing to accept repatriation of their own nationals, other countries can effect the release of these individuals back into the American

community. *Ibid.* If their own nationals are now at large in the United States, the nation of origin may ignore or disclaim responsibility to accept their return. *Ibid.* The interference with sensitive foreign relations becomes even more acute where hostility or tension characterizes the relationship, for other countries can use the fact of judicially mandated release to their strategic advantage, refusing the return of their nationals {533 U.S. 712} to force dangerous aliens upon us. One of the more alarming aspects of the Court's new venture into foreign affairs management is the suggestion that the district court can expand or contract the reasonable period of detention based on its own assessment of the course of negotiations with foreign powers. The Court says it will allow the Executive to perform its duties on its own for six months; after that, foreign relations go into judicially supervised receivership. The cases which the Court relies upon to support the imposition of presumptions are inapposite. The rule announced in *Chefl* v. *Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S. Ct. 1523 (1966) -- "that sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial" -- was based on the definition of a "petty offense" that was still operable in the United States Code, and was proper "under the peculiar power of the federal courts to revise sentences in contempt cases." Id. at 380. The majority can point to no similar statutory or judicial source for its authority to create its own time-based rule in these cases. It cites only an observation in a brief filed by the Government in *United States* v. *Witkovich,* O. T. 1956, No. 295, pp. 8-9, see *ante,* at 21, relying, in turn, on doubts expressed in a 1952 Senate Report concerning detention for longer than six months under an Act with standards different, and far less precise, than those applicable here. In *County of Riverside* v. *McLaughlin,* 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991), our {121 S. Ct. 2511} reasonableness presumption for delays of less than 48 hours between an arrest and a probable cause hearing was, as the majority recognizes, *ante,* at 21, based on the "Court of Appeals' determination of the time required to complete those procedures." 500 U.S. at 57. Here, as far as we know, the 6-month period bears no particular relationship to how long it now takes to deport any group of aliens, or, for that matter, how long it took in the past to remove. Zadvydas' case itself demonstrates that the repatriation process may often take years to {533 U.S. 713} negotiate, involving difficult issues of establishing citizenship and the like. See Brief for Petitioner in No. 99-7791, pp. 17-20.

It is to be expected that from time {150 L. Ed. 2d 682} to time a foreign power will adopt a truculent stance with respect to the United States and other nations. Yet the Court by its time limit, or presumptive time limit, goes far to undercut the position of the Executive in repatriation negotiations, thus ill serving the interest of all foreign nationals of the country concerned. Law-abiding aliens might wish to return to their home country, for instance, but the strained relationship caused by the difficult repatriation talks might prove to be a substantial obstacle for these aliens as well.

In addition to weakening the hand of our Government, court ordered release cannot help but encourage dilatory and obstructive tactics by aliens who, emboldened by the Court's new rule, have good reason not to cooperate by making their own repatriation or transfer seem foreseeable. An alien ordered deported also has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an Immigration and Naturalization Service (INS) detention facility. Neither the alien nor his family would find any urgency in assisting with a petition to other countries to accept the alien back if the alien could simply remain in the United States indefinitely.

The risk to the community posed by the mandatory release of aliens who are dangerous or a flight risk is far from insubstantial; the motivation to protect the citizenry from aliens determined to be dangerous is central to the immigration power itself. The Government cites statistical studies showing high recidivism rates for released aliens. One Government Accounting Office study cited by Congress in floor debates on the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, put the figure as high as 77 percent. 142 Cong. Rec. 7972 (1996); Brief for Respondents in {533 U.S. 714} No. 99-7791, at 27, n. 13. It seems evident a criminal record accumulated by an admitted alien during his or her time in the United States is likely to be a better indicator of risk than factors relied upon

during the INS's initial decision to admit or exclude. Aliens ordered deported as the result of having committed a felony have proved to be dangerous.

Any suggestion that aliens who have completed prison terms no longer present a danger simply does not accord with the reality that a significant risk may still exist, as determined by the many factors set forth in the regulations. See 8 CFR § 241.4(f) (2001). Underworld and terrorist links are subtle and may be overseas, beyond our jurisdiction to impose felony charges. Furthermore, the majority's rationale seems to apply to an alien who flees prosecution or escapes from custody in some other country. The fact an alien can be deemed inadmissible because of fraud at the time of entry does not necessarily distinguish his or her case from an alien whose entry was legal. Consider, for example, a fugitive alien who enters by fraud or stealth and resides here for five years with significant ties to the community, though still presenting a danger; contrast him with an alien who entered lawfully but a month later committed an act making him removable. Why the Court's rationale should apply to the second alien but not the first is not apparent.

{121 S. Ct. 2512} The majority cannot come to terms with these distinctions under its own {150 L. Ed. 2d 683} rationale. The rule the majority creates permits consideration of nothing more than the reasonable foreseeability of removal. See *ante*, at 19-20. That standard is not only without sound basis in the statutory structure, but also is not susceptible to customary judicial inquiry. Cf. *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 425, 143 L. Ed. 2d 590, 119 S. Ct. 1439 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions"). The majority does say that the release of terrorists or other "special circumstances" might justify "heightened deference to the judgments of the political {533 U.S. 715} branches with respect to matters of national security." *Ante*, at 15-16. Here the Court appears to rely on an assessment of risk, but this is the very premise it finds inadequate to sustain the natural reading of the statute. The Court ought not to reject a rationale in order to deny power to the Attorney General and then invoke the same rationale to save its own analysis.

This rule of startling breadth invites potentially perverse results. Because other nations may refuse to admit aliens who have committed certain crimes -- see, *e.g.,* Brief for Petitioner in No. 99-7791, at 19 ("Lithuanian law precludes granting of citizenship to persons who, before coming to Lithuania, have been sentenced in another state to imprisonment for a deliberate crime for which criminal liability is imposed by the laws of the Republic of Lithuania" (citations and internal quotation marks omitted)) -- often the aliens who have committed the most serious crimes will be those who may be released immediately under the majority's rule. An example is presented in the case of Saroeut Ourk, a Cambodian alien determined to be removable and held pending deportation. See *Ourk* v. *INS*, No. 00-35645 (CA9, Sept. 18, 2000), cert. pending, No. 00-987. Ourk was convicted of rape by use of drugs in conjunction with the kidnaping of a 13-year-old girl; after serving 18 months of his prison term, he was released on parole but was returned to custody twice more for parole violations. Pet. for Cert. in No. 00-987, pp. 4-5. When he was ordered deported and transferred to the custody of the INS, it is no surprise the INS determined he was both a flight risk and a danger to the community. Yet the Court of Appeals for the Ninth Circuit concluded, based on its earlier decision in *Kim Ho Ma* v. *Reno,* 208 F.3d 815 (2000), that Ourk could no longer be held pending deportation, since removal to Cambodia was not reasonably foreseeable. App. to Pet. for Cert. in No. 00-987, pp. 3a-4a. See also *Phetsany* v. *INS*, No. 00-16286 (CA9, Sept. 18, 2000), cert. pending, No. 00-986 (requiring release of a native and {533 U.S. 716} citizen of Laos convicted of attempted, premeditated murder); *Mounsaveng* v. *INS*, No. 00-15309 (CA9, Aug. 11, 2000), cert. pending, No. 00-751 (releasing a citizen of Laos convicted of rape of a 15-year-old girl and reckless endangerment for involvement in a fight in which gunshots were fired); *Lim* v. *Reno*, No. 99-36191 (CA9, Aug. 14, 2000), cert. pending, No. 00-777 (releasing a Cambodian convicted of rape and robbery); *Phuong Phuc Le* v. *INS*, No. 00-16095 (CA9, Sept. 18, 2000), cert. pending, No. 00-1001 (releasing a Vietnamese citizen convicted of voluntary manslaughter {150 L. Ed. 2d 684} in a crime involving the attempted murder of two other persons). Today's result will ensure these dangerous individuals, and hundreds more like them, will

remain free while the Executive Branch tries to secure their removal. By contrast, aliens who violate mere tourist visa requirements, *ante*, at 11, can in the typical case be held pending deportation on grounds that a minor offender is more likely to be removed. There is no reason to suppose Congress intended this odd result.

The majority's rule is not limited to aliens once lawfully admitted. Today's result may well mandate the release of those {121 S. Ct. 2513} aliens who first gained entry illegally or by fraud, and, indeed, is broad enough to require even that inadmissible and excludable aliens detained at the border be set free in our community. In *Rosales-Garcia v. Holland*, 238 F.3d 704, 725 (CA6 2001), for example, Rosales, a Cuban citizen, arrived in this country during the 1980 Mariel boatlift. Id. at 707. Upon arrival in the United States, Rosales was released into the custody of a relative under the Attorney General's authority to parole illegal aliens, see 8 U.S.C. § 1182(d)(5)(A), and there he committed multiple crimes for which he was convicted and imprisoned. 238 F.3d at 707-708. While serving a sentence for burglary and grand larceny, Rosales escaped from prison, another of the offenses {533 U.S. 717} for which he ultimately served time. Id. at 708. The INS eventually revoked Rosales' immigration parole, ordered him deported, and held him pending deportation, subject to periodic consideration for parole under the Cuban Review Plan. See 8 CFR § 212.12(g)(2) (2001). In reasoning remarkably similar to the majority's, the Court of Appeals for the Sixth Circuit held that the indefinite detention of Rosales violated Fifth Amendment due process rights, because "the government offered . . . no credible proof that there is any possibility that Cuba may accept Rosales's return anytime in the foreseeable future." 238 F.3d at 725. This result -- that Mariel Cubans and other illegal, inadmissible aliens will be released notwithstanding their criminal history and obvious flight risk -- would seem a necessary consequence of the majority's construction of the statute.

The majority's confidence that the Judiciary will handle these matters "with appropriate sensitivity," *ante*, at 16, 20, allows no meaningful category to confine or explain its own sweeping rule, provides no justification for wresting this sovereign power away from the political branches in the first place, and has no support in judicially manageable standards for deciding the foreseeability of removal.

It is curious that the majority would approve of continued detention beyond the 90-day period, or, for that matter, during the 90-day period, where deportation is not reasonably foreseeable. If the INS cannot detain an alien because he is dangerous, it would seem irrelevant to the Constitution or to the majority's presumption that the INS has detained the alien for only a little while. The reason detention is permitted at all is that a removable alien does not have the same liberty interest as a citizen does. The Court cannot bring itself to acknowledge this established proposition. Likewise, {150 L. Ed. 2d 685} it is far from evident under the majority's theory why the INS can condition and supervise the release of aliens who are not removable in the reasonably foreseeable future, or why "the alien may no doubt be returned to custody upon {533 U.S. 718} a violation of those conditions." Id. at 20. It is true that threat of revocation of supervised release is necessary to make the supervised release itself effective, a fact even counsel for Zadvydas acknowledged. Brief for Petitioner in No. 99-7791, at 20-21. If that is so, however, the whole foundation for the Court's position collapses.

The Court today assumes a role in foreign relations which is unprecedented, unfortunate, and unwise. Its misstep results in part from a misunderstanding of the liberty interests these aliens retain, an issue next to be discussed.

II

The aliens' claims are substantial; their plight is real. They face continued detention, perhaps for life, unless it is shown they no longer present a flight risk or a danger to the community. In a later case the specific circumstances of a detention may present a substantial constitutional question. That is not a reason, however, for framing a rule which ignores the law governing alien status.

{121 S. Ct. 2514} As persons within our jurisdiction, the aliens are entitled to the protection of the Due Process Clause. Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention. The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens, however. See, *e.g.*, *Mathews v. Diaz*, 426 U.S. 67,

79-80, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens"). No party to this proceeding contests the initial premise that the aliens have been determined to be removable after a fair hearing under lawful and proper procedures. Section 1229a sets forth the proceedings required for deciding the inadmissibility or removability of an alien, including a hearing before an immigration judge, at which the INS carries "the burden of establishing by clear and convincing evidence that . . . the alien is deportable." 8 U.S.C. § 1229a(c)(3)(A); {533 U.S. 719} see also *Berenyi* v. *District Director, INS*, 385 U.S. 630, 636, 17 L. Ed. 2d 656, 87 S. Ct. 6661 (1967) ("When the Government seeks to . . . deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by clear, unequivocal, and convincing evidence" (internal quotation marks and footnotes omitted)). Aliens ordered removed pursuant to these procedures are given notice of their right to appeal the decision, 8 U.S.C. § 1229a(c)(4), may move the immigration judge to reconsider, § 1229a(c)(5), can seek discretionary cancellation of removal, § 1229b, and can obtain habeas review of the Attorney General's decision not to consider waiver of deportation. See *INS* v. *St. Cyr, ante*, at __ (2001) (slip op., at 24). As a result, aliens like Zadvydas and Ma do not arrive at their removable status without thorough, substantial procedural safeguards.

The majority likely is correct to {150 L. Ed. 2d 686} say that the distinction between an alien who entered the United States, as these aliens did, and one who has not, "runs throughout immigration law." *Ante*, at 13. The distinction is not so clear as it might seem, however, and I doubt it will suffice to confine the rationale adopted by the majority. The case which often comes to mind when one tests the distinction is *Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206, 97 L. Ed. 956, 73 S. Ct. 625 (1953), where the Court considered the situation of an alien denied entry and detained on Ellis Island. The detention had no foreseeable end, for though Mezei was inadmissible to the United States it seemed no other country would have him. Id. at 209. The case presented a line-drawing problem, asking whether the alien was in our country; or whether his situation was the same as if he were still on foreign shores; or whether he fell in a legal category somewhere in between, though if this were true, it still would not be clear how to resolve the case. The Court held the alien had no right to a hearing to secure his release. Id. at 212-213. (Approximately 17 months after this Court denied Mezei relief, the Attorney General released him on parole. It appears Mezei {533 U.S. 720} never returned to INS custody, though he was not admitted to the United States as a citizen or lawful permanent resident. See Weisselberg, The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L. Rev. 933, 979-984 (1995)).

Here the majority says the earlier presence of these aliens in the United States distinguishes the cases from *Mezei*. For reasons given here it is submitted the majority is incorrect in its major conclusions in all events, so even if it were assumed these aliens are in a class with more rights than *Mezei*, it makes no difference. For purposes of this dissent it is not necessary to rely upon *Mezei*. That said, it must be made clear these aliens are in a position far different from aliens with a lawful right to remain here. {121 S. Ct. 2515} They are removable, and their rights must be defined in accordance with that status. The due process analysis must begin with a "careful description of the asserted right." *Reno* v. *Flores*, 507 U.S. 292, 302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). We have "long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon* v. *Plasencia*, 459 U.S. 21, 32, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982). The same is true for those aliens like Zadvydas and Ma, who face a final order of removal. When an alien is removable, he or she has no right under the basic immigration laws to remain in this country. The removal orders reflect the determination that the aliens' ties to this community are insufficient to justify their continued presence in the United States. An alien's admission to this country is conditioned upon compliance with our laws, and removal is the consequence of a breach of that understanding. It is true the Court has accorded more procedural protections to those aliens admitted to the country than those stopped at the border, observing that "a continuously present alien is entitled to a fair

hearing {150 L. Ed. 2d 687} when threatened with {533 U.S. 721} deportation." Ibid.; Mezei, supra, at 212 ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law . . . . But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned'" (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544, 94 L. Ed. 317, 70 S. Ct. 309 (1950))). Removable and excludable aliens are situated differently before an order of removal is entered; the removable alien, by virtue of his continued presence here, possesses an interest in remaining, while the excludable alien seeks only the privilege of entry.

Still, both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish. See Wong Wing v. United States, 163 U.S. 228, 41 L. Ed. 140, 16 S. Ct. 977 (1896). This accords with international views on detention of refugees and asylum seekers. See Report of the United Nations Working Group on Arbitrary Detention, U. N. Doc. E/CN.4/2000/4 (Dec. 28, 1999); United Nations High Commissioner for Refugees, Guidelines on Applicable Criteria and Standards Relating to the Detention on Asylum-Seekers (Feb. 10, 1999). It is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community.

Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large. The procedures {533 U.S. 722} to determine and to review the status-required detention go far toward this objective.

By regulations, promulgated after notice and comment, the Attorney General has given structure to the discretion delegated by the INA in order to ensure fairness and regularity in INS detention decisions. First, the INS provides for an initial postcustody review, before the expiration of the 90-day removal period, at which a district director conducts a record review. 8 CFR § 241.4 (2001). The alien is entitled to present any relevant information in {121 S. Ct. 2516} support of release, and the district director has the discretion to interview the alien for a personal evaluation. § 241.4(h)(1). At the end of the 90-day period, the alien, if held in custody, is transferred to a postorder detention unit at INS headquarters, which in the ordinary course will conduct an initial custody review within three months of the transfer. § 241.4(k)(2)(ii). If the INS determines the alien should remain in detention, a two-member panel of INS officers interviews the alien and makes a recommendation to INS headquarters. §§ 241.4(i)(1)-(3). The regulations provide an extensive, {150 L. Ed. 2d 688} nonexhaustive list of factors that should be considered in the recommendation to release or further detain. Those include: "the nature and number of disciplinary infractions"; "the detainee's criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history"; "psychiatric and psychological reports pertaining to the detainee's mental health"; "evidence of rehabilitation"; "favorable factors, including ties to the United States such as the number of close relatives"; "prior immigration violations and history"; "the likelihood that the alien is a significant flight risk or may abscond to avoid removal, including history of escapes"; and any other probative information. § 241.4(f). Another review must occur within one year, with mandatory evaluations each year thereafter; if the alien requests, {533 U.S. 723} the INS has the discretion to grant more frequent reviews. § 241.4(k)(2)(iii). The INS must provide the alien 30-days advance, written notice of custody reviews; and it must afford the alien an opportunity to submit any relevant materials for consideration. § 241.4(i)(3)(ii). The alien may be assisted by a representative of his choice during the review, §§ 241.4(i)(3)(i), (ii), and the INS must provide the alien with a copy of its decision, including a brief statement of the reasons for any continued detention, § 241.4(d).

---

**PHONG DOAN, Petitioner, vs. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
**78 F. Supp. 2d 1101;2000 U.S. Dist. LEXIS 182**
**CASE NO. 99-1420 JM**
**January 6, 2000, Decided**
**January 6, 2000, Filed**

---

**Disposition:** Petition for habeas corpus denied.

**Counsel**                         For Petitioner: Todd Burns, Esq., Federal Defenders of San Diego, Inc.,
San Diego, CA.

For Respondent: Samuel W. Bettwy, Esq., Special Assistant U.
S. Attorney, Office of the United States Attorney, San Diego, CA.

**Judges:** JEFFREY T. MILLER, United States District Judge.

## Opinion

**Opinion by:**            JEFFREY T. MILLER

## Opinion

**{78 F. Supp. 2d 1102} REVISED ORDER DENYING PETITION FOR HABEAS CORPUS 1**

Petitioner Phong Doan, who is being indefinitely detained by the Immigration and Naturalization Service ("INS") pending his eventual repatriation to the Socialist Republic of Vietnam ("SRV"), has filed a Petition for Writ of Habeas Corpus ("Petition") in which he challenges the constitutionality of his continued detention. For the reasons set forth below, the petition is denied and the action dismissed.

Petitioner, Phong Doan, has been in detention awaiting deportation since October 28, 1998. On July 9, 1999 Petitioner filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 1441, contending that his indefinite detention is in violation of his due process rights guaranteed by the Fifth Amendment.

Petitioner is a native of Vietnam who immigrated to the United States in 1975; and in 1978 his immigration status was adjusted to that of a lawful permanent resident. Petitioner has a lengthy criminal record which includes convictions for felony assault; felon in possession of a firearm; felony conspiracy to commit robbery; misdemeanor conviction for leaving county jail without authorization; and misdemeanor vandalism. Petitioner has spent the better part of the past decade in state confinement. After completion of the sentence he received on May 25, 1994 for attempted robbery, conspiracy to commit robbery and possession of a firearm, on September 24, 1998, the Immigration and Naturalization Service ("INS") placed Petitioner in removal proceedings and determined that he should be detained without bond.

On October 28, 1998 the immigration judge ordered Petitioner removed from the United States to Vietnam. Petitioner appealed to the Board of Immigration Appeals ("BIA") and, effective April 13, 1999, Petitioner withdrew the appeal. In February 1999, the INS conducted a further custody review at

---

Petitioner's request and determined that he continued to present both a danger to the community and a flight risk.

On July 15, 1999, the court ordered the INS to show cause why Petitioner had not been deported to Vietnam. To assist Petitioner in prosecuting this habeas petition, on September 10, 1999, the court appointed counsel to represent him.

A. Exhaustion of Administrative Remedies 2

As an initial matter, the government appears to contend that the court lacks jurisdiction to entertain the Petition because Petitioner failed to exhaust his administrative remedies. While the Immigration and Naturalization Act ("INA") does not contain a statutory provision requiring exhaustion of administrative remedies, the court may apply the doctrine where "sound judicial discretion" is advisable. McCarthy v. Madigan, 503 U.S. 140, 144, 117 L. Ed. 2d 291, 112 S. Ct. 1081 (1992). While administrative procedures are available to review discretionary determinations by the Attorney General, such as whether Petitioner presents a flight risk or a danger to the community, the issues raised in the Petition go beyond the scope {78 F. Supp. 2d 1103} of available administrative review. Petitioner contends that his continued detention is unlawful and in violation of his Fifth Amendment rights. Because no administrative proceeding is available to determine the extent of Petitioner's liberty interests under the Fifth Amendment, the exhaustion requirements do not bar the present Petition. See Id; Phan v. Reno, 56 F. Supp. 2d 1149, 1153 (W.D. Wash. 1999). B. Basis for Petitioner's Detention

Pursuant to 8 U.S.C. § 1226(c)(1), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IRRIRA"), the Attorney General is mandated to take into custody any alien who is deportable by virtue of having committed one of the wide variety of offenses as set forth in 8 U.S.C. § 1227(a)(2)(A) - (D). Although the INS is mandated to remove deportable aliens within 90 days, under 8 U.S.C. § 1231(a)(6) the INS can continue to detain aliens such as Petitioner who have been ordered deported but who have not been removed within the normal 90 day removal period.

If the alien is not removed within the 90 day removal period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. 1231(a)(6). The regulations provide that the detainee may be released from physical detention upon demonstrating "by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk. . . ." 8 C.F.R. § 241.4(a). In reaching this determination, the INS district director is to take into account the following factors: (1) the nature and seriousness of the alien's criminal convictions; (2) the sentences imposed and time actually served; (3) the detainee's history of failing to appear in court; (4) probation history; (5) disciplinary problems while incarcerated; (6) evidence of rehabilitative effort or recidivism; (7) the equities in the United States; and (8) prior immigration violations and history. Id. Here, in February 1999 the Attorney General determined that Petitioner poses a danger to the community based upon a review of pertinent factors, including his lengthy criminal history.

The issues raised by the detention of "indefinite detainees" require the court to analyze and reconcile two competing and legitimate interests. On the one hand, "'the exclusion of aliens is a fundamental act of national sovereignty' that 'stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.'" Zadvydas v. Underdown, 185 F.3d 279, 288 (5th Cir. 1999) (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 94 L. Ed. 317, 70 S. Ct. 309 (1950)). Not only does the Constitution provide Congress with "plenary power over immigration matters," Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 201, 125 L. Ed. 2d 128, 113 S. Ct. 2549 (1993), but the power to exclude or deport aliens is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Fiallo v. Bell, 430 U.S. 787, 792, 52 L. Ed. 2d 50, 97 S. Ct. 1473 (1977) (citations omitted). Stated another

way, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 97 L. Ed. 956, 73 S. Ct. 625 (1953).

On the other hand, the Fifth Amendment to the United States Constitution protects the basic and fundamental right to ensure that no person will be deprived of life, liberty or property without due process of the law. U.S. Const. Amend. V. The protections of the Fifth Amendment extend to all "persons," including {78 F. Supp. 2d 1104} deportable aliens, within the borders of the United States. See Landon v. Plasencia, 459 U.S. 21, 31-32, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982). "Even one whose presence in this country is unlawful, involuntarily, or transitory is entitled to that constitutional [Fifth Amendment] protection." Mathews v. Diaz, 426 U.S. 67, 77, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976).

In reconciling these apparently conflicting interests, courts generally apply one of two different legal standards to determine the extent of an alien's due process rights. 3 Because the legal standards define the extent of Petitioner's Fifth Amendment rights, each is discussed below.

### 1. The Fundamental Rights Approach

In the first instance, Petitioner contends that his indefinite detention violates his fundamental liberty interests under the Fifth Amendment, i.e., that he has a substantive due process right to be free from the detention under which he now finds himself. Where a fundamental liberty right is at issue, the government may only infringe upon that right if the legislation is narrowly tailored to serve a compelling state interest. See Reno v. Flores, 507 U.S. 292, 301-02, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). If such a fundamental right is not implicated, courts will still scrutinize the governmental action at issue, although courts will only require "a reasonable fit between governmental purpose . . . and the means chosen to advance that purpose." Id. at 305.

The substantive due process analysis has two primary features:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in the Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decision making," that direct and restrain our exposition of the Due Process Clause. Washington v. Glucksberg, 521 U.S. 702, 720, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997) (citations omitted).

Neither of the two features of the substantive due process analysis supports a finding that a resident alien who is ordered deported as an aggravated felon has a fundamental liberty interest in being released from detention pending his or her eventual deportation. Indeed, the history, practices, and traditions of our nation's immigration policies consistently bear witness to judicial deference to congressional power over immigration matters. Further, a study of the history, practices, and traditions does not disclose the existence of any fundamental liberty interest, as asserted by Petitioner, to be free from detention pending deportation. In 1896 the Supreme Court articulated the extent of Congress' plenary powers over immigration:

> We regard it as settled by our previous decisions that the United States can, as a matter of public policy, by congressional enactment forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from the territory. . . . No limits can be put by the courts upon the power of congress to protect, by summary methods, the country from the advent

of aliens whose [] habits render them undesirable as citizens, or to expel such if they have already found their way into our land, and unlawfully remain therein.{78 F. Supp. 2d 1105} Wong Wing v. United States, 163 U.S. 228, 237, 41 L. Ed. 140, 16 S. Ct. 977 (1896). Similarly, "the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law." United States ex rel. John Turner v. William Williams, 194 U.S. 279, 290, 48 L. Ed. 979, 24 S. Ct. 719 (1904). The history of our immigration policies also reveals that prior to the enactment of the Immigration Act of 1907, Sec. 20, 34 Stat. 904, 905, a detained alien did not even have the right to seek a bond and was detained pending the ultimate resolution of the deportation proceedings. See United States ex rel. Zapp v. District Director Of Immigration & Naturalization, 120 F.2d 762, 765 (2nd Cir. 1941); Ng Fung Ho v. White, 259 U.S. 276, 280, 66 L. Ed. 938, 42 S. Ct. 492 (1922) ("Congress has power to order at any time the deportation of aliens whose presence in the country it deems hurtful, and may do so by appropriate executive proceedings.").

In 1953, the Supreme Court again reaffirmed the plenary powers of Congress over immigration by finding that the indefinite detention of aliens does not violate the Fifth Amendment. See Mezei, 345 U.S. at 212. In Mezei, the Attorney General indefinitely detained a long term 25 year resident alien when he attempted to reenter the United States because he posed a security threat. Mezei was a stateless person and no other nation would accept him into their country. The Supreme Court recognized that the power to expel or exclude aliens is a "fundamental sovereign attribute" and concluded that no constitutional violation had occurred while emphasizing that an individual's "right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate." Id. at 216. While Mezei involved an excludable alien, the power to detain and expel either excludable or deportable aliens is a fundamental attribute of sovereignty: the "right of a nation to expel or deport foreigners who have not been naturalized . . . is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." Fong Yue Ting v. United States, 149 U.S. 698, 37 L. Ed. 905, 13 S. Ct. 1016 (1893).

Further supporting a finding that indefinite detainees do not possess a fundamental liberty interest are the numerous authorities holding that the indefinite detention of Mariel Cubans does not violate any fundamental liberty interest. See Guzman v. Tippy, 130 F.3d 64, 65 (2nd Cir. 1997); Barrera-Echavarria v. Rison, 44 F.3d 1441, 1445 (9th Cir. 1995) (excludable aliens do not have a constitutional right to be free from detention, even for an extended period of time); Gisbert v. U.S. Attorney General, 988 F.2d 1437, 1446 (5th Cir.) amended, 997 F.2d 1122 (5th Cir. 1993); Fernandez-Roque v. Smith, 734 F.2d 576, 580 n.6 (11th Cir. 1984); Palma v. Verdeyen, 676 F.2d 100, 103 (4th Cir. 1982); but see Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382 (10th Cir. 1991) (indefinite detention not a permissible alternative to exclusion).

In sum, a review of pertinent authorities indicates a deeply rooted tradition which recognizes the limited rights of aliens and the plenary powers of Congress and the Executive branches of government to regulate and control immigration. Our legal traditions, history and actual practices support a finding that deportable indefinite detainees do not have a fundamental right to liberty. The authorities reveal that there is no fundamental liberty interest for a deportable alien to be free from detention that is "deeply rooted in the nation's history," and "implicit in the concept of ordered liberty." Washington, 521 U.S. at 720.

Petitioner raises several arguments in support of what he believes is the fundamental right of an indefinite detainee to be released into society when his country of citizenship refuses to repatriate him. These arguments are not persuasive. First, Petitioner contends that his detention cannot serve as criminal punishment without violating the Fifth Amendment's double jeopardy clause or his due process {78 F. Supp. 2d 1106} rights. In essence, Petitioner contends that his detention is constitutional only when the detention is limited as to time, is not punitive in effect, and promotes

legitimate governmental interests. See Addington v. Texas, 441 U.S. 418, 427, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1978) ("the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence."). As asserted by Petitioner, the substantive due process analysis includes the determination of whether the detention is imposed for the purpose of punishment or whether the detention is incidental to another legitimate purpose. Whether the legislation was intended to punish indefinite detainees turns on "whether an alternative purpose to which [the detention] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. " Schall v. Martin, 467 U.S. 253, 269, 81 L. Ed. 2d 207, 104 S. Ct. 2403 (1984). "Thus, if a particular condition or restriction of . . . detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Bell v. Wolfish, 441 U.S. 520, 538, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979).

With respect to Petitioner's argument that his continued detention constitutes punishment, as has been articulated by the Supreme Court, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." United States v. Salerno, 481 U.S. 739, 749, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1986). Petitioner is being detained pursuant to 8 U.S.C. 1231(a)(6) and 8 C.F.R. § 241.4(a) and the Attorney General's determination that Petitioner presents a danger to the community and a flight risk. 4 The government has a substantial, if not compelling, interest in safeguarding the community, see Salerno, 481 U.S. at 749, and insuring that aggravated felons subject to a final deportation order will not abscond. See Bell, 441 U.S. at 538. Moreover, "it is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment." Mahler v. Eby, 264 U.S. 32, 39, 68 L. Ed. 549, 44 S. Ct. 283 (1924). The Constitution provides that Congress and the Executive branches of government bear the responsibility of regulating the relationship between aliens and the United States. See Reno v. Flores, 507 U.S. 292, 300, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). Clearly, it is within the plenary powers of Congress, and a rational exercise of legislative power, to mandate the detention of aggravated felons who by their conduct have forfeited the legal right (and privilege) to remain in the country and continue to present a danger to the community or a flight risk. See Fong Yue Ting v. United States, 149 U.S. 698, 730, 37 L. Ed. 905, 13 S. Ct. 1016 (1893). As such, the continued detention of Petitioner, in light of the Attorney General's determination that he continues to represent a threat to the community and a flight risk, does not implicate a fundamental right on the asserted rationale that Petitioner's detention constitutes punishment.

Next, Petitioner contends that this court should follow the reasoning of Phan v. Reno, 56 F. Supp. 2d 1149, wherein the court recognized that resident aliens have a fundamental liberty interests in being free from incarceration. In Phan, the district court judges of the Western District of Washington issued a joint order identifying {78 F. Supp. 2d 1107} three governmental interests related to indefinite detainees: "(1) ensuring the removal of aliens ordered deported; (2) preventing flight prior to deportation; and (3) protecting the public from dangerous felons." Phan, 56 F. Supp. 2d at 1156. Without the benefit of legal authority, the district court judges adopted a Fifth Amendment due process sliding scale whereby

> as the probability that the government can actually deport an alien decreases, the government's interest in detaining that alien becomes less compelling and the invasion into the alien's liberty more severe. Dangerousness and flight risk are thus permissible considerations and may, in certain situation, warrant continued detention, but only if there is a realistic chance that an alien will be deported. Detention by the INS can be lawful only in aid of deportation. Thus, it is "excessive" to detain an alien indefinitely if deportation will never occur. Id. While such an analytical structure is the product of thoughtful consideration of the difficult problem posed by the indefinite detention of alien deportees, such an analysis is predicated upon whether "there is a realistic chance that an alien will be deported," id, 5 rather than upon an analysis of those

fundamental rights and liberties "deeply rooted in the Nation's history and tradition." Washington, 521 U.S. at 720. The Phan court indicates that the focus should be on the status of diplomatic negotiations between the United States and those countries with whom which the United States does not maintain normal diplomatic relations or those countries who are not parties to repatriation agreements. The difficulty with this analytical framework is that it places the court in the position of assessing the adequacy, or desirability, of diplomatic negotiations in order to determine whether an agreement between the parties is objectively "realistic." 6 The Constitution grants to the legislative and executive branches of government the powers to declare and wage war, to conclude peace, to make treaties, and to maintain diplomatic relations with other sovereignties, see U.S. Const. art I, § 8; art II, § 2, and not to the judicial branch of government. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318, 81 L. Ed. 255, 57 S. Ct. 216 (1936). Accordingly, the court's inquiry into the "status" of diplomatic negotiations is severely restricted and mandates judicial deference. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 866, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984) ("Federal judges--who have no constituency--have a duty to respect legitimate policy choices made by those who do").

Furthermore, while the Phan court recognized that Congress has plenary powers over immigration it nevertheless reasoned that "indefinite detention of aliens ordered deported is not a matter of immigration policy; it is only a means by which the government implements congress' directives." Phan, 56 F. Supp. 2d at 1156. {78 F. Supp. 2d 1108} The court then supports this statement by stating that "the prevention of flight and the protection of the community pending deportation of aliens who have been convicted of crimes, involve domestic interests rather than international concerns." Id.

These arguments fail to recognize the constitutional powers delegated to Congress to regulate aliens. "Over no conceivable subject is the legislative power of Congress more complete." Fiallo, 430 U.S. at 792. The detention of alien aggravated felons who are considered to be either a danger to the community or a flight risk are rationally related to Congress's legitimate purpose of expelling such aliens. The detention of deportable aliens pending deportation is inextricably entwined with immigration policy. The simple fact that detention is a means of carrying out the eventual deportation of deportable aliens makes it no less a matter of immigration policy than Congress's determination that aggravated felons are to be deported. Moreover, the detention of aliens significantly implicates international relations in a way not applicable to citizens. Aliens, unlike United States citizens, may claim the protections afforded by numerous international treaties including the Convention on Human Rights and the Vienna Convention on Consular Relation. Thus, it is well within Congress' power to determine when, and under what conditions an aggravated alien felon may be detained or deported. See Fong Yue Ting, 149 U.S. at 730 (the right to expel or deport aliens "is as absolute and unqualified as the right to prohibit and prevent their entrance into the county.").

Finally, not only would a black-letter rule precluding the indefinite detention of deportable aliens, unless there exists a "realistic" opportunity for repatriation, run counter to the Supreme Court's holding in Mezei, but it would significantly expand traditional notions of substantive due process. The Supreme Court has cautioned against the expansion of substantive due process concepts "because the guideposts for responsible decision-making in this unchartered area are scarce and open-ended." Collins v. Harker Heights, 503 U.S. 115, 125, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992). "Accordingly, the court has directed the 'exercise of utmost care' when a party seeks to break new ground in the area of substantive due process rights." Tran v. Caplinger, 847 F. Supp. 469, 474 (W.D. La. 1993) (deportable alien does not have a fundamental right to be free of detention pending his deportation after having been convicted of an aggravated felony) (citing Collins, 503 U.S. at 125). Such an expansive view of substantive due process as urged by Petitioner should not be undertaken lightly or in the absence of persuasive judicial or statutory authority.

Finally, Petitioner contends that the more demanding standard of review set forth in United States v. Salerno, 481 U.S. 739, 746-47, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1986) should apply. In Salerno, the Supreme court addressed a due process challenge to the Bail Reform Act of 1984. The test used in Salerno was twofold: (1) the statute must be regulatory, not punitive; and (2) if the statute is regulatory, it must not "appear excessive" in relation to the purpose behind the statute. Id. at 747. The soundness of applying this more demanding standard of review is suspect. The liberty interests at stake in Salerno involved a defendant's ability be free of pre-trial governmental restraint and imprisonment pending criminal prosecution. Here, by contrast, Petitioner seeks post-conviction relief and, significantly, no longer enjoys the presumption of innocence as did the defendant in Salerno. Moreover, the Bail Reform Act does not implicate the plenary powers of Congress over immigration matters. The court thus rejects the application of the standard set forth in Salerno.

In sum, the court concludes that the indefinite detention of Petitioner does not implicate a fundamental right. Petitioner's substantive due process rights are {78 F. Supp. 2d 1109} simply to be free from arbitrary and capricious governmental conduct.

2. The Deferential Standard of Review

Having determined that Petitioner's detention is not subject to heightened scrutiny, the only remaining issue is to define, in pertinent part, the extent of Petitioner's due process rights. The only two circuit courts that have addressed the issue of indefinite detention of deportable aliens have concluded that

> there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community. Chi Thon Ngo v. Immigration and Naturalization Service, 192 F.3d 390, 397 (3rd Cir.1999); Zadvydas, 185 F.3d at 297 ("We hold that the government may [indefinitely] detain a resident alien based on either danger to the community or risk of flight while good faith efforts to effectuate the alien's deportation continue and reasonable parole and periodic review procedures are in place.").

Both Zadvydas, 185 F.3d at 294, and Chi Thon Ngo, 192 F.3d at 397, followed the reasoning of Mezei. In Zadvydas the Fifth Circuit analyzed the due process rights of a stateless person with a long criminal history in the United States who had been ordered deported but was being indefinitely detained by the INS. Zadvydas was born in a displaced persons refugee camp in Germany following World War II; and subsequently immigrated with his family to the United States, but he never became a citizen. Zadvydas had been a permanent legal resident for over 33 years before his detention by the INS. The district court released Zadvydas from custody finding that his permanent detention violated his Fifth Amendment liberty interests. The Fifth Circuit reversed finding that a deportable "resident alien may claim no greater rights than an excludable alien in like circumstances." Zadvydas, 185 F.3d at 285. The court concluded that the Mezei formulation applied equally to excludable and deportable aliens alike reasoning that "courts have long recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict." Id. at 289; see Fong Yue Ting, 149 U.S. at 698 ("The right of a nation to expel or deport foreigners who have not been naturalized . . . is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.").

The constitutional rationale for applying the Mezei formulation to both excludable and deportable aliens is rooted in the plenary powers of Congress to control immigration, see Landon v. Plasencia, 459 U.S. 21, 74 L. Ed. 2d 21, 103 S. Ct. 321 (1982) (in determining the rights of a resident alien, due process concerns "must weigh heavily in [favor of] control over matters of immigration" because such control is a "sovereign prerogative"), and the notion that deportation is a civil proceedings not subject to the same procedural protections as a criminal trial. See I.N.S. v. Lopez-Mendoza, 468 U.S. 1032,

82 L. Ed. 2d 778, 104 S. Ct. 3479 (1984). Furthermore, excludable and deportable aliens share another common trait: neither have the legal right to be physically present in the country.

To summarize, the court finds the reasoning of the Third and Fifth Circuits persuasive. To the extent Petitioner retains substantive due process rights, those substantive rights do not include a fundamental liberty interest. Petitioner's liberty interests are defined by Congress; and as long as there is a rational basis advancing some legitimate government purpose the court cannot substitute its judgment for that of Congress.

Applying the Fifth Amendment analysis set forth above to the present petition, the court concludes that Petitioner's continued indefinite detention does not {78 F. Supp. 2d 1110} offend the substantive due process provision of the Fifth Amendment. For the above-stated reasons, Petitioner's detention does not implicate a fundamental right, Petitioner's detention is not excessive in relation to the purpose of the statute, and there is a rational relationship between Petitioner's detention and the governmental interest (i.e. Petitioner continues to represent a danger to the community and a flight risk) that the detention seeks to further.

While the government may indefinitely detain Petitioner, that does not mean that Petitioner is afforded no constitutional or statutory protections. At a minimum, Petitioner, as a deportable alien, is entitled to be free from arbitrary and capricious governmental actions or omissions. See Flores, 507 U.S. at 305 (where a fundamental right is not implicated, courts require only "a reasonable fit between governmental purpose . . . and the means chosen to advance that purpose."). Although not presently before the court, were there to be no possibility of repatriation under any future circumstances and were Petitioner not afforded the opportunity to demonstrate that he no longer presents a danger to the community or a flight risk, then Petitioner's continued detention could be arbitrary and capricious. Similarly, Petitioner has certain due process rights which include the opportunity to present evidence at a hearing, see 8 C.F.R. § 241(a), and the right to a meaningful review of the materials submitted to the Attorney General. 7

At this point in time, Petitioner has not suffered a deprivation of his Fifth Amendment due process rights. The court finds that the government has acted in good faith in its attempts to repatriate Vietnamese nationals to the SRV. As set forth in the July 21, 1999 declaration of James G. Herren, Assistant Legal Adviser for East Asian and Pacific Affairs, the United States and SRV have made significant strides towards establishing normal diplomatic relations. Those strides include the recent establishment of full diplomatic ties with SRV, the opening of the United States Embassy in SRV, and the approval by the State Department of a final repatriation agreement which was to be submitted to the SRV Embassy in Washington D.C. prior to the end of August 1999. Further evidence that a repatriation agreement is possible is the fact that the SRV recently entered into a similar repatriation agreement with Canada. (Herren Decl. P 14). Next, there are adequate and reasonable procedures for Petitioner to obtain parole. Petitioner may obtain parole upon demonstrating that he is neither a danger to the community or a flight risk. See 8 C.F.R. § 241.4(a). Here, the Attorney General determined that Petitioner presents a danger to the community and that his continued detention is required to prevent harm to society. Not only does the INS have a duty to periodically review Petitioner's status to determine if continued detention is warranted, but Petitioner may, at any time, come forward with evidence to meet his burden that he is no longer a flight risk or a danger to the community.

Finally, Petitioner contends that he has been denied a meaningful administrative review by the INS. Petitioner argues that, as set forth in Phan and other authorities, the INS has generally not provided a meaningful review of the record. While this is an argument which raises abstract procedural due process concerns, Petitioner fails to identify any constitutional shortcomings as applied to him. Petitioner cannot simply state, in conclusory fashion, that the INS procedures are inadequate without coming forward to identify any particular shortcoming in his specific case.

In conclusion, for the reasons set forth above, the petition for habeas corpus is denied.

DATED: 1/6, 2000

United States District Judge

**Footnotes**

1

This revised order is issued to correct several clerical errors in this court's original order entered on January 4, 2000.

2

The government contends that the court lacks jurisdiction to entertain Petitioner's constitutional challenges. This court has consistently held that the court has limited jurisdiction to review certain constitutional issues, like those presented here, under 28 U.S.C. § 2241. See Magana Pizano v. INS, 200 F.3d 603, 1999 U.S. App. LEXIS 33814, 1999 WL 1249703 (9th Cir.); Goncalves v. Reno, 144 F.3d 110, 119 (1st Cir. 1989). cert. denied, 526 U.S. 1004, 119 S. Ct. 1140, 143 L. Ed. 2d 208 (1999); Velasquez v. Reno, 37 F. Supp. 2d 663 (D.N.J. 1999); Tam v. INS, 14 F.2d 1184, 1187-89 (E.D. Cal. 1998).

3

As emphasized by the parties, neither the Ninth Circuit nor the Supreme Court has addressed the issue of whether an indefinitely detained resident aliens possesses a fundamental liberty interest in being free from detention when his country of citizenship will not accept the individual's repatriation.

4

The court observes that prior to the enactment of IRRIRA, the Attorney General could not detain aliens for more than six months after a final order of deportation. See Castillo-Gradis v. Turnage, 752 F. Supp. 937, 941 (S.D. Cal. 1990). However, prior to enactment of the indefinite detention provisions of IRRIRA, approximately 90% of persons in Petitioner's situation absconded when released on bail. See 62 Fed. Reg. 10,312, 10,323 (1997). Thus, one of the legislative purposes behind the indefinite detention provisions of IRRIRA is to prevent aliens, subject to a final order of deportation, from absconding.

5

The "realistic chance" of deportation is a significant departure from the "possibility of deportation" applied in Zadvydas, 185 F.3d at 297, and Chi Thon Ngo v. Immigration and Naturalization Service, 192 F.3d 390, 397 (3rd Cir.1999). For example, in Zadvydas, the petitioner was stateless but the Fifth Circuit found there was a possibility of deportation because Zadvydas was born to Lithuanian parents who, prior to World War II, lived in a part of the Lithuania that was controlled by the Soviet Union following World War II. The Fifth Circuit reasoned that Zadvydas could possibly apply for Russian citizenship and therefore there was a possibility of deportation. While his repatriation was possible under this scenario, it would not likely have been "realistic" at that point in time because Petitioner appears not to have taken any steps to obtain Russian citizenship. At the very least, Zadvydas faced numerous hurdles before he could realistically obtain Russian citizenship.

6

The ordinary meaning of the word "realistic" is defined as "1. Tending to or expressing an awareness of things as they really are <a <ITALICS>realistic goal for a beginner > 2. Accurately representing what is depicted or described <a <ITALICS>realistic portrayal of pioneer life >." Webster's II New College Dictionary 922 (1995)

7

These are essentially the same rights provided for in <u>Zadvydas</u> and <u>Chi Thon Ngo</u>:

> there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.<u>Chi Thon Ngo</u>, 192 F.3d at 397.

# EXHIBIT 8

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
DENVER, COLORADO

FILE: A 77 309 675  -- Aurora, CO

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| Solomon Ben-Tov COHEN | ) | IN ASYLUM-ONLY PROCEEDINGS |
| | ) | |
| RESPONDENT | ) | |

### ORDER ON MOTION REQUESTING BOND REDUCTION OR SETTING OF BOND

The respondent is presently in "asylum-only" proceedings.  He is a native and citizen of the United Kingdom who was admitted to the United States as a visitor on June 21, 2002, under the Visa Waiver Pilot Program. *See* section 217 of the Immigration and Nationality Act (8 U.S.C. 1187).  After he overstayed his visa,  the Department of Homeland Security issued an administrative order of removal against him on November 26, 2003.  That order is not reviewable by this court.

He appeared before me with previous counsel, Kimberly Medina, on June 25, 2008.  At the time, I did not have access to the entire record.  Counsel advised the court that a Notice to Appear had been issued and that the respondent was entitled to a bond hearing.  Bond was set in the amount of $10,000.

On the same day, after reviewing the entire record, I discovered that there was no Notice to Appear pending before the Immigration Court.  In fact, the respondent was not in removal proceedings, he was in "asylum-only" proceedings pursuant to the filing of Form I-863.  Form I-863  was filed with the Immigration Court in Arlington, Virginia, on February 13, 2004 and it is in the record of proceedings as Exhibit 1.  Newly-retained counsel,  argues that the Department was under an obligation to issue a form I-863 but did not do so, but this appears to be erroneous.

Accordingly, by written order dated June 25, 2008, I vacated the bond order and reopened the bond proceedings.

The respondent appeared with Ms. Medina on July 16, 2008. The Government was represented by Assistant District Counsel Shana Martin. On that date, I advised the parties that I had no jurisdiction to grant bail, and accordingly the request was denied. Respondent's counsel reserved appeal, but no appeal has ever been filed. A written order should have been issued, but apparently none was issued.

On October 9, 2008, newly-retained counsel filed a motion for setting of bond. I find I do not have jurisdiction to give a bond hearing. Accordingly, the motion will be denied.

*Matter of Gallardo*, 21 I&N Dec. 210 (BIA 1995) held that an alien admitted under the Visa Waiver Pilot Program is entitled to a bond hearing where an Order to Show Cause is issued against him and thus he is placed in deportation proceedings, and where he has applied for asylum.

However, the regulations governing this type of case were subsequently changed. The new regulations apply to aliens who filed for asylum on or after April 1, 1997. The regulations state that an alien who is an applicant for admission or who has been admitted under the Visa Waiver Pilot Program is not entitled to removal proceedings, and that an immigration judge has sole jurisdiction over the asylum application after a form I-863 "Notice of Referral to Immigration Judge" is filed. 8 C.F.R. § 208.2(c).

Further, the scope of the hearing is limited to the application for withholding and deferral of removal. "During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers and *eligibility for any other form of relief.*" 8 C.F.R. § 208(c)(3).

Whereas the respondent is under a final administrative order of removal, and whereas he falls under the Visa Waiver Pilot Program regulations, I find that I have no jurisdiction to consider his request.

ORDER: It is ordered that the request for setting of bond be denied.

October 30, 2008

J. P. Vandello
Immigration Judge

# EXHIBIT 9

*Not included in this filing.*

# EXHIBIT 10

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Aurora, Colorado

File No.:  A 077 309 675                          November 6, 2008

In the Matter of                )
                                )
SOLOMON BEN-TOV COHEN           )     IN ASYLUM ONLY PROCEEDINGS
                                )
            Respondent          )

CHARGE:

APPLICATIONS:


ON BEHALF OF RESPONDENT:            ON BEHALF OF DHS:

Brett Davies                       Weldon S. Caldbeck


ORAL DECISION OF THE IMMIGRATION JUDGE

The respondent is a 47-year-old male who is a native and
citizen of Great Britain.  He arrived in the United States on
June 21, 2002, at Los Angeles, California and was admitted under
the Visa Waiver Pilot Program.  He was not in custody for some
time and at some point the Immigration authorities took him into
custody.  The Department issued an administrative order of
removal against him.  After examination it was discovered that he
had expressed a fear of persecution.  Therefore, he was placed in
asylum only proceedings by the issuance of the proper form, in

1

Exhibit 1, which is dated February 6, 2004.

Under Section 217 of the Immigration and Nationality Act and the regulations an alien admitted under this program who overstays his period of admission automatically waives his right to appeal an Immigration officer's finding of deportability. He cannot contest any action other than on the basis for asylum.

One strange part of this case is that on July 22, 2005, an Immigration Judge in Arlington, Virginia ordered the respondent removed to the United Kingdom in absentia. This appears to have been an erroneous order in that an Immigration Judge cannot issue such an order in asylum only proceedings. He or she may only consider the asylum. At any rate, the Judge there reopened the case on February 15, 2008.

The requirements for asylum are that he show first that he filed within one year of his arrival in the United States. He has not done that and there is no reason given for late filing; and, accordingly, he is deemed to be a late filer. But nevertheless, he can ask for protection for withholding of removal. And for that he must show that based upon either race, religion, nationality, membership in a social group or political opinion he will suffer persecution in a certain country. Whereas in an asylum case the burden is to show a reasonable possibility of persecution. For withholding he must show a clear probability of persecution.

Also there is the Torture Convention and for that one must

A 077 309 675                    2                    November 6, 2008

show that he faces torture in a specific country and under Matter of J-E-, 23 I&N Dec. 291 (BIA 2002) it was held that he must show it is more likely than not that he will be tortured.  It must be severe physical mental pain or suffering.  It must be intentionally inflicted for a proscribed purpose and cannot be due to lawful sanctions.

The respondent testified that he is Jewish and also baptized.  His parents were born in Egypt; he has three sisters.  He has a good education and has enjoyed considerable success in business.  A summary of his accomplishments is the first document in Exhibit 7.  It contains numerous letters and motions he has made to the Immigration Court.

It states he was educated at Trinity College in Cambridge.  He is a gifted musician who studied piano and violin.  He attended the Guild Hall School of Music in London and he had tremendous success in the United States stock market.  He had established the Gazelle Global Fund, which made a 300% gain in value in 1995 and there were articles written about it.  Also he was well-known in social circles and was presented to the Princess of Wales in 1992.  He has a photograph to that effect.

His case is based upon the fact that he was reading his play on the street in London.  The play is Exhibit 8.  He claims he delivered a copy to be given to the Queen and he believes that she is aware of him; she is aware of his play which criticizes her government; she wishes to take any action against him.  He

A 077 309 675                          3                          November 6, 2008

noted that they took him into custody from his apartment and took him to a psychiatric hospital, the Priory, where he escaped after 10 days.   He claims he was forced to take a drug which caused him to gain 20 pounds in 10 days and even had to use a dirty razor where he was afraid of AIDS.

He fled England and went to Switzerland, Austria, Hungary, Germany and Belgium, finally to Australia, where he was again taken to some type of mental hospital and he was drugged and not able to function.   His violin was stolen and he went back to London.   Finally, he came to the United States.

I have read all of the materials he has submitted and also the State Department reports on England, which states that England has a very good human rights record.   There are no political prisoners.   People enjoy freedom of speech and religion.   There are no politically motivated killings.   The government has judicial independence, the right to a fair trial and all political rights are guaranteed to the citizens and, of course, to non-citizens.

In his Exhibit 7, toward the end there is a web page dated September 25, 2003, which states, as he said today, that he took prescription methamphetamine for medical purposes and that when he stops taking the drug, "I develop dementia, which progresses further and further until I resume taking the drug."   Exhibit 7 contains numerous statements in his own hand that talk about his fear of persecution.   He accuses the Queen of ordering the Chief

A 077 309 675                              4                    November 6, 2008

Justice of the Cayman Islands to rule against him in a financial case, letter of June 9, 2008. In a letter to Immigration Judge Bryant, received on October 9, 2006, he says the FBI has "sent me up to be bashed and murdered here at the Denver County jail." He comments that other inmates have stolen his coffee and that he is suing Judge Bryant.

His letter of July 30, 2007, to the United Nation Commissioner for Human Rights states that the court appointed trustee in the financial case, Dr. Wanger, has conspired with the Queen and the Bush administration to cause him to lose his teeth and his fortune. He believes that Dr. Wanger is trying to kill him.

And he also states in a June 9, 2003 letter to Mr. DeLong, that he may need to go into the witness protection program and he states that he believes nerve agents were transmitted through the ventilation system in a Mexico City Sheraton Hotel, which has damaged him. And he claims to have PTSD also.

I believe that Mr. Cohen is a very intelligent, well-educated person. I believe he is telling me what he believes to be the truth, but I also find that his asylum case is based upon speculation and delusion and paranoia. I believe that if he returned to England the Queen would have no interest in him whatsoever. He has had people take him into medical custody in three or four different countries. Obviously there is a reason that he has been taken into custody for this type of treatment.

A 077 309 675                        5                   November 6, 2008

And I find that he has not proven that the government of England is possibly going to single him out for persecution because he is Jewish. Although there are documents showing that there are skinheads and other Nazi types of people in England who do attack Jewish people on occasion, he has not shown that the government of England is unwilling or unable to protect him from those people. <u>Matter of McMullen</u>. There is no reliable report in the file to show that the government of England routinely denies people their human rights when they have any type of medical detention for any reason.

For these reasons I find that he was not persecuted in the past, there is no reasonable fear of persecution in the future, and he has not shown a clear probability of torture.

ORDER

It is ordered that the applications for asylum, withholding and the Torture Convention be denied.


                                      JAMES P. VANDELLO
                                      Immigration Judge

A 077 309 675                6                November 6, 2008

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE JAMES P. VANDELLO, in the matter of:

SOLOMON BEN-TOV COHEN

A 077 309 674

Aurora, Colorado

is an accurate, verbatim transcript of the recording as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.


_Anne VanDereedt/SKD_

Anne VanDereedt, Transcriber
Free State Reporting, Inc.


_February 5, 2009_
(completion date)


By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, and/or CD, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

EXHIBIT 11

From: Dudley Cottingham <drc@cml.bm>
To: Cohensb1@aol.com
Cc: jayne.mitten@dla.ky; sfeierabend@gloor-sieger.ch
Subject: Re: OGIERS
Date: Mon, 26 Feb 2007 10:23 pm

Solomon

I tied unsuccessfully to reach you by phone today because I had the following e mail from Chris Russe

"The question of the continuation or discharge of the Court Appointed
Guardianship came before the Cayman Court this morning. The Court has
decided that it has done all that it can to assist Solomon and that the
Guardianship should therefore be discharged. Accordingly I am no longer
Solomon's Guardian here in Cayman, and my role is at an end."

"The Court also made other orders concerning the funds held here in
Cayman. Diamond Law Associates will no doubt be contacting Solomon about
the effects of these orders, but in short, the requirement that the
funds be retained in Cayman will no longer apply. The place where the
funds are to be held is a matter for the trustee of the Corinne Dian
Trust to decide in accordance with his duties as trustee. The Court also
expressed the view that the financial protection of Solomon and the
responsibility for ensuring that trust funds are properly used by
Solomon was a matter for his trustee and not the Court."

As I understand it this will mean that the Cayman court will no longer be affording you any protectio
Wanger as your trustee will decide what should be done with the trust funds.

I therefore suggest you instruct Stefan to represent you and ensure your interests are protected.

As you know I have no legal standing in connection with the Leitohenstein trust and I am unable to an
questions you pose.

Miles Howarth is periodically sending me faxes and registered letters to which I have not responded.S
send these to Stefan to respond to?

Dudley

Cohensb1@aol.com

02/26/2007 06:40 PM

To drc@cml.bm

cc jayne.mitten@dla.ky, sfeierabend@gloor-sieger.ch

Subject OGIERS

Dudley

I cannot work with Christopher Russell.

Nothing personal- but I signed a FEE AGREEMENT and he did not represent me.

Then I was forced to flee from my home because of threat end use of LEGAL GUARDIANSHIP power

http://webmail.aol.com/24022/...



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

Let me start over with a lawyer in Cayman or MIAMI In a fresh relationship.

Why did David Walker refuse to pay KLEINFELD? Surely we would have ALL been working by agreement wit someone I could talk things over with at their offices.

I want someone I can trust to put forward my case.

What option will I have if a US attorney says I must bring this into the US Court system.

Is the claim from Miles going to be sqaushed once and for all and, I cannot see Dr Wanger treating we as wonderfully as Dr Keicher did. II want to re- group with Corhine who is alone and our family in Elm Drive, Bev Hills. One of the cheaper house close to the synagogue is affordable at $1Million.

The risk of Earthquake which does not worry me- keeps real estate prices at good prices.

:)

Solomon

AOL now offers free email to everyone. Find out more about what's free from AOL at AOL.com.

CONFIDENTIALITY CAUTION AND DISCLAIMER

This email and any attachments may contain privileged and/or confidential information and are intended solely for the use of the individual entity to which they are addressed. This email has not been encrypted and therefore privacy cannot be ensured. If you are not the intended recipient and have received this email in error, please advise the sender immediately by return email. Any distribution, use, or copying of email or the information it contains by anyone other than the intended recipient is strictly prohibited.

This e-mail was checked for spam and viruses by the QuoVadis Sweeper Service.

For more information visit the website of QuoVadis Limited:

http://www.quovadis.bm/

# EXHIBIT 12

Dr. iur. Gerhard R. Holzhacker M.B.L.-HSG

Advokaturbüro | Rechtsanwalt

# HOLZHACKER

# KOPIE

To the
Board of Immigration Appeal
Falls Church, Virginia
U.S.A.

March 5, 2008
HG/scm - 08/002

**Solomon Ben-Tov Cohen**

Dear Sirs

To begin with I may introduce myself as Liechtenstein attorney of Mr. Solomon Ben-Tov Cohen – hereinafter called 'Mr. Cohen' in short – representing his interests on legal aid in relation to the Corinne Diaz Trust Settlement – hereinafter called 'Corinne Diaz Trust' in short.

Mr. Cohen, presently residing in custody in the Aurora ICE Processing Center, 11901, East 30th Avenue, Aurora, Colorado 80010, told me that his case will be heard by the Board of Immigration Appeal soon. Furthermore, Mr. Cohen asked me to confirm certain facts which he believes to have a decisive impact on the outcome of his case. I am happy to do this herewith as follows:

- Mr. Cohen is the beneficial owner of the assets held under the Corinne Diaz Trust, a trust under Liechtenstein law set up by his sister Mrs. Corinne Diaz as Settlor on May 11, 1990. I understand that Mrs. Diaz was acting in a fiduciary capacity for Mr. Cohen only and had died meanwhile.

- Mr. Cohen qualifies as beneficiary with an entitlement to 98 % of the assets held under the Corinne Diaz Trust.

- At present Dr. Markus Wanger, a Liechtenstein attorney, is acting as Trustee of the Corinne Diaz Trust.

- The assets held under the Corinne Diaz Trust as on August 20, 2008 were USD 5'623'790.77.

Josef Rheinberger Strasse 11    Telefon +423 239 66 33    office@holzhacker-lawfirm.
P.O. Box 656. FL-9490 Vaduz    Telefax +423 239 66 44    www.holzhacker-lawfirm.c

Advokaturbüro | Rechtsanwalt

# H O L Z H A C K E R

page 2

- I understand that the funds held now under the Corinne Diaz Trust are mainly stemming from the liquidation proceeds from The Gazella Global Fund formerly situated in the Cayman Islands, which was used by Mr. Cohen to pursue his business activities.

- The last payment Mr. Cohen has received from the Corinne Diaz Trust was in ~~August~~ JUNE 2007. Since then Dr. Wanger denies any payments to Mr. Cohen.

- At present there is a litigation pending at the Princely District Court in Vaduz, file no. 8 CG.2007.150, which had been initiated by the Trustee as plaintiff versus Mr. Miles Howarth as defendant seeking a judgement adjudicating that the defendant does neither qualify as a beneficiary of the Corinne Diaz Trust nor as a creditor of it. I represent Mr. Cohen as co-party to the plaintiff.

- During the course of this procedure the Princely District Court has issued a freezing Order disallowing the Trustee to dispose of any assets of the Corinne Diaz Trust until the procedure file no. 8 CG.2007.150 had been definitely terminated. Said Order had meanwhile been lifted by the Court of Appeal and reconfirmed by the Supreme Court, whereas I have filed on behalf of Mr. Cohen a further appeal restricted to constitutional issues in relation to it with the Court of Constitution on October 13, 2008, which is pending there for adjudication under file no. StGH 2008.130.

- I have initiated on behalf of Mr. Cohen a procedure pending at the Princely District Court in Vaduz under file no. 10 HG.2009.2 asking to have Dr. Wanger removed as Trustee of the Corinne Diaz Trust. This application filed on February 17, 2009, is based on the argument that initiating the before mentioned procedure versus Mr. Howarth was not indicated as the frivolous nature of the claims raised by Mr. Howarth in out of court correspondence was obvious, whereas the litigation pending under file no. 8 CG.2007.150 serves mainly the purpose to provide an excuse for the Trustee why the payments to Mr. Cohen were put on hold.

- Finally, I want to state here that Mr. Cohen was denied any information by the Trustee as well as access to the files of the Trustee until the Princely District Court had issued an Order on July 21, 2008, file no. 10 HG.2008.17, instructing the Trustee to do so.

Advokaturbüro | Rechtsanwalt
# H O L Z H A C K E R

page 3

What is said above is within my best knowledge and belief. However, I expressly deny any liability in relation thereto. Nothing what is said above might be construed in order to result in any commitment or obligation on behalf of the Undersigned at the present or in the future which is expressly denied herewith.

If you have any queries, please, do not hesitate and let me know.

Yours sincerely

Dr. Gerhard Holzhacker

An das

Postaufgabe: durch Boten

FÜRSTLICHE LANDGERICHT

9490 Vaduz

Antragsteller:

Dr. Markus Wanger
als Treuhänder des
Corinne Diaz Trust Settlement
Herrengasse 21
9490 Vaduz

vertreten durch:

Dr.iur. Johannes Grabher
Rechtsanwalt
Äulestrasse 45
9490 Vaduz

Antragsgegner:

Solomon Ben-Tov Cohen
Aurora ICE Processing Center
11901, East 30th Avenue
Aurora, Colorado 80010
U.S.A.

vertreten durch:

Advokaturbüro    Rechtsanwalt
HOLZHACKER
FL-9490 Vaduz

wegen:

Art.916 Abs.6 PGR

**I.    ANTRAG**
**auf Gewährung von Verfahrenshilfe**

**II.    ANTRAG**
**auf Erlag einer aktorischen Kaution**

**III.   GEGENÄUSSERUNG**

zweifach
Vollmacht ag. zu
8 CG.2007.150
Beilagen

# Corinne Diaz Trust Settlement

## Statement of assets and liabilities as at August 20, 2008

| ASSETS | 20.08.2008 US$ | 12.06.2007 US$ |
|---|---|---|
| Cash at bank | 4'641'216.18 | 4'739'650.98 |
| Participation "K" | 819'422.99 | 819'422.99 |
| Receivalbel "K" | 65'340.95 | 51'139.18 |
| Loan beneficiary * | 97'809.65 | 97'324.25 |
| Painting | 1.00 | 1.00 |
| Total assets | 5'623'790.77 | 5'707'538.40 |

| LIABILITIES | | |
|---|---|---|
| Creditors      CHF 18839.10 | 17'443.62 | 0.00 |
| Total liabilities | 17'443.62 | 0.00 |

| | | |
|---|---|---|
| 12.06.2007 | 5'707'538.40 | 5'811'118.29 |
| 20.08.2008 | 5'623'790.77 | 5'707'538.40 |
| 20.08.2008 Decrease of assets | 83'747.63 | 103'579.89 |
| Distribution to beneficiaries | 0.00 | 0.00 |
| Donations received | 0.00 | 0.00 |

* The total loan amount to benficiary complies to 1.74% from the total of the net assets amount of USD 5'525'981.12 as at 20.08.2008

## Corinne Diaz Trust Settlement

Cash at bank:

| Nominal/ Quantity US$ | Market Value CHF | Description |
|---|---|---|
| 20'519.00 | 22'160.50 | Current Account wit VP Bank |
| 4'605'000.00 | 4'973'400.00 | 1,25 % Account at call |
| ~~11~~ | ~~16'952.97~~ | ~~Shares VP Bank Cash & Geldmarktfonds USD~~ |
| 4'641'216.18 | 5'012'513.47 | TOTAL |

Corinne Diaz Trust, Vaduz

| Transactions Third Partys | June 12th, 2007 - August 20, 2008 | (in USD) |
| --- | --- | --- |

| Date | Beneficiary | Amount US$ |
| --- | --- | --- |
| 09.07.2007 | Dr. iur. Johannes Grabher | 3'705.54 |
| 09.07.2007 | Dr. iur. Johannes Grabher | 10'129.90 |
| 17.07.2007 | I+F, Vaduz | 18'327.17 |
| 08.08.2007 | Dr. iur. Johannes Grabher | 4'510.89 |
| 12.09.2007 | Dr. iur. Johannes Grabher | 2'226.73 |
| 09.11.2007 | Dr. iur. Johannes Grabher | 3'802.77 |
| 09.11.2007 | Fuerstliches Landesgericht | 185'234.90 |
| 15.01.2008 | Dr. iur. Johannes Grabher | 2'965.44 |
| 15.02.2008 | Dr. iur. Johannes Grabher | 7'047.43 |
| **Total Payments to Third Partys** | | **237'950.77** |

**Creditors as of August 20th, 2008**

| | | | |
| --- | --- | --- | --- |
| Dr. iur. Johannes Grabher | CHF | 15'784.40 | 14'615.19 |
| Industrie- und Finanzkontor | CHF | 3'054.70 | 2'828.43 |
| Total creditors | CHF | 18'839.10 | 17'443.62 |

Corinne Diaz Trust, Vaduz

KLE Management Establishment, Vaduz
Transactions June 12th, 2007 - August 20th, 2008

| Date | Beneficiary | Amount US$ |
|------|-------------|-----------:|
| 22.06.2007 | Davenport Lyons | 5908.38 |
| 16.11.2007 | KLE Management | 4516.71 |
| 06.12.2007 | Davenport Lyons | 3776.68 |
| | Total | 14201.77 |

| | | |
|------|-------------|-----------:|
| 12.06.2007 | Balance brought forward | 51139.18 |
| | Transactions June 12th, 2007 - August 20th, 2008 | 14201.77 |
| 20.08.2008 | Balance | 65340.95 |

Corinne Diaz Trust, Vaduz

| Funds paid in favour of beneficiary |
|---|

| Date | Beneficiary | Amount US$ |
|---|---|---|
| 15.06.2007 | Churchill Corporate Service | 485.40 |

Recapitulation Loan to beneficiary

| Date | | Amount |
|---|---|---|
| 12.06.2007 | Balance brought forward | 97324.25 |
| | Payments 12.6.2007 - 20.8.2008 | 485.40 |
| 20.08.2008 | Total loan to beneficiary | 97809.65 |

## Corinne Diaz Trust Settlement

## Asset statement as of August 20. 2008

| Nominal/ Quantity US$ | Market Value CHF | Description |
|---|---|---|
| 20'519.00 | 22'160.50 | Current Account wit VP Bank |
| 4'605'000.00 | 4'973'400.00 | 1,25 % Account at call |
| 11 | 16'952.97 | Shares VP Bank Cash & Geldmarktfonds USD |
| | 5'012'513.47 | TOTAL |

# EXHIBIT 13



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

* VANDELLO

Breiny Lopez-chee (Brian)    26 yrs old
    Guatemala    from Los Angeles
Shot in The Head two Days after arrived
Left in The Street
Gang - Related
Judge Favored The Plea
Beaten up By ICE officers
Left Six kids older 12 yrs old

EXHIBIT 13

# EXHIBIT 14

JACK ALMELEH, M. D.
340 EAST 52ND STREET
SUITE IF
NEW YORK, N. Y. 10022
———
TELEPHONE (212) 355-4250

January 16, 2009

To The Honorable Immigration Judge:

My name is Dr. Jack Almeleh. I am Assistant Clinical Professor of Psychiatry, Mt. Sinai School of Medicine, and Adjunct Assistant Clinical Professor of Psychiatry, New York Medical College, both in New York City. I am a U.S. Citizen by birth.

Mr. Solomon Ben-Tov Cohen was referred to me for treatment in 1991 by his primary care physician, Dr. Robert Gale, not long after he moved from London to New York City.

I treated Mr. Cohen intensively in my office for a period of approximately 18 months for problems related to anxiety and low self esteem, resulting from the anti-semitism he experienced growing up in England. I also saw his parents twice when they came to visit him in New York City. I have also seen Mr. Cohen intermittently over the years since then.

Mr. Cohen made excellent progress in his treatment, made many friends and became well integrated in New York City. He also went on to become very successful in his business of investments, and was even featured in an article in Barron's for being the top performing trader/hedge fund manager in 1995.

I have always known Mr. Cohen to be a very intelligent, kind, gifted and responsible individual. I think he would make an excellent citizen of the United States of America.

Sincerely,

Jack Almeleh, M.D.
Board Certified in Psychiatry.
Assistant Clinical Professor of
Psychiatry, Mt. Sinai School of
Medicine. Adjunct Assistant
Clinical Professor of Psychiatry,
New York Medical College.